**JENNER&BLOCK**

July 24, 2008                    JUL 2 5 2008

Jenner & Block LLP        Chicago
919 Third Avenue          New York
37th Floor                Washington, DC
New York, NY 10022
Tel 212-891-1600
www.jenner.com

**BY HAND DELIVERY**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED: 8/5/08

The Honorable Theodore H. Katz
United States Magistrate Judge
   Southern District of New York
Daniel Patrick Moynihan
   United States Courthouse
500 Pearl Street
Room 1660
New York, NY  10007

Gianni P. Servodidio
Tel  212-891-1620
Fax  212-891-1699
gps@jenner.com

07CV 8822 (HB)(THK)

Dear Judge Katz:

Plaintiffs respectfully submit this response to Defendant's July 22, 2008 letter.

Defendant concedes the core operative fact underlying Plaintiffs' claims:  knowing it would result in the spoliation of key evidence, on March 8, 2008, Defendant affirmatively disabled user access to a vast amount of Digital Music Files stored on its servers.  It did so without taking any steps whatsoever to preserve copies of those files, or the related Usage Data, for which both discovery requests and preservation demands were outstanding.  Notwithstanding Defendant's elaborate attempts to obfuscate its own conduct,  there is a very straightforward and compelling case for the imposition of evidentiary sanctions against Defendant.  On the very day Defendant had agreed to produce key evidence to Plaintiffs reflecting the full extent of the use of its service to infringe Plaintiffs' copyrighted sound recordings, Defendant destroyed it.  And this occurred after weeks of negotiating with Plaintiffs for the production of the very evidence Defendant destroyed.  Defendant's assurances that the resulting prejudice to Plaintiffs can be cured -- whether by producing existing data or by "rebuilding" one of its servers -- are false.  Any responsive Usage Data or Digital Music Files that Defendant now produces, from the "corrupt server" or otherwise, would be intentionally distorted to understate dramatically the infringing use of Defendant's service that preceded the destruction of this evidence.  To be clear, Defendant's proposed "cure" -- *i.e.* to provide sanitized data -- would result in the very prejudice Defendant sought to cause by its spoliation of this evidence.

Defendant knows full well that its destruction of Usage Data and Digital Music Files was a water-shed event that has undermined Plaintiffs' ability to discover the full extent of the massive copyright infringement facilitated by Defendant's service.  Indeed, Defendant stipulated to withdraw its pending Motion to Dismiss for lack of personal jurisdiction and consented that this case be adjudicated in New York rather than face jurisdictional sanctions for its spoliation of the same evidence it now claims to be inconsequential to this case.  The notion that Defendant is merely an innocent bystander seeking to "appease" Plaintiffs' demands is a stunning distortion of

The Honorable Theodore H. Katz
July 24, 2008
Page 2 of 8

the actual facts underlying this dispute. Plaintiffs respectfully submit that the Court should (1) permit Plaintiffs to proceed with a formal motion to address the serious prejudice to its case resulting from Defendant's conduct, and (2) order Defendant's principal Gerald Reynolds to appear for a short deposition so that he can testify under oath with respect to the demonstrably false assertions in Defendant's submission.

## Plaintiffs Have Suffered Irreparable Prejudice to Their Ability to Prepare this Case for Trial

On March 8th, Defendant fundamentally changed the nature of its service by disabling all user access to the hundreds of Music Groups devoted to the infringement of Plaintiffs' copyrighted works -- the very newsgroups that are the essence of what Plaintiffs' claims in this case are about. In doing so, it destroyed millions of incriminating Digital Music Files that Defendant acknowledges are stored on its "back end" servers. In contravention of its express agreement, Defendant did not preserve any Usage Data, which would have reflected the massive direct infringement, by Defendant's subscribers, of specific works owned by the Plaintiffs. For some limited period after March 8th, Defendant offered its subscribers only a tiny fraction of the voluminous infringing content that had been previously available, and now offers virtually no access to the Music Groups that are at the heart of this case. The most compelling evidence of the usage of Defendant's service *during the period when it offered subscribers unfettered access to infringing content* is now gone.

