UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
ARISTA RECORDS LLC; ATLANTIC       :
RECORDING CORPORATION; BMG         :
MUSIC; CAPITAL RECORDS, INC.;      :
CAROLINE RECORDS, INC.; ELEKTRA    :
ENTERTAINMENT GROUP, INC.;         :
INTERSCOPE RECORDS; LAFACE         :
RECORDS LLC; MAVERICK RECORDING    :
COMPANY; SONY BMG MUSIC            :
ENTERTAINMENT; UMG RECORDINGS,     :
INC.; VIRGIN RECORDS AMERICA,      :
INC.; WARNER BROS. RECORDS INC.;   :
and ZOMBA RECORDING LLC,           :
                                   :
                Plaintiffs,        :
                                   :
        -against-                  :
                                   :
USENET.COM, INC.; SIERRA           :
CORPORATE DESIGN, INC.; and        :
GERALD REYNOLDS,                   :
                                   :
                Defendants.        :
--------------------------------X

07 Civ. 8822 (HB)(THK)

**MEMORANDUM**
**OPINION AND ORDER**

**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

On October 12, 2007, Plaintiffs Arista Records LLC, Atlantic Recording Corporation, BMG Music, Capital Records, Inc., Caroline Records, Inc., Elektra Entertainment Group, Inc., Interscope Records, LaFace Records LLC, Maverick Recording Company, Sony BMG Music Entertainment, UMG Recordings, Inc., Virgin Records America, Inc., Warner Brothers Records, Inc., and Zomba Recording LLC (collectively, "Plaintiffs") commenced this copyright infringement action under the Copyright Act, 17 U.S.C. § 101, et seq., seeking damages and injunctive relief against Defendants Usenet.com, Inc., Sierra Corporate Design, Inc., and Gerald Reynolds (collectively,

-1-

"Defendants").  (See Complaint ("Compl."), dated Oct. 12, 2007; see also First Amended Complaint ("Am. Compl."), dated Sept. 17, 2008.) Pretrial discovery has been proceeding under this Court's supervision.

Plaintiffs now move this Court to (1) sanction Defendants for despoiling evidence, and (2) strike the declaration of Defendants' expert, Professor David J. Farber.  (See Plaintiffs' Memorandum of Law in Support of Motion for Sanctions for Spoliation of Evidence, dated Sept. 8, 2008 ("Pl. Sanctions Mem."); Plaintiffs' Memorandum of Law in Support of Motion to Strike Declaration of Prof. David Farber, dated Oct. 14, 2008 ("Pl. Strike Mem.").)  Defendants oppose Plaintiffs' motions.  (See Memorandum of Law in Support of Defendants' Response in Opposition to Motion for Sanctions for Spoliation of Evidence, dated Sept. 29, 2008 ("Def. Opp. Mem."), and Memorandum of Law in Support of Defendant Usenet.com, Inc.'s Response in Opposition to Plaintiffs' Motion to Strike, dated Oct. 28, 2008 ("Def. Strike Mem.").)

For the reasons stated below, Plaintiffs' Motion to Strike Professor Farber's Declaration is granted in part and denied in part and Plaintiffs' Motion for Sanctions is granted to the extent discussed in this Opinion and Order.

**BACKGROUND**

## I. The Usenet and Defendants' Business

Defendant Gerald Reynolds operates a website and service at

-2-

Usenet.com.  The Usenet is "a worldwide community of electronic [bulletin board systems] that is [also] closely associated with the Internet and with the Internet community."  Parker v. Google, Inc., 422 F. Supp. 2d 492, 495 n.1 (E.D. Pa. 2006).  The Usenet, which predates the World Wide Web, is made up of a network of loosely connected computer servers that share message traffic for discussions.[1]  In order to access the Usenet network one must gain access through a commercial Usenet provider, such as Defendant Usenet.com, or through an Internet service provider.  Usenet users read and post public messages, referred to as "articles" or "posts" and collectively called news.  See Religious Tech. Ctr. v. Netcom On-line Commc'n Servs, Inc., 907 F. Supp. 1361, 1366 n.4 (N.D. Cal. 1995).  Messages are posted to the Usenet by reference to one or more "newsgroups" where they can be located and read.  See id.  The servers at each Usenet hub are programmed to feed the articles its users have posted to other Usenet servers, based on a user's implicit and explicit configuration settings, and, in turn, the servers receive postings from other servers.  See Parker, 422 F. Supp. 2d at 495 n.1.

The Usenet has millions of users who gain access to the Usenet in over 200 countries around the world.  See Paulillo & Heald.

---

[1] See John C. Paulillo & David Heald, *Democratic Participation in the Discursive Management of Usenet*, 4 Proc. Thirty-Fifth Haw. Int'l Conf on Sys Sci. 114 (2002), *available at* http://csdl2.computer.org/comp/proceedings/hicss/2002/1435/04/143 50114.pdf ("Paulillo & Heald").

There are hundreds of businesses similar to Defendants' business that provide access to Usenet for a fee. See The Official TOP1000 Usenet Servers Page Previous Months Statistics, http://www.top1000.org/#previous (last visited Jan. 14, 2009). Subscribers pay Defendants a monthly rate for the right to access Defendants' computer servers and download various types of files.[2] (See Plaintiffs' Letter-Brief, dated July 8, 2008 ("Pl. July 8 Ltr."), at 2.)   The price a subscriber pays ranges from $4.95 to $18.95 per month, depending upon the volume of files the subscriber downloads.   (See Defendants' Letter-Brief, dated July 22, 2008 ("Def. July 22 Ltr."), at 3.)   Defendants' Usenet service provides access to more than 120,000 newsgroups.   (See id. at 2-3.)

Usenet was originally created to distribute text content only. Over time, programs were developed that provided a means of distributing binary files as content as well.   (See Declaration of Ellis Horowitz in Support of Plaintiffs' Motion for Sanctions and for Attorney's Fees and Costs, dated Sept. 8, 2008 ("Horowitz Decl.") ¶ 7.)   When a subscriber finds a file it wishes to download from the Usenet, it downloads the file from Defendants' computer servers to its own personal computer. (See id. ¶ 16.)   This download process is the "essence" of the service Defendants provide their subscribers. (See Pl. July 8 Ltr. at 3.)   According to

---

[2]Defendants own four news servers and purchase peering services of thirty-two transitory cache servers from an affiliate, for a total of thirty-six servers.  (See Def. Opp. Mem. at 5.)

Plaintiffs, Defendants' subscribers also "upload" copies of digital music files to Defendants' computer servers; these files are received and processed by Defendants' servers, and can then be shared with other Usenet subscribers. (See Horowitz Decl. ¶ 16.)

Plaintiffs contend that Defendants provided their subscribers access to hundreds of music piracy newsgroups containing vast amounts of infringing digital music files copyrighted by Plaintiffs. These digital music files were stored on servers operated by or on behalf of Defendants. As a result of Defendants' conduct, Plaintiffs allege that thousands of Plaintiffs' copyrighted works are infringed every day in violation of the Copyright Act, and they seek injunctive and monetary relief for both direct and secondary infringement.

## II. Events Leading to Plaintiffs' Motion for Sanctions

### A. Plaintiffs' Argument

Plaintiffs' Motion for Sanctions is based on the alleged spoliation of the following evidence: 1) "Usage Data," which Plaintiffs define as "pre-existing records from Defendant[s'] computer 'servers' reflecting actual requests by Defendant[s'] paid subscribers to download and upload digital music files using Defendant[s'] service;"[3] 2) "Digital Music Files," which Plaintiffs define as "the physical digital copies of the copyrighted sound recordings at issue in this case and related information hosted on

---

[3]Defendants refer to Usage Data as "log data."

-5-

computer servers operated by or on behalf of Defendant[s]";[4] and 3) "highly incriminating promotional materials previously available on the Usenet.com website."   (Pl. Sanctions Mem. at 1, 3.)[5] Plaintiffs contend that Defendants deliberately destroyed this material even though it had been the subject of discovery requests, and that it would have provided evidence of wide-scale infringement of Plaintiffs' copyrighted sound recordings.   (See id. at 1.)

The chronology of the alleged destruction of this evidence is as follows.   In August 2007, prior to filing this action, Plaintiffs sent Defendants a written notice stating that a number of Music Groups on Defendants' system "are the source of repeated and conspicuous copyright infringement" and that "these newsgroups are disseminating copyright[ed] works without authorization." (Declaration of Gianni P. Servodidio in Support of Plaintiffs' Motion for Sanctions and For Attorney's Fees and Costs, dated Sept. 8, 2008 ("Servodidio Decl.") Ex. 1.)   At that time, Defendants took no action to address the complaint.   On October 12, 2007,

---

[4]Defendants refer to Digital Music Files as "articles."

[5]In their Reply papers, Plaintiffs allege for the first time that Defendants have also destroyed or withheld relevant e-mails and data retention scripts.   (See Plaintiffs' Reply Memorandum of Law in Support of Motion for Sanctions for Spoliation of Evidence, dated Oct. 14, 2008 ("Pl. Reply Mem."), at 15-18.)   Because Plaintiffs raise this issue for the first time in their Reply, and Defendants did not have an opportunity to respond to these allegations, the Court declines to address the alleged destruction or withholding of this evidence at this juncture.   In any event, these matters continue to be the subject of discovery discussions between the parties.

Plaintiffs commenced this action; in their Complaint they provided detailed allegations concerning the infringing nature of Defendants' service and put Defendants on notice that "there are millions of obviously copyrighted sound recordings stored on and disseminated from the binary newsgroups that Defendant[s] [have] chosen to offer to [their] customers." (See Compl. ¶ 19.) In January 2008, Plaintiffs served Defendants with document requests specifically requesting production of the Usage Data. (See Servodidio Decl. Ex. 2.) Between February and March, Plaintiffs attempted to obtain production of the Usage Data, in addition to other documents, through extensive correspondence and communications with Defendants. (See id. ¶ 4 & Ex. 4.) Ultimately, on March 8, 2008, Defendants' counsel acknowledged the relevance of the Usage Data and agreed to produce snapshots of the data. An e-mail from Defendants' counsel stated:[6]

> [W]e will extract the server log information for those newsgroups that contain the words 'mp3' or 'sound'.

_____

[6]Plaintiffs contend that at each step in the discovery process, Defendants attempted to thwart Plaintiffs in filing a Motion to Compel, by delaying production while at the same time claiming to cooperate. For example, Defendants initially provided false written discovery responses, in which they claimed not to own their servers and, therefore, claimed they could not access the Usage Data. (See id. ¶ 4 & Ex. 3.) Defendants then changed their tact, claiming that they did own the servers but did not know how to produce the requested log data. Plaintiffs contend that they explained how the Usage Data could be produced and suggested that Defendants provide access to their servers so that Plaintiffs could collect the Usage Data themselves. Defendants first offered, and then withdrew their offer, to provide Plaintiffs direct access to the data. (See id. ¶ 4.)

-7-

> That list currently exceeds 600.  This should give you
> the truly relevant information that you are seeking.
> We can take several [one-hour] snapshots over the
> weekend and get that information to you by Monday.

(Id. Ex. 6.)   Notwithstanding counsel's commitment, on March 8,

2008, Defendant Reynolds affirmatively disabled user access to what

Plaintiffs estimate to be 900 Music Groups, without preserving the

Usage Data.   (See Horowitz Decl. ¶¶ 31-32; Servodidio Decl. Ex. 26

("Reynolds Dep.") at 83:18-84:19.)   The following business day,

Defendants produced "junk" Usage Data to Plaintiffs, reflecting

subscribers' failed attempts to access the Music Groups.   (See

Servodidio Decl. ¶ 7 & Ex. 7.)

On or around March 11, 2008, Plaintiffs learned of Defendant

Reynolds's actions.   (See id. ¶ 8.)   In an e-mail to Defendants'

counsel, Plaintiffs objected to the disabling of the Music Groups,

and reminded Defendants that those files "are the subject of

outstanding  discovery  requests."    (See  id. ¶  8  &  Ex.  8.)

Plaintiffs followed-up via e-mail, on March 12, and through a

formal letter request on March 21, demanding that Defendants

preserve the Digital Music Files.   (See id. ¶ 9 & Exs. 9 & 11.)[7]

Plaintiffs offered to pay the costs of preserving this evidence and

"Defendant[s] assured Plaintiffs that [they] had preserved the

Digital Music Files and that [they] had also 're-enabled' access to

the Music Groups and would produce Usage Data pursuant to an

---

[7]At this point, the Usage Data had already been lost.

-8-

appropriate stipulation between the parties." (See Pl. Sanctions Mem. at 9.) The parties then scheduled a telephone call on March 12, in order to discuss whether Defendants could mitigate the prejudice caused by disabling the Music-related Groups. (See Plaintiffs' Supplemental Reply Memorandum of Law in Support of Motion for Sanctions for Spoliation of Evidence, dated Oct. 23, 2008 ("Pl. Supp. Mem.") at 5.)