Defendant urges the Court summarily to accept that its conduct has not prejudiced Plaintiffs irreparably because it was able to recreate a small portion of the Digital Music files and could do so again if asked by Plaintiffs. This claim is specious in several respects. First, Defendant's ten-page letter to the Court fails to disclose that it never "re-enabled" user access to the vast majority of the newsgroups it had made available prior to March 8, 2008. Contrary to Defendant's suggestion, Plaintiffs estimate that only 73 newsgroups (out of over *900 Music Groups* previously available on its servers) received any articles after March 8th. There can be no question that the total universe of music-related newsgroups and corresponding Digital Music Files available through Defendant's service was vastly greater prior to March 8th than anytime thereafter. Since volume of infringement is of critical relevance to this case (*see* Plts' July 8th Lt. at 5-6), Defendant's notion that it somehow cured the harm to Plaintiffs by re-enabling a fraction of its Music Groups fails to pass even a threshold test for credibility.

Even with respect to the few newsgroups Defendant claims to have "re-enabled," Defendant grossly mischaracterizes the representativeness of the recaptured data vis-a-vis the despoiled Digital Music Files. Specifically, Defendant argues for the first time that that it only stored (and therefore despoiled) the Digital Music Files at issue for a fourteen-day period prior to March 8th, claiming that this was its normal retention time for such files. *See* Defendant's July 22, 2008 Letter ("Def.'s Lt.") at 3. Thus, since the re-enabled groups allegedly repopulated with music files for a period of ten days, according to Defendant, it was able to capture similar volumes of files that existed prior to March 8th. This is demonstrably false and not supported by the citation in Defendant's letter. Defendant's own website, which states that "Usenet now offers . . . up to 150 Days Binary Retention" and used to state that "there are billions of mp3s" available through its service, should alone put this claim to rest. Documents produced so far in

The Honorable Theodore H. Katz
July 24, 2008
Page 3 of 8

discovery in this case also show Defendant's technical support personnel stating that Defendant's *average* binary retention is 120 days, with some newsgroups retained for longer. Moreover, a simple analysis of the files available today on Defendant's service confirms that Defendant's servers maintain copies of "binary" files for extended periods ranging from 150 days or even longer. Several examples of the "headers" for articles obtained from Defendant's servers reflecting the dates on which they were first available are reproduced in Exhibit A attached hereto.

Plaintiffs' analysis of the files Defendants produced from the "corrupt server" also confirms that they represent only a fraction of the articles that had been available in those newsgroups prior to March 8th. For example, Plaintiffs attached as Exhibit D to the Complaint in this case a printout from Defendant's web access server reflecting that there were 7,671,734 articles available from the "alt.binaries.mp3" newsgroup prior to October 2007. In contrast, Defendant only produced approximately 31,000 articles from this same newsgroup from the corrupt server, or roughly 0.4% of what would have been the full data set under pre-spoliation conditions. In addition, the articles produced by Defendant for the "re-enabled' newsgroups confirm that they did not "re-populate" in a manner consistent with the normal functionality of these groups. Plaintiffs' analyses of these files reflect poor "completion" rates indicating that components of useable Digital Music Files were often missing from Defendant's server. This is consistent with the hundreds of emails from subscribers Defendant has received complaining that these newsgroups were not functioning properly.[1]

In view of the above, Defendant's description of "where things stand today," Def.'s Lt. at. 6, is simply not correct. The data produced from the "corrupt server" has been deliberately manipulated to understate dramatically the pre-spoliation infringement levels, and cannot stand as a reasonable surrogate for Digital Music Files that were despoiled prior to March 8th. Moreover, Defendant cannot simply "rebuild" the corrupt server and produce more Digital Music Files and Usage Data. Discovery is set to close in this case in less than three months, and the Court has made it clear that this schedule cannot be extended. It would take at least five months before Defendant could possibly recreate the volume of infringing files that existed prior to March 8th, and even then any data would almost certainly materially understate pre-spoliation infringement activities given that Defendant's subscribers have had virtually no access to music files for almost five months, and users accustomed to obtaining infringing music files through

---

[1] Defendant's attempt to minimize the importance of the despoiled Digital Music Files by arguing that they account for a small fraction of the "*total volume*" of all available articles is misleading at best. Music files are typically far smaller in terms of volume (i.e. bytes of data) than video files containing television and movie content, which are similarly infringed on Defendant's service. Indeed, it may take many hundreds of individual music files to reach the volume of a single video file. Thus, -- by volume -- music files would be expected to make up a smaller portion of the total files. But the despoiled Digital Music Files undoubtedly comprised a substantial portion of the files *actually downloaded* by Defendant's subscribers. Defendant itself openly promoted the availability of these files and produced a customer survey suggesting that 40% of all users used the service to download music files.