Despite Defendants' assurances, Defendants did not preserve copies of the Digital Music Files for the disabled groups, nor did they re-enable all the Music-related Groups that had been disabled.[8] (See Pl. Sanctions Mem. at 9.) In fact, Plaintiffs claim that Defendants took affirmative steps to delete the Digital Music Files on March 10, and then Defendants reconfigured their system in order to write-over the Digital Music Files, making them irretrievable. (See Pl. Supp. Mem. at 2-4.) Plaintiffs estimate that only 78 of the 900 Music Groups once available on Defendants' servers were re-enabled to receive articles after March 8, 2008. (See Pl. Sanctions Mem. at 9; see also Horowitz Decl. ¶ 33.)[9]

---

[8]Defendant Reynolds testified at his deposition that Defendants took no steps to prevent the Digital Music Files from expiring off the system. (See Reynolds Dep. at 87:10-89:17; 92:24-94:9.) Defendant Reynolds was asked to explain why he did not preserve the Digital Files. He first stated that it was impossible, then conceded that they "could have been" preserved, but explained "there was no request to produce the articles or to save them." (Id. at 92:19-20.)

[9]While Defendant Reynolds was certainly allowed to stop offering access to copies of Plaintiffs' copyrighted works, he was not entitled, at the same time, to destroy evidence of infringement

On March 24, Defendants' server crashed and stopped populating the re-enabled newsgroups; Defendants have not offered Music-related Groups on their system since that date. (See Pl. Reply Mem. at 13; see also Def. Opp. Mem. at 8-9.) Thus the newsgroups that Defendants did re-enable after March 12, received files for only approximately ten days. (See Pl. Sanctions Mem. at 9.) Moreover, the newsgroups that had been re-enabled "did not 're-populate' in a manner consistent with the normal functionality of these groups." (Id.)

Plaintiffs' analysis of the re-populated files reflects poor "completion" rates, meaning that components of the Digital Music Files were often missing from Defendants' server, which resulted in incomplete sound recordings. (See Servodidio Decl. ¶ 20; Horowitz Decl. ¶ 40.) This analysis is consistent with hundreds of e-mails Defendants received from their subscribers complaining about the functionality of these newsgroups. (See Servodidio Decl. Ex. 19.) Plaintiffs contend, therefore, that Defendants have done nothing to ameliorate the prejudice caused by their failure to preserve the Usage Data and Digital Music Files.

In addition to failing to preserve the Usage Data and Digital Music Files, Plaintiffs claim that Defendants have either destroyed other inculpatory evidence or misrepresented that it does not exist. (See Pl. Reply Mem. at 15.) For example, Plaintiffs

---

Defendants in this action are alleged to have engaged in.

contend that Defendants destroyed highly incriminating promotional materials that were previously available on the Usenet.com website.[10]   (See Pl. Sanctions Mem. at 3.)   Defendant Reynolds testified at his deposition that it was not until after the commencement of the litigation that he personally removed the webpages, and failed to retain copies.   (Fabrizio Decl. Ex. 11 ("Reynolds Oct. 8, 2008 Dep.") at 1039:12-1041:21.)   Plaintiffs argue that this controverts Reynolds's Declaration indicating the materials were simply removed from public access before the case was filed.[11]   (See Declaration of Gerald Reynolds in Support of Defendant Usenet.com, Inc.'s Opposition to Plaintiffs' Motion for Sanctions, dated Sept. 29, 2008 ("Reynolds Decl.") ¶ 22.) Although Defendants have offered to authenticate Plaintiffs' copies of the webpage containing the promotional materials, Plaintiffs take issue with this cure since they are unable to ascertain what other incriminating webpages Defendants destroyed.   (See Pl. Reply Mem.

---

[10]"For example, all references to 'Music' and 'Mp3s' were deleted from a promotional [webpage] on Defendants' website sometime after March 13, 2008."   (Pl. Reply Mem. at n.9.) Plaintiffs contend that Defendants destroyed all copies of this webpage, and only produced a sanitized version of it during discovery. (See Declaration of Steven B. Fabrizio in Support of Plaintiffs' Motion for Sanctions for Spoliation of Evidence, dated Oct. 14, 2008 ("Fabrizio Decl.") ¶ 19.)

[11]After service of the Complaint, users in public Internet forums observed that some of Defendants' "incriminating webpages" were still available on Defendants' website, and they posted links. (See Fabrizio Decl. ¶ 15.) Additionally, Plaintiffs verified four days before the Complaint was filed that the webpages were publicly available.   (See id. ¶ 14.)

at 15-16 n.8.)

### B.   Defendants' Response

Defendants    argue    that    "Plaintiffs    have    grossly
mischaracterized the Defendant[s], [their] business and how [their]
service operates." (Def. Opp. Mem. at 1.)   The evidence Plaintiffs
claim Defendants have destroyed has always been available, but is
difficult, if not impossible, to extract.   (See id.)   Defendants
further claim that the so-called spoliated evidence would not prove
what Plaintiffs claim.   The Usage Logs, for example, show user
requests for articles in general and do not prove infringement.
(See id. at 1.)   Defendants contend, the logs do not indicate
whether the content of the articles is copyrighted material nor do
they contain information identifying the user.   (See id. at 19.)[12]
The logs simply show that some user requested some article at a
certain time, but retrieving an article from a so-called Music
Group does not necessarily prove infringement.   (See Def. Opp Mem.
at 19.)   The articles that do temporarily reside on Defendants'
servers are only text files, which must be combined and converted
in order to create a music file that could be played on an iPod or

---

[12]Although the logs identify the name of the article uploaded or
downloaded, Defendants claim that an article's name does not
necessarily reveal the contents of the requested file.   (See id.)
Plaintiffs dispute this position, claiming that the log files do
indicate which user requested a particular article.   (See
Horowitz Decl. ¶¶ 23-30.)

computer.   (See id. at 1.)   Moreover, newsgroups[13] whose names
contain the terms "mp3," "sound," or "music" are directed to only
one of Defendants' thirty-two cache servers and do not even use one
server's full capacity; therefore, Plaintiffs' allegations about
the pervasive infringing use of Defendants' system is false.   (See
id. at 5)   Finally, Defendants argue that if they truly sought to
hide incriminating evidence, they would have done so well before
the eve of document production.   (See id. at 1.)

        From the commencement of discovery, Plaintiffs requested a
wide array of electronic files, including the articles (Digital
Music Files) and log data (Usage Data).   (See id. at 6.)
Defendants repeatedly explained why it was not technologically
feasible to produce these potentially responsive documents.   (See
id.)   Because of the volume of information requested and the fact
that Defendants' system was not capable of capturing and storing
the majority of this information, the parties discussed protocols
and logistics for trying to extract and produce this information.
(See id.)   As a result of these conversations, Defendants took it
upon themselves to capture and store some of the requested
information from the live flow of data, and they also agreed to

---

[13]The name of a newsgroup is determined by the creator of that
group and not by a Usenet access provider such as Defendant.
There is no authority that determines a name or grants permission
to establish a new newsgroup.   Defendants claim that the "vast
majority of newsgroups contain advertisements or opinions
unrelated to the group title — the Usenet equivalent of 'spam'."
(See Def. Opp. Mem. at 4.)   Thus, a newsgroup named mp3 may or
may not contain text versions of an mp3 converted to binary form.

conduct an informal discussion between Defendant Reynolds and two of Plaintiffs' consultants, which took place on March 12, 2008. (See id. at 6-7.)   During this discussion, Defendant Reynolds explained the operation of his business, the servers involved, how the articles reside on the servers, and that the articles were not saved due to the volume of posts and lack of adequate storage space.   (See id. at 7.)

Defendants argue that the data Plaintiffs seek is transitory in nature, meaning that in-flow of new articles pushes out old articles present on the Usenet.   (See id. at 6.)   The life-span is normally measured in days,[14] and contrary to Plaintiffs' contention, there is no static body of data stored on Defendants' system.   (See id. at 5-6.)   Log files or Usage Data, at issue in this motion, do not readily exist and could not easily be generated.[15]   (See Def.

---

[14]Defendants acknowledge that their website does advertise that some articles remain posted for "up to 150 days."   Defendants claim, however, that their system averages a fourteen-day retention time.   (See id. at 5-6.)

[15]Plaintiffs requested all log files for data that passed through Defendants' servers, but Defendants contend that extracting these log files would have required modifying Defendants' servers from their normal operation mode, "error mode," which they claim only logs errors, to "info mode," which logs almost everything.   (See Def. July 22 Ltr. at 5.)   Defendants state that this "operational change would have caused vast quantities of data (millions of lines per hour) to quickly fill Defendants' servers . . . thereby causing Defendants' service to stop functioning properly within minutes." (Id.)   Defendants point to an incident on March 24, when they experimented with extracting these log files from the server.   (See id.)   When the server was in "info" mode, on March 24th, it crashed. (See id.)

-14-

Opp. Mem. at 7.)  In fact, Defendants contend these logs can only be obtained sparingly without causing Defendants' system to shut down.  (See id. at 8.)  Defendant Reynolds claims that on March 8, the servers were configured to "error mode" and, therefore, did not create the Usage Data.  (See Reynolds Decl. ¶ 8.)

Prior to March 8, 2008, the parties were also discussing settlement.  (See Def. Opp. Mem. at 7.)  Defendants argue that Plaintiffs' counsel insisted that before Plaintiffs would consider settlement, Defendants had to disable access to a variety of newsgroups Plaintiffs alleged were associated with infringement of their content.  (See id.)  Because of this request, Defendants disabled access to a variety of newsgroups.  (See id.)  As a result of disabling the newsgroups, the articles posted to the mp3 or Music-related Groups expired off the system "through normal system operational attrition" as millions of other Usenet articles were fed onto the server.  (See id.)  Defendants claim that Plaintiffs knew this would result from their demand.  (See id.)[16]

After the March 8 incident, Defendants' counsel immediately offered to re-enable the servers, but Defendants contend that Plaintiffs' counsel discouraged the re-enablement since it would contribute to further infringement.  (See Def. Opp. Mem. at 8.)

---

[16]Defendants believe that Plaintiffs sought this result from the beginning of this litigation, not to stop alleged infringement but, rather, to devise a claim for spoliation in order to ease their burden of proving that Defendants' users are committing direct copyright infringement.  (See Def. July 22  Ltr. at 4.)

Defendants claim that in response to these inconsistent demands, and not knowing what else to do, Defendants re-enabled access to the newsgroups on or about March 12, 2008.  (See id.)  The flow of articles referenced to the mp3 newsgroups began to reappear and the parties began discussions on protocols for extracting and storing the massive amounts of information generated.  (See id.)

Defendants claim that two technical impediments arose to extracting and storing the information from the re-enabled newsgroups.  (See id. at 8.)  First, Plaintiffs demanded that Defendants produce all logs or Usage Data that passed through their servers.  (See id.)  Defendants argue that this was impossible because extracting these files would have required modifying their servers from their normal operational mode, "error mode," to "info mode."[17]  (See Reynolds Decl. ¶ 8.)  Second, after Defendants re-enabled the Music Groups they changed the logging function on one server to info mode, but this server ("the Corrupt Server") quickly

_____

[17]Plaintiffs argue that Usage Data is copied to, and stored on, Defendants' server while in "error mode."  (See Reply Declaration of Ellis Horowitz in Support of Plaintiffs' Motion for Sanctions and for Attorney's Fees and Costs ("Horowitz Reply Decl.") ¶ 21.)  "Error mode" logs produced by Defendants support this contention.  (See id.)  Plaintiffs further argue that Defendants could have preserved this data by increasing the size of the files or by periodically copying the files to an external storage medium.  (See id. ¶¶ 29-30.)  Plaintiffs claim that Defendants did not have to change the operation of their server to preserve this data.  (See Pl. Reply Mem. at 9.)  Plaintiffs also argue that Defendants' position — that it was impossible to preserve and produce this data — is specious, since Defendants have been able to preserve and produce Usage Data subsequent to March 8, 2008.  (See id. at 9-10; see also Horowitz Reply Decl. ¶ 28.)

-16-

filled to capacity and stopped functioning.  (<u>See</u> Def. Opp. Mem. at 8-9; <u>see also</u> Reynolds Decl. ¶ 16.)

A snapshot of the so-called Digital Music Files flowing through the server at the time of the crash was captured, and Defendants produced this data to Plaintiffs on June 19, 2008.  (<u>See</u> Def. Opp. Mem. at 9-10.)  As a result of the server corruption, however, Defendants were unable to extract the log data.  (<u>See</u> <u>id.</u> at 10.)