The Honorable Theodore H. Katz
July 24, 2008
Page 4 of 8

Defendant's service will undoubtedly have shifted their usage patterns and since found alternate sources for pirated music. This is precisely the prejudice Defendant sought to create by despoiling key evidence in this case.

<u>Defendant Was Under a Clear Obligation to Preserve and Produce the Digital Music Files and Usage Data</u>

While Defendant attempts to dismiss Plaintiffs' accusations as "over-blown" and denies any "intentional" misconduct, the uncontroverted evidence establishes the core elements of Plaintiffs' spoliation claims. It is undisputed that:

- On March 8th, Defendant destroyed a minimum of hundreds of thousands of incriminating Digital Music Files residing on its servers from "newsgroups" dedicated nearly exclusively to the infringement of Plaintiffs' copyrighted works.

- Defendant maintained copies of the Digital Music Files in the ordinary course of business on its "back end" servers, *i.e.* computers with massive storage capacity that are the equivalent of digital warehouses used for long-term storage of infringing merchandise.

- Defendant received the Usage Data on servers that had the built-in functionality to preserve that Usage Data.

- Plaintiffs served Defendant with both document requests and preservation demands for the production of the Usage Data and Digital Music Files making Defendant fully aware of their relevance to the underlying litigation.

- Defendant unequivocally agreed to preserve and produce Usage Data and, after weeks of negotiations with Plaintiffs, Defendant was scheduled to begin preservation of this data on the same day it was despoiled.

- Even though Defendant's counsel assured Plaintiffs repeatedly that they would be preserved, Defendant allowed the Digital Music Files to "automatically expire[] from Defendant's servers." Def.'s Lt. at 8.

In view of the foregoing, Defendant's destruction of the Digital Music Files and Usage Data runs afoul of one of the most fundamental principles of discovery provided for under the Federal Rules -- the obligation to take affirmative steps to preserve and produce relevant evidence. *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a litigation hold' to ensure the preservation of relevant documents."); *see also* Rule 37(f) Advisory Committee Notes ("[A] party is not permitted to exploit the routine operation of an information system to thwart discovery obligations by allowing that operation to continue in order to destroy specific stored information that it is require to preserve.").

The Honorable Theodore H. Katz
July 24, 2008
Page 5 of 8

    With respect to the Digital Music Files, Defendant does not even purport to argue that it had no obligation to preserve and produce these files to Plaintiffs. Indeed, Defendant concedes that it stored these files in the ordinary course of business on its back-end servers. Defendant has cited no authority, and none exists, that would excuse its destruction of actual copies of copyright-infringing files stored in tangible form for extended periods of time on its back end servers.

    With respect to the Usage Data, Defendant argues -- for the first time -- that it was under no duty to preserve this evidence because "to do so would have been impossible." Def.'s Lt. at 8. But Defendant's own conduct and statements throughout this case belie its newfound position that it would have been "impossible" to preserve and produce the Usage Data. Defendant *affirmatively agreed* to produce samples of the Usage Data to Plaintiffs and spent weeks engaged in discussions with Plaintiffs, both before and after March 8th, about the logistics of how and when this data would be produced to Plaintiffs. Indeed, even now, in its letter to the Court on this very issue, Defendant affirmatively offers to produce the Usage Data to Plaintiffs inviting them to "take the log files they desire." Def.'s Lt. at 6. Defendant simply cannot have it both ways. It cannot avoid the imposition of sanctions for destroying data on the theory that it was impossible to produce it while at the same time offering to produce the very same kind of data (albeit with the vast majority of the infringing files no longer available) to argue that its destruction of evidence caused no prejudice.