Defendants state that "[o]nce Plaintiffs give their permission to wipe the [server] clean of data in order to 'rebuild,' it will begin receiving . . . articles posted to the Usenet that reference mp3 newsgroups."  (<u>See</u> Def. July 22 Ltr. at 6.)  Defendants have been prepared to take this action since mid-June.  (<u>See</u> <u>id.</u>) Defendants also posit that the mp3 articles would appear on their system quickly, as evidenced by the over 200,000 articles captured on Defendants' Corrupt Server during the ten days (from March 12 to March 24) that the mp3 newsgroups were re-enabled.  (<u>See</u> <u>id.</u>)[18]

Moreover, Defendants argue that the articles that are the basis of Plaintiffs' motion (the so-called Digital Music Files) comprise only those articles that expired off the system during the four-day period between March 8, when the "music" newsgroups were disabled, and March 12, when they were re-enabled.  (Def. Opp. Mem.

---

[18]Plaintiffs claim it would take months to recreate the volume of infringing files that was on Defendants' service on March 8.  (<u>See</u> Pl. Sanctions Mem. at 3.)

at 2.)[19]   Further, Defendants never deleted, or allowed to be
deleted, any data of any kind that they had in their control.  (See
id. at 2.)  Defendants have produced over 200,000 articles (so-
called Digital Music Files) and 73,000,000 file headers (so-called
Usage Data) pursuant to stipulations the parties negotiated.  (See
id.)  More data that was received in August was or will be
produced.

Finally, Defendants argue that "Plaintiffs' accusation that
Defendant[s] destroyed 'promotional materials' is scurrilous and
false."  (Id.)  Defendant Reynolds removed some pages from the
website in response to Plaintiffs' pre-lawsuit demands.  (See id.;
see also Reynolds Decl. ¶ 22.)  Defendants point out that
Plaintiffs fail to acknowledge that Defendants agreed "to
authenticate a copy of this material totally deflating any argument
of spoliation."  (See Def. Opp. Mem. at 2.)

**DISCUSSION**

## I.  Motion to Strike Declaration of Professor David J. Farber

Defendants offer the Declaration of Professor David J. Farber

---

[19]Defendants also claim that the "numbers" (78 out of 900)
Plaintiffs refer to in comparing the number of Music Groups
disabled, versus those re-enabled, are "meaningless because of
[their] complete failure to consider whether the vast majority
of such newsgroups contained any [Music-related] articles."
(Id. at 4-5.)  Defendants explain that "[j]ust as there are no
controls on the posting or naming of newsgroups, there is no
meaningful control on newsgroup use or deletion.  This results
in thousands of newsgroups with little or no use at all
remaining available on the Usenet, and these dead newsgroups
rarely go away."  (Id. at 5.)

-18-

("Farber Decl.") as expert evidence in opposition to Plaintiffs'
Motion for Sanctions.   Professor Farber's Declaration concerns
Usenet technology, the Usenet network, and Defendants' system
specifically, which are matters relevant to Plaintiffs' Motion for
Sanctions.  Plaintiffs move this Court to strike Professor Farber's
Declaration on the grounds that Professor Farber did not have a
sound basis on which to proffer expert conclusions or opinions
about Defendants' system.   (See Pl. Strike Decl. at 1.)   Because
Defendants have failed to meet their burden of demonstrating that
Professor Farber's opinions about Defendants' system are based on
sufficient facts or data, or are the product of reliable methods or
principles, as required by  Federal Rule of Evidence 702 and the
Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals,
Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993), the Court grants in
part Plaintiffs' Motion.

> A.   Legal Standard for Determining Admissibility of
> Expert Evidence

Rule 702 of the Federal Rules of Evidence requires that an
expert be qualified to testify on the basis of "knowledge, skill,
experience, training, or education" on a subject matter that will
"assist the trier of fact to understand the evidence or to
determine a fact in issue."  Fed. R. Evid. 702.   The rule permits
a qualified expert to testify in the form of an opinion (1) if his
testimony is based upon sufficient facts or data and is the product
of reliable principles and methods, and (2) the witness applies the

-19-

principles and methods reliably to the facts of the case.  See id.
The reliability requirements were added in 2000 and were intended
to codify the requirements set forth in Daubert, 509 U.S. 579, 113
S. Ct. 2786, and the subsequent Supreme Court case of Kumho Tire
Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167 (1999).  See
Advisory Committee Note to the 2000 Amendment to Evidence Rule 702.

"While the proponent of expert testimony has the burden of
establishing by a preponderance of the evidence that the
admissibility requirements of Rule 702 are satisfied, the district
court is the ultimate gatekeeper."  United States v. Williams, 506
F.3d 151, 160 (2d Cir. 2007) (internal quotation marks and citation
omitted).    Under  the  Daubert  standards,  a  court  must  first
determine whether the expert is qualified to testify.  See Zaremba
v. Gen. Motors Corp., 360 F.3d 355, 360 (2d Cir. 2004) (noting that
where a witness lacked qualifications, an analysis of the remaining
Daubert factors "seems almost superfluous").  Rule 702, states that
an expert must be qualified "by knowledge, skill, experience,
training, or education."  A court must consider "the totality of a
witness's background when evaluating the witness's qualifications
to testify as an expert."  29 WRIGHT & GOLD, FEDERAL PRACTICE AND
PROCEDURE § 6265, at 246 (2008).  Additionally, a court must ensure
that an expert will be proffering opinions on issues or subject
matter that are within his area of expertise.  See Stagl v. Delta
Air Lines, Inc., 117 F.3d 76, 81 (2d Cir. 1997).

-20-

"Next, the district court must decide whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation marks and citation omitted); see also Daubert, 509 U.S. at 589, 113 S. Ct. 2786 (internal quotation marks omitted) (a court must make certain that challenged expert testimony "is not only relevant, but reliable"). In a reliability inquiry, the district court should consider the indicia of reliability identified by Rule 702: (1) that the testimony is grounded on sufficient facts or data that "is the product of reliable principles and methods," and (2) that "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; see also Amorgianos, 303 F.3d at 265. Essentially, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho, 526 U.S. at 152, 119 S. Ct. 1167. "Although Rule 702 sets forth specific criteria for the district court's consideration, the Daubert inquiry is fluid and will necessarily vary from case to case." Amorgianos, 303 F.3d at 266. Courts have broad discretion in determining whether to admit expert testimony. See id. at 265.

Expert testimony should be excluded if it is speculative or

-21-

conjectural, see In re Air Disaster at Lockerbie Scotland, 37 F.3d 804, 824 (2d Cir. 1994), or if it is based on assumptions that are "so unrealistic and contradictory as to suggest bad faith." Shatkin v. McDonnell Douglas Corp., 727 F.2d 202, 208 (2d Cir. 1984). Nevertheless, "contentions that assumptions are unfounded 'go to the weight, not the admissibility of the testimony.'" Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (quoting Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1188 (2d Cir. 1992)); see also Raskin v. The Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("disputes as to the validity of underlying data [relied upon by an expert] go to the weight of the [expert's] evidence" not the admissibility of the testimony).

"In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos, 303 F.3d at 267. A minor flaw in an expert's reasoning or a small modification to a reliable method will not render an opinion per se inadmissible; a "judge should only exclude evidence where the flaw is large enough that the expert lacks 'good grounds' for his conclusions." Id. (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 746 (3d Cir. 1994)). "This limitation on when evidence should be excluded accords with the liberal admissibility

standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." Id. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596, 113 S. Ct. 2786.

### 1. Professor Farber's Qualifications

Professor Farber is currently the Distinguished Career Professor of Computer Science and Public Policy in the School of Computer Science at Carnegie Mellon University. (See Farber Decl. at 1.) His qualifications include: 1) a Bachelor of Science in Electrical Engineering from Stevens Institute of Technology; 2) a Master's Degree in Math from Stevens Institute of Technology;[20] 3) an eleven-year career at Bell Laboratories assisting in the design of the first electronic switching system and co-designing the programming language SNOBOL; 4) creation and management of large software systems; 5) implementation of several software systems which patterned themselves on the Usenet model; and 6) being a heavy Usenet user prior to the arrival of the World Wide Web. (See id. Ex. 1.)

The Court finds, and Plaintiffs do not dispute, that Professor Farber is sufficiently qualified to submit his expert opinions

---

[20]Professor Farber has also received several honorary degrees. (See id. Ex. 1.)

-23-

about Usenet technology or the Usenet network generally.   See
United States v. Brown, 776 F.2d 397, 400 (2d Cir. 1985) (the
qualification requirement under Rule 702 "must be read in light of
the liberalizing purpose of the Rule").

　　　　　2. The Basis for Professor Farber's Expert Opinion

Plaintiffs argue that "without any independent review or
analysis of his own — and without any familiarity with
Defendant[s'] system — Prof[essor] Farber simply accepted
conclusions from [Defendant] Reynolds and, without verification,
presented them as his own expert conclusions." (Pl. Strike Mem. at
1.)   They further contend that portions of Professor Farber's
Declaration are unreliable because they "purport[] to give
testimony about Defendant[s'] system — not Usenet technology
generally and not the broader Usenet network generally."   (See id.
at 2.)   Professor Farber "repeatedly proffers 'facts' and
conclusions about the nature and capacity of Defendant[s'] system
— as if those facts and conclusions are the result of a well-
considered expert analysis," but Professor Farber admits "he does
not know the first thing about Defendant[s'] system, how it is
designed, the hardware and software used, or its capabilities."
(See id.)

Defendants respond that Professor Farber only relied on
information from Defendant Reynolds where his experience suggested
it would be appropriate.   (See Def. Strike Mem. at 5.)   Defendants

-24-

contend that Professor Farber did not "repackage" Mr. Reynolds's assertions and "pass them off as his own conclusion," but, rather, he had the information necessary to form the opinions in his Declaration.  (See id. at 6.)

By his own admission, the following represents the sum of Professor Farber's investigation.    In  preparation  for  his Declaration, Professor Farber received, but only "scanned" notes from Mr. Reynolds (see id.).  He also "reviewed the operations manual for Surgenews"[21] and performed Internet research on the Surgenews software.[22]    (See Def. Strike Mem. at 6.)   Professor Farber did not download any articles from the Usenet in preparation for his Declaration, but he was a heavy Usenet user beginning in the late 1990's.  Nevertheless, he has used the Usenet only on a couple of occasions each year since 2000.   (See id.; Farber Dep. 36:8-38:13.)    Professor  Farber  had  discussions  with  Defendant Reynolds concerning the Usenet.com system, the software, the age of the  servers,  which  Professor  Farber  accepted  as  reasonable information based on his experience.  (See Def. Strike Mem. at 7;

---

[21]Surgenews is the software that Usenet.com and Sierra use to operate their front-end servers.  (See Horowitz Decl. ¶ 21.)

[22] The deposition section Defendants cite for this proposition does not indicate that Professor Farber reviewed an operations manual for Surgenews (see Fabrizio Decl. Ex. 1 ("Farber Dep.") 14:25-16:6).  In fact, later in Professor Farber's deposition he testified that he only reviewed help files, possibly some "introductory thing," and ran a few Google searches.  (See Farber Dep. 60:23-62:11.)

see also Farber Dep. 39:3-40:22.)

In forming their opinions, experts, of course, often rely on interviews of people with knowledge of relevant facts.   Here, however, Professor Farber has offered opinions about the capacity and capabilities of Defendants' servers and software, which are the matters largely in contention, by simply accepting what Defendant Reynolds told him.   The underlying premise of allowing expert testimony is that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."   Fed. R. Evid. 702.   An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge.   Cf. United States v. Mejia, 545 F.3d 179, 197-98 (2d Cir. 2008) (although an expert may rely on hearsay in forming his expert opinions, "[t]he expert may not, however, simply transmit that hearsay to the jury.   Instead, the expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials.   Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever") (internal quotation marks and citations omitted); Robinson v. Sanctuary Record Groups, Ltd., 542 F. Supp. 2d 284, 292 (S.D.N.Y. 2008) (expert whose methodology was founded on hearsay supplied by the party itself, rather than "a source of first-hand, independent expert knowledge," did not provide reliable

evidence).[23]

There are four main subjects addressed in Professor Farber's Declaration that are not based upon sufficient facts or data, or are not the product of reliable principles and methods: 1) the capacity of Defendants' servers; 2) what the Usage Data from Defendants' servers shows; 3) article retention times on Defendants' servers; and 4) the content of specific Usenet groups that have appeared on Defendants' servers. Paragraphs 7-14, 16, and 18-21 are, therefore, stricken in whole or in part from Professor Farber's Declaration. The Court finds that the remaining portions of Professor Farber's Declaration, concerning Usenet technology and the Usenet network in general, which are based on Professor Farber's experience in both the creation and management of large software systems, his education, and direct, hands-on experience, sufficiently satisfy Rule 702 and Daubert.[24]

---

[23]By contrast, Plaintiffs' expert, Ellis Horowitz, engaged in a detailed analysis of Defendants' system and the data available on that system. The Court finds Horowitz's conclusions about Defendants' system to be deserving of substantial weight.