    Moreover, Defendant's protestations regarding the volume of the Usage Data and the alleged difficulties in collecting it are vastly overstated if not false. Defendant is a sophisticated usenet operator in the business of storing vast amounts of data over up to 39 commercial grade servers. The software used to run these servers is *designed* to operate in "info mode," a setting that automatically results in generation of the server logs reflecting the Usage Data requested by Plaintiffs. It would be a trivial matter for Defendant to use this built-in functionality to copy some appropriate sample of its log files to an external storage device and produce them to Plaintiffs. Indeed, contrary to Defendant's representations to the Court on this issue, the configuration files for Defendant's servers produced in discovery reflect that a number of Defendant's servers *do* operate in "info mode," and apparently do so without any of the catastrophic system failures described by Defendant.[2]

    Equally misplaced is Defendant's reliance on the *Bunnell* decision as a defense to the imposition of evidentiary sanctions in this case. *See Columbia Pictures, Inc. v. Bunnell*, No. CV 06-1093FMCJCX, 2007 WL 2080419 (C.D. Cal. May 29, 2007). In *Bunnell*, the Court held that: i) Defendant had an affirmative obligation to preserve server log data stored in the RAM

---

[2] Defendant also cannot evade responsibility for their failure to preserve *any* Usage Data whatsoever prior to March 8th by claiming that it would have been burdensome to preserve *all* such data continuously over an extended period of time. *See* Lt. at 5. Plaintiffs have always been willing to accept a reasonable sampling of the data over a period of days or hours, as evidenced by their attempts over the course of several weeks to develop a suitable sampling protocol with Defendant.

The Honorable Theodore H. Katz
July 24, 2008
Page 6 of 8

memory of its servers; ii) Defendant's servers received and processed this data such that it was
subject to a Rule 34 document request; and iii) as is the case here, the data was "extremely
relevant" to establishing Plaintiffs' claims against Defendant for secondary liability for online
copyright infringement. In ordering Defendant to preserve and produce server log data
comparable to the Usage Data, the Court declined to impose evidentiary sanctions in large part
because, in contrast to the situation here, there had been no specific request by the Plaintiffs that
Defendant preserve the data stored in RAM. But here, Plaintiffs expressly and repeatedly
notified Defendant that it was under an obligation preserve its Usage Data using the appropriate
logging functionality on it servers, and the parties were engaged in extensive discussion for
weeks with respect to the logistics of such production. Moreover, unlike in the *Bunnell* case,
Defendant here affirmatively agreed to produce Usage Data to Plaintiffs, directly refuting its
position that it believed in good faith it was under no obligation to do so.

 Defendants are and have been obligated to preserve the Usage Data, and could have
easily done so using the logging function on their own web servers. Even if it were true that
Defendants servers did not previously operate in "info mode," this is no defense. As described
above, Defendant was required to alter its document-retention practices and initiate a "litigation
hold" once litigation commenced (if not sooner) in order to preserve relevant evidence. *See
Zubulake*, 220 F.R.D. at 212.

Defendant Has Acted in Bad Faith Since the Inception of this Case

 Contrary to Defendant's representation that "the key events in question began the week
of March 3, 2008," Def.'s Lt. at 4, Defendant has been on notice of both the relevance of and
need to preserve the despoiled evidence since at least as early as October 2007 when this
litigation commenced. Plaintiffs served discovery requests seeking production of the despoiled
evidence in January 2008, and, throughout February of 2008, the parties engaged in extensive
meet-and-confer sessions and exchanged correspondence in an attempt by Plaintiffs to obtain a
full and fair production of the evidence at issue.

 Defendant's attempt to portray itself as a small business run by a single employee who
has worked "many long hours to appease Plaintiffs' repeated demands" is misleading at best.
Defendant is run by a sophisticated businessman who has been involved in various Internet
"spam" operations in the past; he personally owns and operates at least seven related
Internet/technology companies; he has a staff of five employees for one of these companies
under his control; and he has the resources to retain multiple sets of attorneys in a number of
different law firms to represent his interests in this case.

 Since the inception of this case, Defendant has sought, through one misrepresentation to
Plaintiffs after another, to conceal the extent of its spoliation and delay any attempt by Plaintiffs
to bring this matter to the Court. First Defendant claimed not to understand which server log
data Plaintiffs were seeking, and required Plaintiffs to retain experts to study Defendant's
software and "educate" Defendant about its own system. Then Defendant affirmatively agreed
to produce Usage Data but disabled access to all of the infringing newsgroups on the date
production was set to commence. After that, Defendant falsely represented that it had preserved

The Honorable Theodore H. Katz
July 24, 2008
Page 7 of 8

all the Digital Music Files and "re-enabled" access to the Music Groups. On that basis, Plaintiffs
entered into negotiations with Defendant to determine if the prejudice resulting from Defendant's
earlier actions could be cured and attempted to work with Defendant to find a resolution of this
dispute. They believed Defendant was working toward this same goal. It was not until Plaintiffs
received and analyzed Defendant's document productions in May and June that Plaintiffs learned
that the Digital Music Files had not been preserved and that the Music Groups had not truly been
"re-enabled." Plaintiffs immediately notified Defendant of the situation. For Defendant to
accuse Plaintiffs of "laggardness" under these circumstances is mind-boggling.