[24]After Plaintiffs filed their Motion to Strike, Professor Farber submitted a Supplemental Declaration in which he claims that he verified the adequacy of the bases for his opinions in his September 29, 2008 Declaration. (See Supplemental Declaration of David J. Farber in Support of Defendant Usenet.com, Inc.'s Response in Opposition to Plaintiffs' Motion to Strike Farber Declaration, dated Oct. 27, 2008 ("Farber Supp. Decl.").) This purported verification, subsequent to the submission of his Declaration, and the opinions contained therein, reinforce the Court's conclusion that Professor Farber did not employ a sound methodology in reaching the conclusions contained in his Declaration. Moreover, even the "verification" that Professor Farber claims to have undertaken is left vague.

a. The Capacity of Defendants' Servers

In his Declaration, Professor Farber offers testimony concerning the capacity of Defendants' system. (See, e.g., Farber Decl. ¶¶ 7, 8, 9, 10, 19, 21.)  For example, Farber states that "Defendant[s'] machines are old and do not have much spare memory." (Id. ¶ 19(a); see also id. ¶ 20 ("Separate hardware would have to be acquired to accept the massive amounts of log data generated because no such storage space exists in sufficient quantities on Defendant[s'] servers"); id. ("Defendant[s'] system runs on older hardware no longer in production with an older Windows 2000 platform"); id. ¶ 19(a) (Defendants' system "resources are stretched to the maximum"); id. ¶ 10 ("Defendant[s'] system in early March of 2008 . . . d[id] not have the resources for such [preservation] activity").  At his deposition, Professor Farber admitted that he did not conduct any independent examination of Defendants' system or servers, but merely accepted what Defendant Reynolds told him about his system.  (See Farber Dep. 133:8-133:13, 146:7-146:17.)  In fact, Professor Farber 1) did not know how many servers Defendants operated (see Farber Dep. 40:14-41:12, 50:16-50:24); 2) did not know what types of servers Defendants operated or exactly how old they were (see id. 118:24-119:25, 134:12-138:19); 3) did not know the storage capacity of any of Defendants' individual servers or the storage capacity of Defendants' system overall (see id. 67:14-67:23, 134:22-135:24); 4) did not know

-28-

whether Defendants allocated article traffic to a particular server
or how they allocated traffic (see id. 54:6-57:13, 62:19-62:23);
and 5) did not know what version of Surgenews server software
Defendants were using, or how current it was (see id. 115:16-
117:24).

Moreover, when asked to defend his statement that Defendants'
servers are "old," Professor Farber responded that they have to be
old since they run on a Windows 2000 operating system.  (See id.
57:4-57:8,  114:24-115:15.)    Professor  Farber,  however,  was
operating  under  a  factually  incorrect  assumption.  Defendants'
servers that log user requests, the front-end servers, run on the
server version of Windows XP (see Horowitz Reply Decl. ¶ 27), which
is a newer operating system that Professor Farber identified in his
deposition as a "better" and "robust" operating system.  (Farber
Dep. 117:25-118:19.)

As  Plaintiffs  point  out,  the  record  contains  objective
evidence concerning the capacity of Defendants' system, including:
the  number,  configuration,  storage  capacity,  and  memory  of
Defendants'  computers, the operating system, and the software run
by Defendants' servers, none of which Professor Farber appears to
have reviewed prior to submitting his Declaration or Supplemental
Declaration.[25]  (See, e.g., Horowitz Reply Decl. Exs. 2, 4, & 8.)[26]

---

[25]By contrast, this is the very information that Professor
Horowitz reviewed prior to offering his opinions on the capacity
of Defendants' servers.  (See generally Horowitz Decl.; see also
Horowitz Reply Decl.)  Horowitz concludes that Defendants' system

## b. Usage Data and Surgenews software

The Surgenews software is responsible for creating the log
files or Usage Data that is at issue.   In his Declaration,
Professor Farber opined about the logs created by the Surgenews
software and what type of information those logs would contain.
(See Farber Decl. ¶¶ 18-19, 20.)[27]   At his deposition, however,
Professor Farber admitted that he had little familiarity with the
Surgenews server software. (See Farber Dep. 16:7-17:17, 57:19-
62:18, 103:14-103:20, 146:18-147:7.)   Professor Farber testified
that he had not been able to download the Surgenews software and

_____

has the capacity to preserve and produce the data requested by
Plaintiffs.

[26]In his Supplemental Declaration, Professor Farber claims that he
verified that Defendants' servers have "little or no memory
available" and "[t]he capacity of the four Usenet.com, Inc.
servers is less than 100 megabytes."   (Farber Supp. Decl. ¶ 9.)
Leaving aside the questionable practice of investigating the
facts after first having submitted sworn statements to the Court
without any such investigation, it is clear that Professor
Farber's post facto investigation was superficial and unreliable.
His statements about Defendants' servers' capacity are
contradicted by the system configuration reports Defendants
produced.   (See Horowitz Reply Decl. Ex. 8.)   Additionally,
Professor Farber failed to take into account the Sierra "spool"
servers, which are used in conjunction with the Usenet servers,
to run Defendants' business.   These "spool" servers have
approximately 360 terabytes of storage capacity.   (See id. Ex.
2.)

[27]For example, Professor Farber states "information identifying a
user making a request for an article from a server is not linked
to the identified article retrieved from [the] cache.   The fact
that a user is logged in simultaneously with hundreds of other
users is available, but nothing is recorded linking any user to
any article activity."   (Id. ¶ 18.)

only reviewed the help files, possibly an "introductory thing", and ran a few Google searches, which he could not describe except to say that he was looking to see what companies were selling the software.   (See id. 61:4-62:11.)   Moreover, Professor Farber admitted that while the Surgenews software would handle the logging function on Defendants' system, he had never experimented with logging on Defendants' system. (See id. 62:12-62:18.)   Although he claims that the Usage Data produced by the Surgenews software does not contain information identifying users requesting downloads from Defendants' system, he conceded that he was unfamiliar with what various codes and numbers represented on the Usage Data logs.   (See id. 19:25-20:13.)

Again, Professor Farber claims to have verified the conclusions in his Declaration after the fact.   By his own admission, however, this verification consisted of reviewing "the entire log file" with Defendant Reynolds about which he was questioned at his deposition, discussing this log file with Defendant Reynolds, and reading relevant provisions of the Surgenews manual.   (See Farber Supp. Decl. ¶ 4.)   Yet, Professor Farber conducted no independent analysis which would allow him to obtain the information necessary to understand the codes and numbers represented on the Usage Data logs.   Professor Farber claims in his Supplemental Declaration that the Usage Data does not identify user downloads because the thread ID numbers are "recycled

-31-

and not unique to any user."   (Id. ¶ 7.)   The fact that these
numbers are recycled does not necessarily mean that the Usage Data
does not identify user downloads.   Although Surgenews recycles
thread ID numbers and some users may have multiple threads, each
thread number is unique to a particular user at a particular time.
(See Horowitz Reply Decl. ¶ 22 & n.13.)[28]

### c. Retention Time

Professor Farber "suggest[s] a retention rate for the relevant
newsgroups [to be] about two weeks."   (Farber Decl. ¶ 13.)
Professor Farber states that retention times are based on numerous
and changing factors, but mainly: 1) how much space is available on
the particular server or servers through which the article is being
pushed; and 2) the relative level of traffic at any given time for
each of the newsgroups.   (See id. ¶ 11.; see also Farber Dep.
49:15-50:15.)   Yet, Professor Farber testified at his deposition
that he did not know, and was never told, how much storage space
Defendants' system had.   (See Farber Dep. 51:9-52:8.)   Professor
Farber further testified that he did not conduct any tests to
determine the actual retention time for articles on spool 2, the
server on which Defendants generally stored the Music-related
Groups (see id. 62:24-64:21); nor did he ask Defendant Reynolds for

---

[28]Contrary to Professor Farber's opinion, Horowitz concludes "the
news.log files generated by the SurgeNews software contain
information from which one can identify Articles that are
downloaded by users, newsgroups visited by users, and the users
making requests to visit newsgroups and/or retrieve Articles."
(Id. ¶ 22.)

actual data relating to retention time.  Professor Farber accepted Defendant Reynolds's representation that there was approximately a two-week retention period on spool 2, testifying that he may have relied on other factors, but he "can't recall what they were." (Id. 64:3-66:7; 67:7-67:13.)

In his Supplemental Declaration, Professor Farber claims that his September 29, 2008 Declaration only suggested "one possibly relevant retention rate, suggested by Defendant [Reynolds, which] was more accurate and relevant than that offered by Plaintiffs' expert."  (Farber Supp. Decl. ¶ 10.)  He adds that "retention rates are very difficult to quantify specifically and meaningfully, given all the possible factors to consider."  (Id.)  Yet, he has "had a talk" with Defendant Reynolds on this topic and asked him "a lot more questions."  (Id.)  Based upon this additional information from Defendant Reynolds, Professor Farber stands by his opinion that a "two-week retention rate is more accurately suggested from the facts."  (Id.)

There exists, however, objective evidence of the pre-spoliation retention time for the Digital Music Files, such as log files, configuration files, status reports, and crash reports for the specific spool 2 server on which these files were stored; this information would allow for a determination of the storage space, storage allocation, and incoming volume of data — all factors Professor Farber claims govern retention time.  (See, e.g.,

-33-

Supplemental Reply Declaration of Ellis Horowitz in Support of
Plaintiffs' Motion for Sanctions, dated Oct. 22, 2008 ("Horowitz
Supp. Reply Decl.") Exs. 2-6.)  Professor Farber does not claim to
have reviewed any of this material.[29]

### d. Content of Music Newsgroups

Professor Farber discusses the content of specific newsgroups.
(See Farber Decl. ¶¶ 14, 16.)  In particular, he discusses two
"apparently dead newsgroups" — "alt.binaries.sounds.mp3.beachboys"
and "alt.binaries.music.springsteen" — stating that "it is not
clear whether these newsgroups ever carried any so-called 'music'
articles, but they do not now."  (See id. ¶ 16.)  Yet, Professor
Farber admitted that he never visited those newsgroups prior to
submitting his Declaration to this Court, but, instead, accepted
Defendant Reynolds's information about the groups because "it
sounded right".  (See Farber Dep. 126:10-129:17.)  In his
Supplemental Declaration Farber claims that he later viewed
numerous newsgroups, on or after October 23, 2008, in order to
verify his earlier assertions.  During this verification, Farber
"found a dearth of any so-call[ed] 'Digital Music Files' or so-
call[ed] 'music' articles even though the newsgroup names contained
the phrase 'alt.binaries.music.'" (Farber Supp. Decl. ¶ 12.)  This

---

[29]Horowitz's analysis of this data indicates "that if Defendants
distributed the incoming data across their servers evenly, one
would expect Articles to be retained on their system for
approximately 90 days."  (See Horowitz Reply Decl. ¶ 13.)
Horowitz acknowledges that there are other factors that affect
retention time and this figure is an estimate.  (See id.)

is hardly surprising, however, since the music newsgroups on Defendants' system have been disabled for months; there is no reason that Professor Farber would encounter Digital Music Files on Defendants' system at this point in time.

\* \* \*

Professor Farber's Declaration is replete with opinions and conclusions which appear to be nothing more than information supplied to Professor Farber by Defendant Reynolds.  The Court acknowledges that "disputes as to the validity of underlying data [relied upon by an expert] go to the weight of the [expert's] evidence" rather than its admissibility.  Raskin, 125 F.3d at 66. Even if the Court were to deny Plaintffs' Daubert motion, however, and were to consider the conclusions in Professor Farber's Declaration, it would accord them little weight insofar as they purport to describe the capabilities of Defendants' system.  As has been discussed, and will be described further, Defendant Reynolds's contentions about his system, which Professor Farber relied upon, have been shown to be misleading and erroneous.

Nevertheless, Farber does not simply rely on erroneous data; his opinions are merely a restatement of Defendant Reynolds's views and are not the product of independent analysis.  "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony."

-35-

Amorgianos, 303 F.3d at 266; see also Malletier v. Dooney & Bourke,
Inc., 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) ("[T]he expert
witness must in the end be giving his own opinion.  He cannot
simply be a conduit for an unproduced expert."); In re Zyprexa
Prods. Liability Litig. v. Eli Lilly & Co., 489 F. Supp. 2d 230,
288 (E.D.N.Y. 2007) (excluding expert's testimony as to the
specifics of how Zyprexa regulatory issues were processed by the
FDA since he had not looked at any key data nor conducted any
independent analysis of the issues); Gary Price Studios, Inc. v.
Randolph Rose Collection, Inc., No. 03 Civ. 969 (CSH), 2006 WL
1319543, at *8 (S.D.N.Y. May 11, 2006) (granting motion to exclude
expert testimony where court found expert was, in large measure,
parroting the testimony of the plaintiff); In re Med Diversified,
Inc. v. Addus Healthcare, Inc., 334 B.R. 89, 100-02 (E.D.N.Y. 2005)
(excluding expert testimony where expert testified that "he did not
do any independent analysis of these companies, and did not
independently analyze the data from the databases from which he
derived his figures"); Rowe Entm't, Inc. v. The William Morris
Agency, Inc., No. 98 Civ. 8272 (RPP), 2003 WL 22124991, at *6
(S.D.N.Y. Sept. 15, 2003) (excluding expert's damages calculation
under Daubert, in part, for failing to do any independent analysis
to validate information provided by the plaintiff).