Even more egregious, however, is Defendant's assertion that Plaintiffs' counsel
demanded that Defendant disable access to the music groups as a precondition for the parties to
engage in settlement discussions. This is not only false, it is absurd. At the time of this alleged
"demand," Plaintiffs had served discovery requests seeking the despoiled evidence and were
doing everything possible to get Defendant to produce it. It would defy logic for Plaintiffs to
demand that Defendant takes steps to destroy the very evidence they were seeking to obtain
through discovery. If Defendant truly wanted in good faith to disable the Music Groups for
settlement purposes, it readily could have *first* preserved the evidence at issue, i.e. a sample of
the Usage Data and the Digital Music Files, and *then* disabled access. Its failure to do so cannot
be excused by unsubstantiated, false and counter-intuitive claims it was responding to
"settlement demands."

<u>Defendant Should be Ordered to Appear for a Deposition Related to its Spoliation</u>

In keeping with its delay tactics throughout this case, Defendant seeks to avoid producing
Mr. Reynolds for a discrete deposition regarding the narrow issues raised herein arguing that
Plaintiffs should wait to take his deposition on all the issues in the case. Pursuant to
Fed. R.Civ. P. 26(b)(2), the Court can and should order Defendant's principal to appear for a
discrete deposition limited to this issues raised herein without prejudice to Plaintiffs' ability to
depose Mr. Reynolds later on the underlying merits of the case.

There is no question that the despoiled evidence and the relief sought herein by Plaintiffs
concern such fundamental issues as direct infringement, overwhelming use of Defendant's
service for copyright infringement and the defense of substantial non-infringing uses. The Court
resolution of the issues will greatly impact how Plaintiffs prepare this case for trial and,
importantly, how they depose Mr. Reynolds on the merits. It is simply not feasible for Plaintiffs
to conduct the key deposition in the case until the Court has resolved the spoliation issues.

Moreover, Defendant is well aware that it has not even completed production of
documents responsive to Plaintiffs' first set of Requests for Production and that the parties are in
the process of meeting and conferring on a number of outstanding discovery issues. Even if
Defendant promptly cures the deficiencies in its documents production, Plaintiffs will require
additional time to work with its technical experts and complete its analyses of the data produced
by Defendant. Plaintiffs are also in the midst of third party discovery that will a direct impact on
the issues they will need to address with Mr. Reynolds during his deposition.

The Honorable Theodore H. Katz
July 24, 2008
Page 8 of 8

Contrary to its suggestion, Defendant has officers other than Mr. Reynolds that appear to have relevant knowledge of the issues in this case. Plaintiffs will need to conduct multiple depositions of these officers as well as the employees of Defendant's related companies. There is no reason why Mr. Reynolds cannot provide testimony under oath to address the substance of the spoliation issues now and provide whatever non-duplicative testimony is needed later in the case. Plaintiffs are not seeking to depose Mr. Reynolds multiple times on the same topics. They simply believe that because the issues before the Court are sufficiently complex, and Defendant has made a number of questionable representations in its submission, a limited deposition would be useful for the resolution of this dispute.

In sum, Plaintiffs respectfully request that Defendant be ordered to appear for deposition limited to the issues raised herein within the next week, and that the Court set an expedited briefing schedule thereafter so that the issues raised herein can be presented to the Court through a formal motion.

Very truly yours,

Gianni P. Servodidio

GPS/mbw
Enclosure

cc:  Counsel for Defendants

*Plaintiff's request to depose Mr. Reynolds on issues relating to the alleged spoliation of evidence is granted. The parties should schedule the deposition so that it occurs within the next 10 days. The parties are then to initiate a telephone conference with the Court on August 19th at 3:00 P.M.*

**SO ORDERED**

8/5/08    Theodore H. Katz
THEODORE H. KATZ
**UNITED STATES MAGISTRATE JUD**