    An expert who simply repeats the hearsay of the client who
retained him, without any independent investigation or analysis,

does not assist the trier of fact in understanding matters that require specialized knowledge. That, in fact, is what Professor Farber has done in offering opinions about Defendants' system. The Court, therefore, grants Plaintiffs' Motion to Strike those portions of the Declaration that purport to describe the capabilities of Defendants' system. Those portions of the Declaration that are based on Professor Farber's expert knowledge of the Usenet in general and Usenet technology will not be stricken.

## II.  Motion for Sanctions

### A.  Spoliation

Plaintiffs ask the Court to exercise its inherent power to sanction Defendants for the spoliation of evidence.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) (citation omitted). "[A] court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs."[30] Residential Funding Corp. v. Degeorge Fin. Corp, 306 F.3d 99, 106-107 (2d Cir. 2002); see also Reilly v. Natwest Markets

---

[30]Federal Rule of Civil Procedure 37 also provides an avenue for courts to sanction a party who "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2). There is no court order in issue, however, and Plaintiffs do not allege any other violation that would fall under Rule 37.

Group Inc., 181 F.3d 253, 267 (2d Cir. 1999) (a district court has wide discretion in sanctioning a party for discovery abuses); see also Metro. Opera Ass'n. v. Local 100, Hotel Employees & Rest. Employees Int'l Union, 212 F.R.D. 178, 219 (S.D.N.Y. 2003).  Due to the "potency of the court's inherent power, courts must take pains to exercise restraint and discretion when wielding it. Accordingly, [the Second Circuit] has required a finding of bad faith for the imposition of sanctions under the inherent power doctrine." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 136 (2d Cir. 1998) (citing United States v. Int'l Bhd. of Teamsters, 948 F.2d 1338, 1345 (2d Cir. 1991)).  Bad faith can be shown by (1) "clear evidence" or (2) "harassment or delay or . . . other improper purposes." Int'l Bhd. of Teamsters, 948 F.2d at 1345 (internal quotation marks and citation omitted).

The party bringing a spoliation motion must demonstrate: 1) that its adversary had control of the evidence and a duty to preserve it at the time it was lost or destroyed; 2) that the adversary had a "culpable state of mind" when the evidence was lost or destroyed; and 3) that the lost or destroyed evidence was "relevant" to the moving party's claims such that a reasonable trier of fact could find that it would support a claim.  See Residential Funding Corp., 306 F.3d at 107; see also Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) (citing Byrnie v. Town of Cromwell, Bd. Of Educ., 243 F.3d 93, 107-12 (2d Cir.

-38-

2001)).

### 1.  Obligation to Preserve Evidence

"Identifying the boundaries of the duty to preserve [evidence] involves two related inquiries: <u>when</u> does the duty to preserve attach, and <u>what</u> evidence must be preserved." <u>Zubulake</u>, 220 F.R.D. at 216.  A party is obligated to preserve evidence when it "has notice that the evidence is relevant to litigation . . . [or] should have known that the evidence may be relevant to future litigation." <u>Kronisch v. United States</u>, 150 F.3d 112, 126 (2d Cir. 1998) (citations omitted); <u>accord</u> <u>Fujitsu Ltd. v. Fed. Express Corp.</u>, 247 F.3d 423, 436 (2d Cir. 2001).

### a.  The Relevant Date

In the usual case the duty to preserve evidence arises no later than on the date the action is initiated. <u>See</u> <u>Kronisch</u>, 150 F.3d at 126 ("This obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation — most commonly when suit has already been filed, providing the party responsible for the destruction with express notice. . . ."); <u>Zubulake</u>, 220 F.R.D. at 216-17 (party was obligated to preserve evidence in employment discrimination case when litigation was reasonably anticipated).  Where copyright infringement is alleged, and a cease and desist letter issues, such a letter triggers the duty to preserve evidence, even prior to the filing of litigation. <u>Cf.</u> <u>Fox v. Riverdeep, Inc.</u>, No. 07 Civ. 13622, 2008 WL 5244297, at

-39-

*7 (E.D. Mich. Dec. 16, 2008) (awarding sanctions where defendant in copyright infringement case failed to preserve evidence, including e-mails, once it received cease and desist letter); Google Inc. v. American Blind & Wall Paper Factory, No. 03 Civ. 5340 (JF) (RS), 2007 WL 1848665, at *1 (N.D. Cal. June 27, 2007) (holding that defendant's duty to preserve relevant evidence arose no later than the date the complaint was served and that this duty "likely arose some eighteen months earlier" when it received a cease and desist letter).

Nevertheless, when the duty to preserve evidence arises may, under certain circumstances, be dependent upon the nature of the evidence. For example, among other things, Plaintiffs in this action sought e-mails and other communications from Defendants' employees, customers, and business associates, discussing or referring to the Music Groups on Defendants' servers and the uploading and downloading of Music-related files. Defendants were on notice to preserve such documents by no later than the date on which the Complaint was filed, and perhaps earlier, when Plaintiffs notified Defendants of the alleged infringement.

Some of the other evidence at issue in the instant motion, such as Usage Logs and Music Files contained on Defendants' servers, is transitory in nature, is not routinely created or maintained by Defendants for their business purposes, and requires additional steps to retrieve and store. Arguably, Defendants may

-40-

not have had an obligation to preserve such evidence until placed on notice that Plaintiffs considered it relevant and were requesting it.  However, Plaintiffs explicitly requested the Usage Data on January 7, 2008.  Moreover, there can be no doubt that the Digital Music Files are highly relevant to this case, and Defendants should have been aware of their relevance no later than the date on which the Complaint was filed.  In any event, Plaintiffs specifically requested, and sought assurances on March 11, 2008, that these files would be retained.

### b.  Scope of Preservation

Defendants argue that they had no independent duty to preserve the data at issue.  First, Defendants contend that they had no duty to preserve the electronic Usage data because of its transitory nature and because it served no business purpose of Defendants.  Defendants next argue that their system did not have the capacity to preserve the requested data.  (See Def. Opp. Mem. at 12, 13.)  Defendants claim that a party does not have to preserve "every single scrap of data on its servers or in its business and does not have to go to extraordinary measures to preserve all potential evidence." (See id. at 13 (citing Wiginton v. Ellis, No. 02 Civ. 6832, 2003 WL 22439865, at *4 (N.D. Ill. Oct. 27, 2003).)

Defendants' arguments may have some force with respect to when the duty to preserve transitory data arose, but once Defendants had

-41-

actual notice that Plaintiffs were requesting the data, Defendants had the obligation to preserve it, if possible, or to at least negotiate in good faith what data they could produce.[31]  Plaintiffs specifically requested the Usage Data in their document requests (see Servodidio Decl. Ex. 2), and they reminded Defendants that they had requested the Digital Music Files, on both March 11 and March 12 (see id. Exs. 8 & 9).[32]  The parties were in negotiations concerning production of the Usage Data (see, e.g., id. Ex. 4), and Defendants counsel affirmatively advised Plaintiffs in a March 8,

---

[31]Although Federal Rule of Civil Procedure 37(e) is not cited by the parties, and does not apply under the circumstances of this case, by analogy the Rule is useful in understanding what steps parties should take to preserve electronic evidence.  Rule 37(e) states: "Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good faith operation of an electronic information system."  The Advisory Committee notes make clear, however, that "[w]hen a party is under a duty to preserve information because of pending or reasonably anticipated litigation, intervention in the routine operation of an information system" is required. Advisory Committee Note to the 2006 Amendment to Federal Rule of Civil Procedure Rule 37(e).  Moreover, "[a]mong the factors that bear on a party's good faith in the routine operation of an information system are the steps the party took to comply with a . . . party agreement requiring preservation of specific electronically stored information."  (Id.)

[32]Plaintiffs March 11, 2008 e-mail to Defendants states: "As such, please be advised that these files are the subject of outstanding discovery requests and highly relevant to the issues in this case.  As a result, your client is under a legal obligation to preserve all of that data."  (See id. Ex. 8.)  It is not clear which discovery request submitted prior to March 11 requested production of the Digital Music Files.  There is no doubt, however, that these files are highly relevant to this case and Defendants should have been aware of their relevance by no later than the date on which the Complaint was filed.

-42-

2008 e-mail that Defendants would extract and produce Usage Data for newsgroups that contain the words "mp3" or "sound." (See id. Ex. 6.)  Nevertheless, after giving that assurance, Defendant Reynolds disabled the Music Files and failed to preserve the Usage Data.

Defendants cite two cases for the proposition that they have no duty to preserve the "transient electronic data at issue." (Def. Opp. Mem. at 14.)  In Convolve, Inc. v. Compaq Computer Corp., 223 F.R.D. 162 (S.D.N.Y. 2004), the court denied sanctions for alleged spoliation of wave forms.  See id. at 176-77.  In its analysis, the Convolve court distinguished between e-mails, which have a "semi-permanent existence" and "are recoverable as active data until deleted," and "ephemeral" data which "exist only until the tuning engineer makes the next adjustment, and then the document changes."  Id. at 177.  The court held that under a general litigation hold, and absent a preservation order, sanctions were not warranted.  See id. at 177.  Similarly, in Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey, 497 F. Supp. 2d 627 (E.D. Pa. 2007), the court held that sanctions for spoliation were not warranted where a party failed to preserve temporary cache files, since the party did not affirmatively destroy the evidence and the cache files may have been emptied dozens of times before the request for production was made.  See id. at 641-42.  Defendants reliance on these cases is misplaced

-43-

because, unlike the instant case, the lost data was not specifically requested prior to its destruction. See Convolve, 223 F.R.D. at 176-77 (parties were under a general litigation hold); Healthcare Advocates, 497 F. Supp. 2d at 642 ("To impose a sanction on the Harding firm for not preserving temporary files that were not requested . . . does not seem to be a proper situation for an adverse spoliation inference.").

The Court similarly finds Defendants' argument concerning their system's capacity to preserve this evidence unpersuasive. Federal Rule of Civil Procedure 26(b)(2)(B) provides that "[a] party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost." Yet, Defendants never moved for a protective order pursuant to Rule 26(c), to address the issue of burden in honoring Plaintiffs' discovery requests.[33] Moreover, subsequent to disabling the Music Groups, Defendants did produce some Usage Data and Digital Music Files, supporting Plaintiffs' position that Defendants could have preserved and produced the requested evidence.[34] (See Pl. Sanctions

---

[33]If a party is able to show that information requested in discovery is "not reasonably accessible because of undue burden or cost," a court may still "order discovery from such sources if the requesting party shows good cause." Fed. R. Civ. P. 26(b)(2)(B).

[34]Defendants argue that "absent substantial changes to the server operation and purchase of additional and expensive servers to store the data," the Usage Data could not be preserved. (Def. Opp. Mem. at 14.) Yet, on March 10, 2008, Defendants produced

-44-

Mem. at 12 n.7.)   There is an obvious inconsistency between
Defendants' claim that they could not preserve the Usage Data
absent substantial changes to their server and the purchase of
additional storage servers, and their claim that no prejudice has
occurred to Plaintiffs by the loss of evidence since Defendants
subsequently produced great volumes of the very data Plaintiffs
requested.[35]   In his declaration, Professor Horowitz explains that
Defendants could have preserved the Usage Data by changing the size
of the files or by copying the files from the servers' hard drives.
(See Horowitz Decl. ¶¶ 26, 27.)   He also explains that the
articles, although transitory, do remain on Defendants' system for
a period of time, which Plaintiffs estimate to be, on average,
approximately 90 days.   (See Horowitz Reply Decl. ¶ 13.)

In sum, the Court concludes that Defendants did have an
obligation to preserve and produce the requested Usage Data and
Digital Music Files.   A litigant "is under a duty to preserve what

---

Usage Data to Plaintiffs showing how Defendants' subscribers had
been unable to access the Music-related Groups.   Defendants later
produced over 200,000 Digital Music Files to Plaintiffs.   (See
id. at 2.)   Further, as Plaintiffs' expert found, Defendants'
server logs Usage Data in its normal course of operation.   (See
Horowitz Decl. ¶¶ 29-30.)   Although Defendants' expert disagreed
with this assessment, that portion of his declaration has been
stricken from the record and, in any event, in light of the
expert's lack of familiarity with Defendants' system, the Court
gives no weight to his opinions on this matter.

[35]Even assuming the Usage Data and Digital Music Files Defendants
subsequently produced consisted only of samples or snapshots of
the requested data, Defendants would have a stronger argument if
they had preserved the pre-March 8 data in this manner, rather
than failing to preserve any of it.

it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." <u>Turner v. Hudson Transit Lines, Inc.</u>, 142 F.R.D. 68, 72 (S.D.N.Y. 2001); <u>see also</u> <u>Whitney v. Jetblue Airways Corp.</u>, No. 07 Civ. 1397 (CBA), 2008 WL 2156324, at *4 (E.D.N.Y. Apr. 29, 2008) (finding that defendant had a clear obligation, no matter its document retention policy, to put a litigation hold on any and all documents relating to claim); <u>Zubulake</u>, 220 F.R.D. at 217 (a litigant is under a duty to retain relevant evidence that is likely to be requested and/or is the subject of a pending discovery request).[36]  Here, the discovery in issue was the subject of discovery requests, and Defendants' counsel assured Plaintiffs' counsel that the Usage Data would be produced.  (<u>See</u> Servodidio Decl. Ex. 6.)   <u>See</u> <u>Langley v. Union Elec. Co.</u>, 107 F.3d 510, 513-14 (7th Cir. 1997) (affirming district court's decision to sanction party where counsel agreed to produce

---

[36]Courts have recognized the relevance of user log data and infringing digital files in copyright infringement actions, and they have ordered litigants to preserve and produce such data. <u>See</u> <u>Viacom Int'l v. YouTube Inc.</u>, 253 F.R.D. 256, 261-62 (S.D.N.Y. 2008) (compelling production of user log data and alleged infringing video files in copyright infringement action); <u>see also</u> <u>Columbia Pictures, Inc. v. Bunnell</u>, No. 06 Civ. 1093 (FMC) (JCX), 2007 WL 2080419, at *13 (C.D. Cal. May 29, 2007) (requiring production of server log data stored in RAM, and denying sanctions for spoliation, in part, because data was not specifically requested); <u>Twentieth Century Fox Film Corp. v. iCraveTV</u>, No. Civ. A. 00-120 & 00-121, 2000 WL 255989, at *6 (W.D. Pa. Feb. 8, 2000) (relying on log data to demonstrate that users accessed video stream of copyrighted works).

evidence, but failed to actually produce it); <u>see also</u> <u>In re</u> <u>Bristol-Myers Squibb Sec. Litig.</u>, 205 F.R.D. 437, 444 (D.N.J. 2002) (enforcing discovery agreement and stating that "[i]t is essential to our system of justice that lawyers and litigants, above all, abide by their agreements and live up to their own expectations.").

Defendants also had an obligation to preserve images of the webpages from their website, which Plaintiffs contend contained evidence of Defendants' promotion and encouragement of copyright infringement. Defendants acknowledge the relevance of this evidence, as they have offered to authenticate copies of the webpages that Plaintiffs copied before Defendants destroyed them. (<u>See</u> Pl. Sanctions Mem. at 16; <u>see also</u> Def. Opp. Mem. at 2.)

In conclusion, the Court finds that Defendants had a duty to preserve the evidence at issue in this Motion.

2. <u>Culpability</u>

Once a court has determined that a party was under an obligation to preserve the evidence it destroyed, the court must then consider whether that party acted with sufficient culpability to warrant the imposition of sanctions. <u>See</u> <u>Fujitsu</u>, 247 F.3d at 436; <u>see also</u> <u>Kronisch</u>, 150 F.3d at 127; <u>Great Northern Ins. Co. v.</u> <u>Power Cooling, Inc.</u>, No 06 Civ. 874 (ERK) (KAM), 2007 WL 2687666, at *9 (E.D.N.Y. Sept. 10, 2007). In analyzing this prong of the spoliation test, some courts in this Circuit have required a showing of bad faith, some have required proof of intentional

destruction, and others have drawn an inference of bad faith based on negligence.  See Byrnie, 243 F.3d at 107-08 (citing Reilly, 181 F.3d at 267).  The Second Circuit has concluded that "a case by case approach [is] appropriate."  Id. at 108.

"The degree of culpability bears on the severity of sanctions that are warranted.  Severe sanctions for discovery violations, including dismissal, may be imposed for intentional conduct, such as bad faith or gross negligence."  Reino De Espana v. Am. Bureau of Shipping, No. 03 Civ. 3573, 2007 WL 1686327, at *3 (S.D.N.Y. June 6, 2007).  Dismissal of the action, as a sanction, however, is "a drastic penalty" used only in "extreme circumstances." Salahuddin v. Harris, 782 F.2d 1127, 1132 (2d Cir. 1986) (internal quotation marks and citation omitted).  Lesser sanctions, such as an adverse inference instruction, may be imposed where a party acted "knowingly, even if without intent . . . or negligently." Residential Funding, 306 F.3d at 108 (internal quotation marks and citation omitted).

Plaintiffs argue that Defendants despoiled evidence willfully and in bad faith.  On the very day that Defendants' counsel agreed to produce Usage Data to Plaintiffs, Defendant Reynolds disabled newsgroups with the words "music," "sounds," or "mp3" in the title and the Usage Data for those files was lost.  (See Reynolds Dep. 83:18-87:2.)  The Court rejects Defendants' contention that they disabled the groups on Plaintiffs request, in order to engage in

settlement discussions.[37]   On August 6, 2007, prior to filing this action, Plaintiffs sent Defendants a letter requesting that they disable the infringing newsgroups (see Servodidio Decl. Ex. 1 ("RIAA Letter")), at which point Defendants took no action in order to comply with Plaintiffs demand. Months later, litigation was commenced and Plaintiffs served discovery requests seeking the Usage Data and Digital Music Files, and the parties engaged in extensive negotiations concerning production of this evidence.[38] It is disingenuous for Defendants to claim that they took actions that prevented the production of the very documents Plaintiffs were negotiating to obtain, in order to satisfy a demand of Plaintiffs. Indeed, even assuming Plaintiffs had asked Defendants to disable the newsgroups, Defendants still had an obligation to preserve the data requested in discovery.   See Zubulake, 220 F.R.D. at 220 ("Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent.").

---

[37]Plaintiffs adamantly deny that they or their counsel ever "said or suggested that disabling the [M]usic-related [Groups] was a pre-condition for having settlement discussions." (Pl. Reply Sanctions Mem. at 2; see also Fabrizio Decl. ¶ 2.)  Moreover, "on the evening before Defendant despoiled the Usage Data, Plaintiffs' counsel told Defendants — in writing — that Defendant[s] failure to preserve the Usage Data would likely impede settlement discussions." (Pl. Reply Sanctions Mem. at 3; see also Servodidio Decl. Ex. 6; Fabrizio Decl. ¶ 3.)

[38]After Plaintiffs learned that Defendants had disabled the Music newsgroups and the Usage data had been destroyed, Plaintiffs' counsel sent e-mails and a formal letter-request to Defendants in order to insure the Digital Music Files would be preserved.  (See id. Exs. 8-9, 11.)  These files, as well, were not preserved.

Defendants also argue that "there is no authority to support the culpability of a party in a situation where the alleged despoiled data is of a transitory nature and where no mechanism exists for saving or backing up the massive amount of data and information that is flowing through the server at any given moment." (See Def. Opp. Mem. at 15-16.) Defendants contend that they do not have back-up tapes, a back-up mechanism like those present for e-mail servers, or hard copies of the relevant data. (See Reynolds Decl. ¶ 14.) In short, Defendants claim that their actions cannot even be considered negligent since they "cannot reasonably compile the requested information." (Def. Opp. Mem. at 16.)

The Court cannot accept this position when Defendants concede in their submissions that they later produced Usage Data and Digital Music Files to Plaintiffs. (See id. at 11; see also Fabrizio Decl. Ex. 7 ("Reynolds Dep. Aug. 13, 2008") 112:14-112:18 (admitting that Defendants are able to produce log data from "front end" servers without adverse impacts on the functionality of the servers).)

For example, when Plaintiffs' counsel questioned Defendant Reynolds about whether he took steps to preserve the Digital Music Files (see Reynolds Dep. at 90:24-90:25), Reynolds first responded that "[w]e wouldn't have the capability to do that" (id. 91:2), but then agreed that he had produced "hundreds of thousands of

-50-

articles" (or Digital Music Files) in this case (id. 91:3-91:18).
When asked how he was able to produce those articles or Digital
Music Files, he testified that "we had a stipulation that we worked
out" which allowed Defendants to copy and produce the articles.
(Id. 91:19-91:25.)   Defendant Reynolds further testified that
copying the articles "altered [them] from [their] original form .
. . [and] the [P]laintiffs were requesting us not to do that."
(Id. 92:6-92:10.)   Defendant Reynolds admitted, however, that
Defendants could have produced the Digital Music Files in the same
way the others were produced, but stated "there was no request to
produce the articles or to save them."   (Id. 92:11-92:20.)   In
light of Plaintiffs' specific request that Defendants take actions
to preserve the Digital Music Files after the March 8 incident (see
Servodidio Decl. Exs. 8, 9, & 11.), this Court rejects Reynolds's
contention that there was no outstanding request to produce or
preserve this data.[39]

Defendants further argue that the Digital Music Files expired
off their server in the normal course of business, and, therefore,
the evidence was not destroyed with a culpable state of mind.
Defendant Reynolds testified that no commands that he knew of would
change the expiration rate of the Files.   (See Declaration of
Charles S. Baker in Support of Defendant's Response in Opposition

---

[39]Even if preserving the data meant altering the Digital Music Files
in some manner, to do so would have been far more appropriate than
completely deleting the data.

to Plaintiff's Motion for Sanctions, dated Sept. 29, 2008 ("Baker Decl.") Ex. 5 ("Reynolds Dep.") at 89:11-89:25.)   The Court disagrees.   The evidence submitted by Plaintiffs' expert demonstrates that Defendants took affirmative steps to both change the retention time of the data, and to permanently delete it.[40]

The analysis of raw data produced from Defendants' spool 2 server establishes that Defendants engaged in a calculated reconfiguration of their servers, which caused the Digital Music Files to expire in an expedited manner.   Prior to the time the Music-related Groups were disabled, the spool 2 server exclusively stored articles in mp3-related newsgroups.   (See Horowitz Supp. Reply Decl. ¶ 9.)   At that time, spool 2 contained 20.2 terabytes of storage space, and Defendants allocated 100% of that storage space to newsgroups likely to contain Digital Music Files.   (See id. ¶¶ 9, 12 n.6.)   On March 8, spool 2 contained approximately 84 million articles it was storing from 244 newsgroups, and the daily volume of article traffic to spool 2 was approximately 95 gigabytes a day, meaning that 95 gigabytes of new Music-related articles arrived daily.   (See id. ¶¶ 11, 12, 13.)

Plaintiffs' analysis establishes that the Digital Music Files

---

[40]On October 23, 2008, Plaintiffs submitted a Supplemental Reply Memorandum of Law in Support of Their Motion for Sanctions for Spoliation of Evidence, along with a Supplemental Reply Declaration of Ellis Horowitz in Support of Plaintiffs' Motion for Sanctions, analyzing data from the spool 2 server produced by Defendants.   Defendants did not respond to this supplemental submission.

expired off the system almost immediately because Defendants took affirmative steps to delete them.  (<u>See</u> Pl. Supp. Mem. at 3-4.)   On March 10 at 3:12 a.m., a "status report" reflects that spool 2 was storing over 84 million articles.  (<u>See</u> Horowitz Supp. Reply Decl. ¶ 13 & Ex. 3.)   Thus, disabling public access to the Music-related Groups from the "front-end" servers on March 8 had no effect on spool 2.  (<u>See</u> Pl. Supp. Mem. at 4.)   A status report for spool 2 from March 10, at 10:16 p.m., shows that spool 2 was storing only about 2 million articles – meaning that almost all of the Digital Music Files had been deleted in approximately 17 hours.[41]   (<u>See</u> Supp. Horowitz Reply Decl. ¶ 13 & Ex. 3.)   A status report on March 12, at 2:22 a.m. shows 0% of the storage space being used by mp3 or Music-related articles – indicating that the remaining Digital Music Files had been deleted.   (<u>See</u> <u>id.</u> ¶ 13 & Ex. 3.)   After deleting the Digital Music Files, Defendants reconfigured the spool 2 server in order to make sure the deleted files would be written-over and thus irretrievable.  (<u>See</u> <u>id.</u> ¶ 14.)   Plaintiffs objected to Defendants disabling the Music Groups first in writing on March 11.  (<u>See</u> Servodidio Decl. ¶ 8 & Ex. 8.)   According to Plaintiffs, Defendants unequivocally assured Plaintiffs that the Digital Music Files were preserved.   (<u>See</u> <u>id.</u> ¶¶ 14-16.)

The parties then scheduled the March 12 telephone call with

---

[41]By their own account, Defendants claim that "most articles have an overall average retention of about 2 weeks" (Def. Opp. Mem. at 5), and they fail to submit any explanation for why the majority of the Digital Music Files on spool 2 expired in less than a day.

Defendant Reynolds in order to discuss whether Defendants could mitigate the prejudice caused by the disabling of the Music Groups. However, Defendants took actions prior to May 12 that eliminated any possibility of mitigation. Before the March 12 telephone call, Defendants proceeded with a series of changes to the configuration of spool 2, making the Digital Music Files permanently irretrievable. On March 8, the only articles stored on spool 2 were for newsgroups likely to contain Digital Music Files — Defendants had allocated 100% of the 20.2 terabytes of storage on spool 2 to the Digital Music Files. (See Horowitz Supp. Reply Decl. ¶ 9.) Between 2:19 a.m. on March 11 and 2:22 a.m. on March 12, Defendants changed the setting for the spool 2 server, allowing the "alt.binaries.boneless" group to be stored on spool 2 as well. (See id. ¶ 9 & n.4.)[42]  Defendants also reallocated the storage space on spool 2 so that "alt.binaries.boneless" had 85% of the space and the Music-related Groups were limited to one-tenth of 1% of the storage space. (See Horowitz Supp. Rely Decl. ¶ 9.) Because of these changes, and due to the volume of the "alt.binaries.boneless" group, "boneless" articles quickly wrote-over and permanently destroyed the pre-March 8 Digital Music Files. (See id. ¶¶ 9, 11, 14.) By adding the "alt.binaries.boneless"

---

[42]This newsgroup is the most highly trafficked group on the entire Usenet network. It accounts for approximately one-fifth of the total volume received by Defendants' servers each day. (See Pl. Reply Mem. at 8.)

group, and limiting the server storage space to one-tenth of 1% for the Music-related Groups, Defendants reduced the retention time for the Digital Music Files to less than one day.  (See id. ¶ 9.) This series of reconfigurations immediately deleted the Digital Music Files from spool 2.  (See id. ¶¶ 13-14.)

Finally, Defendants argue that the only "destruction" that has occurred here relates to some, but not all, mp3 articles and log data that happened to be on Defendants' server on March 8, 2008. (See Def. Opp. Mem. at 16.)  Defendants add that, "[t]he suggestion that blocking access to the mp3 newsgroups constitutes destruction of evidence overlooks the fact that the mp3 newsgroups can be re-enabled for Plaintiffs to obtain whatever they have the ability to collect."[43]  (See id.)  Moreover, Defendants have produced large quantities of Usage Data and Digital Music Files from the period after March 8.  (See id. at 2, 11, 16 n.7.)

The data produced to Plaintiffs post-March 8, however, is not comparable to the data destroyed as a result of Defendants' decision to disable the Music-related Groups, and provides a distorted picture of the activity occurring on Defendants' system. Defendants disabled all of the Music-related Groups on March 8, and

---

[43]Defendants re-enabled access to the mp3 newsgroups and captured and produced over 200,000 articles referencing mp3 newsgroups (or Digital Music Files).  (See id. 16 n.7.)  Defendants also produced over 2 gigabytes of logs and, at the time Defendants' papers were filed, were in the process of copying and producing approximately 4 terabytes of files from newsgroups Plaintiffs identified.  (See id. at 11.)

they claim to have re-enabled some fraction of those groups on March 12.  On March 24, Defendants' server crashed and Defendants acknowledge that they have not offered any Music-related Groups to their subscribers on a continuous basis since that date.  (See id. at 8-9.)  Thus, the Music-related Groups re-enabled after March 12 were only a fraction of the Music-related Groups that were once available on Defendants' system, and the files received by these Groups were only a fraction of the files that had previously been available.

From this post-March 8 data, Defendants produced over 200,000 Digital Music Files and over 73,000,000 file headers (or Usage Data), pursuant to stipulations that the parties negotiated concerning the server that crashed.  (See id. at 2; see also Servodidio Decl. ¶ 20.)  Yet, Plaintiffs' analysis of this data demonstrates that the newsgroups that re-populated Defendants' site had poor "completion" rates, meaning components of the Digital Music Files were missing and, therefore, users would not have been able to download a complete sound recording.  (See Servodidio Decl. ¶ 20; see also Horowitz Decl. ¶ 40.)  This analysis is consistent with hundreds of e-mails Defendants received from subscribers complaining that these newsgroups were not functioning correctly. (See Servodidio Decl. Ex. 19.)

In addition, Defendants manipulated the Music Group retention times so that they were reduced to just a few days.  "A spool 2

-56-

status report on March 16, 2008, at 3:08 [a.m.,] shows that on March 16 Defendant[s] again dramatically changed the spool 2 server configuration." (See Pl. Supp. Mem. at 6; see also Horowitz Supp. Reply Decl. ¶ 11 & n.5.)  Due to this reconfiguration, the spool 2 server began storing over 121,000 newsgroups, or all newsgroups that Defendants receive.  (See Horowitz Supp. Reply Decl. ¶ 11 & n.5; see also Reynolds Decl. ¶ 4.)  On March 8, spool 2 stored 244 groups (the Music-related Groups only); after the March 11-12 reconfiguration, spool 2 stored 245 groups (the Music-related Groups plus "alt.binaries.boneless"); and, on March 16, spool 2 began to store 121,269 groups.  (See Horowitz Supp. Reply Decl. ¶ 11.)   These changes increased the volume of articles stored on spool 2 from approximately 95 gigabytes a day to over 1,800 gigabytes per day.  (See id. ¶ 12.)   Ultimately, Defendants' reconfigurations of their spool 2 server, to receive more data, resulted in a reduced retention rate for the Digital Music Files. (See id. ¶ 11.)[44]

The parties dispute the length of time it would take to restore the Digital Music Files to their former volume, assuming the original server configurations were restored.  But even assuming the relevant data could re-populate these groups again quickly, the data would likely understate pre-spoliation

_____

[44]By reducing the retention time, the service would become less attractive to subscribers because they would have less time to download Digital Music Files.

-57-

infringement activities given that Defendants' subscribers have had essentially no access to music files for months, and users accustomed to obtaining infringing music files through Defendants' service will undoubtedly have shifted their usage patterns and found alternate sources for pirated music. (See Pl. Reply Mem. at 13-14.)   In fact, one of Defendants' former business partners received complaints concerning Defendants' disabled Music-related Groups, and referred Defendants' users to competitors.   (See Fabrizio Decl. Ex. 3 ("Harry Sanders Dep.") at 47:13-49:18.)

Finally, Defendants have destroyed highly incriminating promotional materials that were previously available on the Usenet.com website.   For example, all references to "Music" and "mp3s" were deleted from a promotional webpage on Defendants' website, some time after March 13, 2008.  Defendants destroyed all copies of this webpage, and only produced the sanitized version of it to Plaintiffs during discovery.   (See id. ¶ 19.)   Although Plaintiffs secured copies of some of the webpages containing the promotional material on their own, and Defendants are prepared to authenticate these pages, Plaintiffs take issue with this cure since they do not know what other webpages Defendants destroyed that might have contained evidence of infringing activity. Defendant Reynolds admitted that it was not until "after the commencement of the litigation" that he personally removed the webpages.  (Reynolds Dep. Oct. 8, 2008 at 1039:12-1041:21.)   This

controverts the statement in his declaration that the materials were simply removed from public access before the case was filed.[45]

\* \* \*

It is clear that, Defendants took affirmative steps to disable the Music Groups; they then changed their server configuration, which caused the Digital Music Files to expire at a faster pace, and, ultimately, failed to preserve the requested Usage Data and Digital Music Files. Moreover, Defendants' production of the post-March 8 data does not serve to cure their discovery abuses because it is not substantially equivalent to the destroyed data. Finally, Defendant Reynolds has provided, at best, misleading information to this Court concerning Defendants' webpages.

The Court, therefore, finds that Defendants' failure to preserve the requested discovery material was in bad faith. See PSG Poker, LLC v. Serosa-Grund, No. 06 Civ. 1104 (DLC), 2008 WL 190055, at *12 (S.D.N.Y. Jan. 22, 2008) (party's "repeated failure to either produce relevant documents or a credible story regarding their whereabouts — despite the admonitions of this Court and repeated requests from plaintiffs — can only be interpreted as an intentional and willful act."); Shaffer v. RWP Group, Inc., 169

---

[45]After the service of Plaintiffs' Complaint, users in public Internet forums observed that some of Defendants' "incriminating webpages" were still available on Defendants' website, and they posted links. (See Fabrizio Decl. ¶ 15.) Additionally, Plaintiffs verified "just four days before the [C]omplaint was filed that webpages were still publicly available." (See id. ¶ 14.)

F.R.D. 19, 26 (E.D.N.Y. 1996) (finding a conscious disregard for discovery obligations where defendants were involved in litigation, served with document requests encompassing most, if not all, of the documents destroyed, and after commencement of the instant action ordered numerous relevant documents destroyed in order to "make room" for new files).

Plaintiffs have, thus, satisfied their burden with respect to the second prong of the spoliation test.

### 3.   Relevance of Missing Evidence

The Court must next determine whether the despoiled evidence was "'relevant' to the party's claim or defense such that a reasonable trier of fact would find that it would support that claim or defense." Residential Funding, 306 F.3d at 107; accord Zubulake, 220 F.R.D. at 221.  The Second Circuit has explained:

> [R]elevant in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction. Courts must take care not to hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence, because doing so would subvert the . . . purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction.

Residential Funding, 306 F.3d at 108-09 (quoting Kronisch, 150 F.3d at 127-28 and Byrnie, 243 F.3d at 110) (internal quotation marks omitted).

When evidence is destroyed in bad faith, that alone is sufficient to support an inference that the missing evidence would have been favorable to the party seeking sanctions, and thus relevant. See Residential Funding, 306 F.3d at 109; see also M & T Mortgage Corp. v. Miller, No. 02 Civ. 5410, 2007 WL 2403565, at *10-11 (E.D.N.Y. Aug. 17, 2007) (finding that the "missing documents [were] clearly critical to plaintiff's claims," and imposing sanctions for spoliation because "defendants acted in bad faith in destroying the documents."   "[S]uch improper conduct alone is sufficient to support a finding that the documents were unfavorable to" defendants). By contrast, when the destruction of evidence is negligent, relevance must be proven through extrinsic evidence by the party seeking sanctions.   De Espana, 2007 WL 1686327, at *6.  "This corroboration requirement is . . . necessary where the destruction was merely negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful."   Zubulake, 220 F.R.D. at 221 (quoting Turner, 142 F.R.D. at 77.)   However, "a showing of gross negligence in the destruction or untimely production of evidence" will support an inference that the evidence would have been unfavorable to the spoliator.   Residential Funding, 306 F.3d at 109.

The circumstances here warrant a finding that Defendants' destruction of evidence was in bad faith, or, at a minimum, grossly

-61-

negligent; however, even assuming this was not the case, Plaintiffs present sufficient extrinsic evidence to confirm the relevance of the spoliated evidence.  To begin with, Defendants acknowledged the relevance of the Usage Data in their March 8, 2008 e-mail.  (See Servodidio Decl. Ex. 6 ("This should give you the truly relevant information that you are seeking.") (emphasis added).)  Moreover, Defendants' website openly advertised the availability of Music Files.[46]    Additionally,    there   is   evidence   that   Usenet.com representatives    routinely    provided    technical    assistance    to subscribers to help them download Music Files.  (See id. Ex. 18) In a survey conducted prior to March 8, 2008, and produced by Defendants to Plaintiffs in discovery, over 42% of respondents acknowledged that they used the Usenet.com service to download mp3s.  (See id. Ex. 22.)  After the Music Groups were disabled, on March 8, 2008, Usenent.com subscribers sent written complaints indicating that they were no longer able to access Music Groups and download mp3s.  (See id. Ex. 19.)  The server log data Defendants produced,   from   after   March   8,   corroborates   the   fact   that subscribers continued to attempt to download Music Files without success.  (See Horowitz Decl. ¶ 41; see also Servodidio Decl. Ex.

---

[46]Defendants' website contained, inter alia, the following: (1) users "do not have to pay per mp3, so you can virtually download all the files that your heart desires"; (2) Defendants' claimed their service provided access to "billions of mp3s that can be downloaded by anyone with a Usenet account" and "[n]o other source for mp3s hosts that many files at one place!"  (See id. Ex. 24.)

7.)   Finally, attached as Exhibit A to Plaintiffs' Amended
Complaint is a list of over 1200 infringing works that Plaintiffs
downloaded from newsgroups on Usenet.com that Defendants later
disabled.   (See Am. Compl. Ex. A.)

Moreover, the evidence that was destroyed is directly relevant
to Plaintiffs' legal claims.   For example, Plaintiffs' claims for
direct and secondary copyright infringement require a showing that
Plaintiffs' copyrights have been infringed (i.e., the Digital Music
Files must have existed on Defendants' system and must have been
uploaded or downloaded by one or more of Defendants' subscribers).
The Usage Data, in combination with the Digital Music Files would,
according to Plaintiffs' expert, have provided evidence of direct
copyright infringement.[47]

In addition, the Usage Data and the Digital Music Files would
have been critical in showing the extent to which Defendants'
service was used for the purpose of copyright infringement — a key
inquiry under each of the three theories of secondary copyright

---

[47]Although Defendants argue that the Usage Data and Digital Music
Files are not relevant since the logs do not contain information
concerning the identity of the user who requests a specific file,
the Court disagrees.   As set forth by Plaintiff's expert, the
Usage Data shows the username of the user who logs on, a session
identification number for that user, the name of the file
requested for download, and the date and time of the download
request.   (See, e.g., Horowitz Reply Decl. ¶ 22.)   Defendants
presumably have other data correlating these usernames with
contact information and legal names that Defendants received when
users opened their accounts.   Moreover, the Usage Data provides
the identity of the article a specific user downloaded, which
would allow Plaintiffs to locate the article, download it, and
determine whether the content is copyrighted material.

infringement alleged by Plaintiffs: inducement, contributory infringement, and vicarious infringement. As the Supreme Court held in <u>Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.</u>, 545 U.S. 913, 125 S. Ct. 2764 (2005), "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." <u>Id.</u> at 919, 125 S. Ct. at 2770. In <u>Grokster</u>, the Court discussed categories of facts that would give rise to an inference that a defendant acted with an intent to foster infringement — one such category is whether the service is used overwhelmingly for copyright infringement and whether the defendant's business model depends upon this infringement. <u>Id.</u> at 939-40, 125 S. Ct. at 2781-82. Here, much like in <u>Grokster</u>, Plaintiffs contend that users assemble at Defendants' service and pay Defendants' subscription fees precisely because Defendants provide access to popular sound recordings and other copyrighted entertainment works. (<u>See, e.g.</u>, Am. Compl. ¶¶ 21-30.) Plaintiffs argue that the Usage Data and Digital Music Files would have shown the volume of direct infringement occurring on Defendants service and the proportion of Defendants' business that serves to facilitate infringement — thus providing the best source of proof of direct and secondary infringement.

    Evidence of the volume and proportion of infringement

occurring on the service is also relevant to rebutting Defendants'
affirmative defense that Defendants' service has commercially
significant "non-infringing uses" (see Defendant Gerald Reynolds's
Answer to Plaintiffs' First Amended Complaint, dated Oct. 10, 2008,
at 9) — a key defense to contributory copyright infringement. See
Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 442, 104
S. Ct. 774 (1984). It may also have demonstrated that "the
availability of infringing material acts as a draw for customers,"
establishing the critical "financial benefit" prong for vicarious
liability. A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1023
(9th Cir. 2001) (internal quotation marks and citation omitted).
Clearly, the post-March 8 data was not as complete or voluminous.
Moreover, Defendants stopped offering Music-related Groups on a
continuous basis after March 24.

Ultimately, there can be no serious dispute that the Usage
Data and Digital Music Files in issue are extremely relevant to
Plaintiffs' claims. It follows that the spoliation of the various
categories of evidence justifies the imposition of sanctions.

## B. Appropriate Remedy

### 1. Sanctions

As a sanction, Plaintiffs have requested that the Court deem
the following matters to be established: (1) "[e]ach of Plaintiffs'
copyrighted works that has appeared in one of the disabled Music
Groups has been directly infringed under the Copyright Act by

-65-

Defendant[s'] subscribers"; (2) "[e]ach of Plaintiffs' copyrighted works that has appeared in one of the disabled Music Groups has been transmitted from Defendant[s'] computer servers to the personal computer[s] of Defendant[s'] subscribers"; (3) "[t]he distribution of each Digital Music File in each of the disabled Music Groups constitutes an infringement of the rights of Plaintiffs (or other copyright owners) such that there were no substantial non-infringing uses for the disabled Music Groups"; (4) "the disabled Music Groups constituted a substantial portion of the content previously available through Defendant[s'] service"; (5) "and acted as a draw to entice users to subscribe to Defendant[s'] service".[48]   (See Pl. Sanctions Mem. at 18-21.)   Plaintiffs also request that Defendants be "precluded from challenging any statistical evidence of infringement via the Usenet.com service presented by Plaintiffs[,] on the grounds that it does not fairly and accurately reflect pre-spoliation usage of Defendant[s'] service."   (Id. at 22.)

Determining the appropriate sanction for spoliation is left to the sound discretion of the trial judge, see West, 167 F.3d at 779-80, and is to be assessed on a case-by-case basis.   Fujitsu, 247 F.3d at 436; see also Reilly, 181 F.3d at 267 ("Trial judges should have the leeway to tailor sanctions to insure that spoliators do

---

[48]Plaintiffs construe the contentions set forth above as numbers 3, 4, and 5, as one factual conclusion. The Court views them as distinct legal or factual contentions.

-66-

not benefit from their wrongdoing — a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case.").

> The sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

West, 167 F.3d at 779 (internal quotation marks omitted). Courts, however, should be wary of ordering case-dispositive sanctions, such as dismissal, which "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." Id. (quoting John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir. 1988). Taking these objectives into account, the Court finds the following sanctions appropriate.

Plaintiffs' contentions (1) and (3) — "[e]ach of Plaintiffs' copyrighted works that has appeared in one of the disabled Music Groups has been directly infringed under the Copyright Act by Defendant[s'] subscribers," and "[t]he distribution of each Digital Music File in each of the disabled Music Groups constitutes an infringement of the rights of Plaintiffs (or other copyright owners) such that there were no substantial non-infringing uses for the disabled Music Groups" — are not factual contentions. Rather, they are legal conclusions, which, if deemed established, would effectively be case-dispositive and result in a judgment for

-67-

Plaintiffs.  This would go far beyond simply restoring Plaintiffs to the same position they would have been in had there been no spoliation of evidence.  The Court views such a sanction to be disproportionate to Defendants' sanctionable conduct.[49]  See West, 167 F.3d at 780 (disagreeing with dismissal as a sanction for spoliation and finding that alternative sanctions would fully protect the aggrieved party); M & T Mortgage Corp. v. Miller, No 02 Civ. 5410 (NG) (MDG), 2007 WL 2403565, at *12 (E.D.N.Y. Aug. 17, 2007) (rejecting as too severe, the sanctions of deeming certain matters established and of prohibiting the offending party from opposing the adversary's allegations, because that "would be tantamount to granting judgment in favor" of the aggrieved party).

With respect to contentions (2), (4) and (5) — "[e]ach of Plaintiffs' copyrighted works that has appeared in one of the disabled Music Groups has been transmitted from Defendant[s'] computer servers to the personal computer[s] of Defendant[s'] subscribers"; "the disabled Music Groups constituted a substantial portion of the content previously available through Defendant[s'] service;" "and [the Music Groups] acted as a draw to entice users to subscribe to Defendant[s'] service" — the  Court concludes that

---

[49] Plaintiffs do not contend that the Usage Data or Digital Music Files Defendants have produced post-March 8 are completely useless in proving direct and secondary copyright infringement. Further, Plaintiffs will still be in a position to prove the components of direct and secondary copyright infringement using the adverse inferences the fact-finders will be permitted to draw, as will be discussed infra, in conjunction with other evidence.

-68-

an adverse inference instruction is an appropriate sanction.

> It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.

Kronisch, 150 F.3d at 126 (internal citations omitted); accord Byrnie, 243 F.3d at 107-08; see also West, 167 F.3d at 780 (endorsing use of alternative sanctions to dismissal, including adverse presumption instruction, barring a party from presenting evidence, and preventing witness from testifying about despoiled evidence); PSG Poker, LLC, 2008 WL 190055, at *12 (adverse inference appropriate after repeated and purposeful evasion of discovery requests and orders).

Notwithstanding Defendants' spoliation of evidence, there is some evidence in the record that supports Plaintiffs' contentions that Defendants' subscribers downloaded copyrighted material from the Music Files on Defendants' servers, and that the Music Files that had been present on Defendants' servers represented a substantial portion of the content made available by Defendants' service. Although the spoliated evidence would have assisted Plaintiffs in quantifying the amount of infringing activity occurring through the use of Defendants' service, allowing the adverse inference that the spoliated evidence would have been unfavorable to Defendants, with respect to the contentions Plaintiffs seek to advance, should serve the remedial function of

-69-

restoring Plaintiffs to the same position they would have been in
absent the wrongful destruction of evidence by Defendants.   See
Kronisch, 150 F.3d at 126.

This sanction, although less drastic than the alternative
proposed by Plaintiffs — deeming facts to be established — is still
a serious one.

The primary harm caused by Defendants' spoliation of evidence
is the difficulty Plaintiffs' now face in demonstrating the volume
of infringement that may have occurred on Defendants' system.  This
information  is  relevant  to  assessing  the  extent  to  which
Defendants' service is or has been used for infringing purposes,
and the extent to which Defendants knew about, facilitated, and
profited from such infringement.   See, e.g., Napster, 239 F.3d at
1023.  As discussed, the post-March 8 data does not accurately
represent the volume of Music-related Groups that were enabled on
and before March 8.  Defendants' Music-related Groups have now been
disabled for months, and re-enabling the groups at this late date
would provide a distorted picture of the level of infringing
activity on Defendants' system, since Defendants' subscribers have
likely shifted their usage patterns.   Therefore, the Court finds
that the final evidentiary sanction requested by Plaintiffs —
precluding Defendants "from challenging any statistical evidence of
infringement via the Usenet.com service presented by Plaintiffs on
the grounds that it does not fairly and accurately reflect pre-

-70-

spoliation usage of Defendant[s'] service" — best serves "the trifold aims" of a spoliation sanction. <u>West</u>, 167 F.3d at 780 (suggesting that precluding a spoliator from introducing evidence on matters contained in altered or destroyed evidence was an appropriate sanction); <u>M & T Mortgage</u>, 2007 WL 2403565, at *12 (precluding defendants from offering evidence with respect to matters that spoliated evidence would have addressed, and allowing jury to draw an adverse inference); <u>In re WRT Energy Sec. Litig.</u>, 246 F.R.D. 185, 200 (S.D.N.Y. 2007) (precluding spoliator from challenging representativeness of evidence offered by injured party); <u>McConnell v. Costigan</u>, No. 00 Civ. 4598 (SAS) (THK), 2001 WL 1456609, at *5 (preventing party from opposing facts due to alleged destruction of evidence).

### 2. <u>Attorneys' Fees & Costs</u>

As a consequence of Defendants' actions, Plaintiffs have been forced to expend substantial resources investigating and analyzing Defendants' misconduct. (<u>See</u> Servodidio Decl. ¶ 31.)  The Court finds, therefore, that Plaintiffs are entitled to an award of attorneys' fees and costs incurred in connection with determining that there had been a spoliation of evidence, as well as in connection with this motion.   Attorneys' fees and costs "may be appropriate to punish the offending party for its actions or to deter [the] litigant's conduct, sending the message that egregious conduct will not be tolerated . . . [S]uch an award serves the

-71-

remedial purpose of making the opposing party whole for costs incurred as a result of the spoliator's wrongful conduct." Chan v. Triple 8 Palace, Inc., 03 Civ. 6048 (GEL)(JCF), 2005 WL 1925579, at *10 (S.D.N.Y. Aug. 11, 2005) (internal quotation marks and citations omitted); see also Phoenix Four, Inc. v. Strategic Res. Corp., 05 Civ. 4837 (HB), 2006 WL 1409413, at *9 (S.D.N.Y. May 23, 2006) (while denying evidentiary sanctions, ordering the award of attorneys' fees and costs); Pastorello v. City of New York, 95 Civ. 470 (CSH), 2003 WL 1740606, at *13 (S.D.N.Y. Apr. 1, 2003) (awarding costs, as well as permitting an adverse inference instruction); Turner, 142 F.R.D. at 78 (awarding attorneys' fees since defendant's spoliation caused "plaintiff to expend time and effort in attempting to track down the relevant information. It then caused the expenditure of additional resources by misleading the plaintiff and the Court . . .").

The assessment of fees and costs will be deferred until the case is completed. If Plaintiffs prevail at trial, the fees and costs related to the spoliated evidence and the instant motion may be included in their fee application as a prevailing party. Alternatively, if they do not prevail in this action, they simply can submit appropriate documentation demonstrating the reasonable fees and costs incurred with respect to the spoliated evidence.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion to Strike

-72-

the Declaration of David J. Farber is granted in part and denied in part.  Plaintiffs Motion for Sanctions for Spoliation of Evidence is granted to the extent discussed above.

SO ORDERED.

_____

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE


Dated:      January 26, 2009
            New York, New York

-73-