UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------x

ARISTA RECORDS LLC, ATLANTIC RECORDING : 
CORPORATION, BMG MUSIC, CAPITOL RECORDS, :
LLC, CAROLINE RECORDS, INC., ELEKTRA :
ENTERTAINMENT GROUP INC., INTERSCOPE :     07 Civ. 8822 (HB)
RECORDS, LAFACE RECORDS LLC, MAVERICK :
RECORDING COMPANY, SONY BMG MUSIC :     OPINION & ORDER
ENTERTAINMENT, UMG RECORDS, INC., VIRGIN :
RECORDS AMERICA, INC., WARNER BROS. RECORDS, :
INC., and ZOMBA RECORDING LLC, :

                         **Plaintiffs,** :
                         :

      **-against-** :

USENET.COM, INC., SIERRA CORPORATE DESIGN, :
INC., and GERALD REYNOLDS, :
                         :
                     **Defendants.** :

-------------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., United States District Judge:**

This action arises out of allegations of widespread infringement of copyrights in sound recordings owned by Plaintiffs Arista Records LLC; Atlantic Recordings Corporation; BMG Music; Capitol Records, LLC; Caroline Records; Elektra Entertainment Group Inc.; Interscope Records; LaFace Records LLC; Maverick Recording Company; Sony BMG Music Entertainment; UMG Recordings, Inc; Virgin Records America, Inc.; Warner Bros. Records Inc; and Zomba Recording LLC ("Plaintiffs"), copies of which are available for download by accessing a network of computers called the USENET through services provided by Defendants Usenet.com, Inc. ("UCI"),[1] Sierra Corporate Design, Inc. ("Sierra"), and spearheaded by their director and sole shareholder, Gerald Reynolds ("Reynolds") (collectively, "Defendants"). Specifically, Plaintiffs brought this action alleging (1) direct infringement of the Plaintiffs' exclusive right of distribution under 17 U.S.C. § 106(3);[2] (2) inducement of copyright infringement; (3) contributory copyright infringement; and (4) vicarious copyright infringement. There are two motions by Plaintiffs

---

[1] In an effort to avoid confusion based on the similarity between the name of Defendant Usenet.com, Inc. and the network to which it provides access, the latter will hereinafter be referred to as the "USENET," while Defendant Usenet.com, Inc. will hereinafter be referred to as "UCI."

[2] In their Amended Complaint, filed September 17, 2008, Plaintiffs alleged as a second cause of action direct infringement of their exclusive right of reproduction under 17 U.S.C. § 106(1). Based on the arguments that Plaintiffs have propounded on the instant motions and at oral argument, it appears that they have abandoned that claim, and their direct infringement claim is focused only on the distribution right.

1

before me – one for termination due to discovery abuse, and another for summary judgment – with a cross-motion for summary judgment from the Defendants.  Defendants'[3] cross-motion for summary judgment argues that they are entitled to the safe harbor protections of § 512(c) of the Digital Millennium Copyright Act ("DMCA").  All parties filed numerous additional motions to exclude certain testimony, as well as voluminous evidentiary objections.  Plaintiffs opine that their motion for terminating sanctions alleges discovery abuse sufficient to require that I strike the Defendants' answer and enter a default judgment in their favor ("Terminating Sanctions Motion").  For the reasons set forth below, Plaintiffs' Terminating Sanctions Motion is granted to the extent discussed in this opinion, though not in its entirety; Plaintiffs' motion for summary judgment is granted with respect to all claims; and Defendants' motion for summary judgment is dismissed as moot.

## I. FACTUAL BACKGROUND

**A.      The USENET and How It Works**

The USENET network, created over twenty years ago, is a global system of online bulletin boards on which users (or "subscribers") may post their own messages or read messages posted by others.  Defendants' Statement of Undisputed Facts ("Defs.' SUF") 1.  To obtain access to the USENET, a user must gain access through a commercial USENET provider, such as Defendant UCI, or an internet service provider.  *See* Memorandum Opinion & Order, dated January 26, 2009 ("Sanctions Order") at 3.  Messages posted to the USENET are commonly known as "articles." *Id.*  Articles, in turn, are posted to bulletin boards called "newsgroups."  *Id.*  Newsgroups often are organized according to a specific topic or subject matter, and are oftentimes named according to the subject matter to which the articles posted to the newsgroup relate.  Defs.' SUF 2.  The USENET is divided into nine major subject headings known as "hierarchies," one of which is the *alt.\** hierarchy.  Defs.' SUF 3-4.  Content files known as binaries, which represent computer files such as images, videos, sounds, computer programs and text, are found in the *alt.\** hierarchy.  Defs.' SUF 5.  These binary files are encoded in text form for storage and processing, and require a software program to convert the text into a content file such as an image or music file.  *See id.*

---

[3] On May 21, 2009, Sierra filed a Suggestion of Bankruptcy in this matter advising the Court that it has filed a petition pursuant to chapter 7 of the Bankruptcy Code in the District of North Dakota.  Pursuant to 11 U.S.C. § 362, an automatic stay is therefore in place with respect to Sierra, and it is not subject to the Court's Order and Opinion.  For ease of reference, and because the majority of Plaintiffs' allegations are directed equally to all Defendants, this Opinion will, for the most part, refer to the "Defendants" in the collective.  However, the Court is fully aware that no order shall affect the rights of Defendant-Debtor Sierra.

Users review available articles for potential download by selecting a newsgroup and then perusing the "headers" or titles of articles that are posted to that newsgroup; based on the header, the user may request to download articles that are of interest. Horowitz Decl. ¶ 21. Some news servers include a search field in which a user may type the name of a desired file and then review a list of articles responsive to the search request. *Id.* ¶ 24; Plaintiffs' Statement of Uncontroverted Facts ("Pls. SUF") 91. Once an article is retrieved, software is used to convert the text file into binary content; however, this conversion process is automated and virtually invisible to the user. Horowitz Decl. ¶ 35. "The combination of these additional features creates a user experience that substantially mimics the user experience of applications used on peer-to-peer file-sharing networks" such as Napster. *Id.* ¶ 36. Once the file is retrieved and converted, it is downloaded from the USENET provider's server and a copy is stored on the user's personal computer. *Id.*

To post an article to the USENET, a user must first obtain access to at least one USENET host, such as UCI; second, the user must use the proper USENET protocol for posting messages; and third, upon uploading the article to the USENET host, the article is distributed across the USENET network to other hosts' servers. Defs.' SUF 33; *see also* Sanctions Order at 3 ("The servers at each Usenet hub are programmed to feed the articles its users have posted to other Usenet servers, based on a user's implicit or explicit configuration settings, and, in turn, the servers receive postings from other servers."). This process is not completely automated; rather, USENET providers control which articles in which newsgroups are transmitted to, and accepted from, other providers through this "peering" process. *See* Horowitz Decl. ¶¶ 26, 57-58; Pls.' SUF 71. Articles that are posted to the USENET are not retained on the network indefinitely; rather, retention rates range from days to months depending on the host's server capacity. Defs.' SUF 14. Once the maximum capacity is reached, the server deletes older articles to make room for newer articles. *Id.* Unlike other forms of file-sharing networks, such as peer-to-peer networks, articles on the USENET are saved to news servers instead of another end-user's personal computer; a user accesses these articles and content files by connecting to these central servers that are available through their provider's service. *See* Horowitz Decl. ¶ 15.

**B.**     **Defendants and Their Business**

Sierra purchased the domain name "www.usenet.com" in 1998, and it ran the website until UCI was formed in 2004. Defs.' SUF 17. Defendants offer access to the USENET to subscribers who sign up for Defendants' services on the www.usenet.com website. *See* Defs.' SUF 19. To subscribe, the user may choose among a variety of monthly subscription plans, which vary in price

depending on the user's desired bandwidth allocation. *Id.*; *see also* Defs.' SUF 38. Subscribers pay Defendants a monthly rate ranging from $4.95 to $18.95; for a monthly fee of $18.95, users had access to unlimited downloads. *See* Pls.' SUF 63-64; *see also* Pls.' SUF 65-66; Sanctions Order at 4. The user must then accept certain "Terms of Use" ("TOU") that govern the relationship between UCI and its subscribers. Pls.' SUF 67. Among the terms in the TOU is UCI's official policy prohibiting the upload of unauthorized, including copyrighted, content without the permission of the rights owner. Defs.' SUF 20. Once a user subscribes to Defendants' service, he or she is provided access to over 120,000 newsgroups. Defs.' SUF 28. Defendants themselves operate over 34 different computer servers that perform tasks that include storing content and transmitting copies of articles to users upon request. Pls.' SUF 89. Defendants' "front-end" servers (which manage interactions with subscribers and transmit requested articles) display articles available for download on servers over the USENET, and are configured to connect to the correct "spool server" (which actually store the articles) to retrieve an article that the user requests. *See* Defs.' SUF 28; Horowitz Decl. ¶¶ 46, 50, 67, 92. Defendants' spool servers have the ability to filter or block groups or articles, and can define feeds that specify which articles and newsgroups are copied to the spool servers. Horowitz Decl. ¶ 62. Defendants also have the ability to create designated servers for certain kinds of newsgroups; they exercised this ability by creating servers for newsgroups containing music binary files to increase their retention time. *See* Pls.' SUF 93-96. Defendants have, at times, exercised their right and ability to restrict, suspend or terminate subscribers, including by suspending accounts of users who sent "spam" messages and restricting download speeds of subscribers who downloaded what Defendants considered to be a disproportionate volume of content. Pls.' SUF 69. They have also taken measures to restrict users from posting or downloading articles with pornographic content. Pls. SUF 70; *see also* Pls' SUF 112. Defendants likewise have the right and ability to block access to articles stored on their own servers that contain infringing content. Pls.' SUF 72.

C.     **Evidence of Defendants' Subscribers Downloading Plaintiffs' Works**

There can be no dispute that Defendants' services were used overwhelmingly for copyright infringement. Indeed, Plaintiffs' expert has testified that, based on a statistical analysis, over 94% of all content files offered in music-related binary newsgroups previously carried by Defendant UCI were found to be infringing or highly likely to be infringing. Pls.' SUF 7; Declaration of Dr.

Richard Waterman ("Waterman Decl.") ¶ 5, 13.[4]  Moreover, not only is there rampant copyright infringement of musical works occurring on Defendants' service in general, but there is direct undisputed evidence that Plaintiffs' copyrighted sound recordings have been distributed and downloaded in violation of their copyrights.[5]  First, Plaintiffs' evidence shows that both Plaintiffs' forensic investigators and Defendants' own former employees confirmed downloads of digital music files of Plaintiffs' sound recordings from Defendants' service.  *See* Pls.' SUF 2.  It is undisputed that Plaintiffs have not authorized the distribution or reproduction of their copyrighted works via Defendants' service.  Pls.' SUF 3.  Further, the record shows that at one time, Defendants' servers stored what has been termed "Usage Data," or "pre-existing records from Defendants' computer servers reflecting actual requests by Defendants' paid subscribers to download and upload digital music files using Defendants' service," which would have provided direct and irrefutable evidence of copyright infringement.  *See* Sanctions Order at 5.  Near the initial close of discovery in this case, Plaintiffs filed a motion for sanctions, contending that Defendants had deliberately destroyed this Usage Data, among other information, and that it would have provided direct evidence of widespread infringement of Plaintiffs' copyrighted sound recordings.[6]  Specifically, Plaintiffs alleged that on March 8, 2008, notwithstanding Defendants' obligations to preserve relevant and requested information, Defendant Reynolds personally and affirmatively disabled approximately 900 music-related newsgroups, which essentially destroyed or made unusable the Usage Data that Plaintiffs had requested.[7]  As a result, Judge Katz granted an adverse inference to establish the fact that copies of Plaintiffs' copyrighted sound recordings were actually transmitted from Defendants' computer servers to the personal computers of their subscribers.  *See* Sanctions Order at 65-66, 68.

---

[4] Defendants have moved to exclude Dr. Waterman's testimony, arguing it is unreliable and irrelevant.  As discussed in further detail below, Dr. Waterman's testimony is admissible on the instant motion for summary judgment.  Additionally, Defendants have offered no facts to controvert the actual findings of Dr. Waterman's study.

[5] There is no dispute that Plaintiffs own or control the copyrights in sound recordings as detailed in the record.  *See* Pls.' SUF 1 (citing testimony).

[6] Plaintiffs' allegation of spoliation of the Usage Data, as well as the alleged spoliation of "Digital Music Files," or the physical digital copies of the copyrighted sound recordings and related information hosted on Defendants' servers, was before Magistrate Judge Katz on Plaintiffs' first Motion for Sanctions, and formed the basis, in part, of Judge Katz's subsequent Sanctions Order granting certain adverse inferences as a result of the destruction of that evidence during discovery.  These allegations of spoliation have been fully addressed on the first Motion for Sanctions, and are not before the Court on the Plaintiffs' instant Motion for Terminating Sanctions.

[7] Reynolds then personally selected 73 of the most popular music newsgroups that had been disabled and re-enabled them, but the Usage Data and Digital Music Files were essentially irretrievable.  *See* Pls.' SUF 88b.

D.     **Defendants' Involvement in Infringement on Their Service**

The record in this case is replete with instances of Defendants and their employees specifically engendering copyright infringement and targeting infringement-minded users to become subscribers of Defendants' service.  First, Defendants' own former employees have testified that their marketing department specifically targeted young people familiar with other file-sharing programs and suggested they try Defendants' services "as a safe alternative to peer-to-peer file sharing programs that were getting shut down" due to copyright infringement lawsuits and resulting injunctions.  *See* Pls.' SUF 8; *see also* Pls.' SUF 9 (advertising Defendants' service as the best way to get "free" music now that "[f]ile sharing websites are getting shut down"); Pls.' SUF 10 (comparisons of Defendants' service to Kazaa, a formerly popular peer-to-peer service notorious for permitting exchange of copyrighted materials); Pls.' SUF 88a ("We understood that our marketing should be more targeted at persons interested in copyrighted entertainment media content.") (citing Declaration of Jolene Goldade ("Goldade Decl.") ¶ 8).  Indeed, Defendants' promotional literature, created by marketing specialists at Reynolds's behest, stated that when Napster and Kazaa began to have problems from copyright owners' enforcement of their rights, "[t]his made the way for Usenet to get back in the game."  Pls.' SUF 11; *see also* Pls.' SUF 12 (marketing specialist's statement that Defendants' service targeted "people who want to get free music, ilelgal [*sic*] or not"); Pls' SUF 108-109.  Defendants' website also had pages devoted to certain popular recording artists and expressly promoted the availability of "FREE MUSIC" and mp3 files for download.  Pls.' SUF 20-26, 29; Goldade Decl. ¶ 18.  Defendants were aware that the downloading free music was, at the very least, a principal reason for a substantial portion of their subscribers' signing up for their service: their own consumer survey showed that 42% of responding subscribers identified downloading music files as a "primary" reason they used Defendants' service.  Pls.' SUF 52; *see also* Pls.' SUF 53-55.  Indeed, after Defendants disabled access to their music newsgroups in March 2008, they received hundreds of complaints and cancellations due to the unavailability of music content.  Pls.' SUF 56.

Defendants also inserted "meta tags" into the source code for their website to attract internet traffic to their service.  Horowitz Decl. ¶ 94; Pls.' SUF 13.  Meta tags are not directly visible to a user who searches the internet; they are embedded in the source code of a website to increase the likelihood that the website will match a search that is run in a search-engine query.  *See* Horowitz Decl. ¶ 94.  Defendants inserted certain meta tags in their website's source code that increased the likelihood that their site would match searches for copyrighted content; for example,

Defendants' meta tags included the term "warez," which is well-known internet slang for pirated content, and "kazaa," the name of a formerly popular file-sharing service. *See id.* ¶ 95.

Moreover, the record reflects numerous instances of Defendants' own employees explicitly acknowledging the availability of infringing uses through Defendants' service and using the service themselves to download Plaintiffs' copyrighted works. *See, e.g.*, Pls.' SUF 16-18; *see also* Pls.' SUF 46-49, 78. Defendants' technical support staff even provided assistance to users seeking to download copyrighted material, and while employees did at times recite Defendants' official policy against assisting with potentially infringing conduct, they often went on to assist the subscriber in any event. *See* Pls.' SUF 30-35, 37-39a; Declaration of Charles S. Baker ("Baker Decl.") Ex. C; *see also* Pls.' SUF 79-80; Borud Decl. ¶ 10, Ex. 6. In addition, Defendants offered website tutorials on how to download content from www.usenet.com, using infringing musical works as illustrations. Pls.' SUF 81. Defendants also promoted the fact that users' uploading and downloading activities could not be tracked or monitored, and that unlike other "lower security" file-sharing programs like Napster and Kazaa, users would be able to conduct their infringing activities cloaked in anonymity. *See* Pls.' SUF 40-42, 44; Goldade Decl. ¶¶ 10-11. Based on this knowledge of, and participation in, widespread infringement, Defendants' own employees have acknowledged that Defendants profit from availability of copyrighted material, including music, stored on their servers. *See* Pls.' SUF 61; Declaration of Matthew Borud ("Borud Decl."), Ex. 9.

**E.      Reynolds's Role in Defendants' Business**

As director and sole shareholder of both Defendants UCI and Sierra, Reynolds's role is ubiquitous.[8] Pls.' SUF 106-107. When asked about his role in the business, Reynolds replied "the company's me." Pls.' SUF 102. Moreover, other of Defendants' employees testified that they engaged in the business according to Reynolds's will and instructions, and that Reynolds was the individual responsible for the "overall strategic vision" of the business. Pls.' SUF 103-104. When asked in interrogatories to describe Reynolds's job responsibilities, Defendants responded that his responsibilities "included and continue to include virtually all aspects of Defendant's operations." Pls. SUF 105; *see also* Order dated June 16, 2009 at 5-7 ("June 16 Order") (noting Reynolds's "personal, active involvement" in the businesses of the corporate Defendants and describing Reynolds as "the driving force behind, and personally involved in, every act of spoliation found in the Court's [Sanctions Order]").

---

[8] Defendant UCI never had any employees; rather, the business was run by employees of Sierra. However, by the summer of 2008, Sierra had terminated all of its employees, and only Reynolds remained.

## II. MOTION FOR TERMINATING SANCTIONS

### A.    Factual Background Relating to Spoliation of Evidence and Discovery Misconduct

As noted earlier, Defendants have once been sanctioned for spoliation of certain relevant and potentially highly incriminating data.[9]  However, upon the close of discovery and after having learned of certain even more egregious discovery violations, Plaintiffs filed their Terminating Sanctions Motion, this time seeking entry of a default judgment against Defendants based on widespread spoliation of evidence and gross discovery misconduct.  Plaintiffs' motion catalogs numerous misdeeds on the parts of Defendants generally, and particularly by Reynolds.

Plaintiffs allege that despite numerous requests for production, "meet and confer" conferences, and correspondence between the parties regarding discovery requests, Defendants continually "stonewalled" discovery by failing to produce responsive documents or identify critical witnesses until after the initial discovery cutoff of October 15, 2008.  *See* Declaration of Gianni P. Servodidio ("Servodidio Decl.") ¶¶ 10-12, 24, 37-38.  Specifically, Plaintiffs demanded explanations for Defendants' failure to produce virtually any internal email communications, promotional website "essays," internal documents or reports, or documents relating to infringement by Defendants, their employees and subscribers.  Servodidio Decl. ¶ 11, Exs. 11-14.  Defendants' constant refrain was that they had produced all responsive documents.  *See id.*  Only upon deposing Defendants' former assistant newsmaster and email administrator, Jessica Heiberg, did Plaintiffs experience what they characterize as a "watershed moment" in the case.  Heiberg's testimony confirmed that Defendants' employees regularly used internal email for work-related matters, that a significant number of Defendants' employees stored their emails on their local computer hard drives, and that she had personally checked employees' work stations to ensure they were implementing proper email retention policies.  *See* Deposition of Jessica Heiberg ("Heiberg Dep.") at 23:12-16, 27:15-29:21, 30:7-21, 34:4-11, 35:14-37:17, 39:5-9; 41:12-43:9.  Heiberg also identified other key internal documents that Defendants had not produced, including "retention scripts" and reports reflecting Defendants' assessment of the most popular newsgroups available on its service.  *See id.* at 100:14-16, 109:11-113:2, 116:18-117:10, 120:10-16.

#### 1.  The Seven "Wiped" Hard Drives

Based on the revelation of this new evidence, Plaintiffs promptly filed a motion to compel production of responsive documents stored on Defendants' employee hard drives, and requested

---

[9] As Judge Katz recently held, the Sanctions Order applied to all three Defendants, including Reynolds, who "was the driving force behind, and personally involved in" all acts of misconduct discussed in the Sanctions Order.

an extension of the discovery period.  A hearing was held before Magistrate Judge Katz on October 27, 2008 to address Plaintiffs' motion and Defendants' failure to produce discovery.  At this hearing, Defendants' counsel acknowledged for the first time that he was in possession of seven computer hard drives that had belonged to Defendants' employees (the "Seven Hard Drives").  October 27, 2008 Hearing Transcript ("Oct. Tr.") at 13:9-22.  Initially, Defendants conceded that four of the Seven Hard Drives had had their contents deleted or "wiped" and suggested they would produce documents from the remaining three drives.  *Id.* at 11:30-12:11.  Later, Defendants admitted that the remaining three drives had the majority of their contents deleted, as well.  *See* Servodidio Decl. ¶ 20, Ex. 29.  Defendants hired a forensic expert to examine the drives, and were able to extract approximately 300,000 file fragments from the remaining three drives.  These files consisted largely of fragments of deleted files and were largely unusable; however, Plaintiffs' forensic expert's analysis revealed that the file fragments contained pieces of incriminating documents, including emails and word processing documents that had been stored on the hard drives.  *See* Declaration of John Loveland ("Loveland Decl.") ¶¶ 8-9.

Over time, Defendants have proffered numerous explanations for the "wiping" of the hard drives.  First, Defendants represented that the hard drives had been found in storage, and that they had been purchased blank on eBay and never used.  *See* Oct. Tr. at 13:12-20, 17:3-5.  Defendants later recanted this position and admitted that the Seven Hard Drives had all been pulled directly from the active workstations of Defendants' employees in June 2008, at the direction of Reynolds.  *See* Servodidio Decl. ¶ 16, Ex. 25 (Defendants' letter dated 12/10/08); *id.*, Ex. 3 (Reynolds Spoliation Deposition Transcript ("Spoliation Tr.") at 69:17-70:7).  In opposing the Terminating Sanctions Motion, Defendants now espouse a different story – they now contend that the drives "would have appeared wiped" as a result of Defendants having upgraded all employee computers to the new Windows Vista operating system in early 2008.  Analysis by Plaintiffs' forensic expert reveals that this explanation simply is not plausible.  *See* Reply Declaration of John Loveland ("Loveland Reply Decl.") ¶¶ 5-7; Loveland Decl. ¶¶ 4, 6-7, 11.  As Plaintiffs' expert explains, data that is simply deleted from a hard drive leaves traces on the hard drive; rather, to "wipe" a drive clean in this fashion requires running specific types of software that permanently eliminates the data and makes it irretrievable.  *See* Loveland Decl. ¶¶ 10-11.  Here, analysis of document fragments indicates that the drives were deleted as late as June 2008.  Loveland Decl. ¶¶ 4, 11.  Plaintiffs allege that the user-generated data that had been wiped off these Seven Hard Drives, and

not backed up on any central server, including emails and other internal documents, was voluminous and "undoubtedly would have been some of the incriminating evidence in this case."

In addition to the Seven Hard Drives that were purposefully wiped, the record evidence indicates that Defendants purposefully ensured that other of its work-issued computers became unavailable for production. For example, in March 2008, at the outset of discovery, Defendants terminated several key employees, including its chief technology officer Miro Stoichev and Jessica Heiberg and rather than preserving the data on their computers, Defendants allowed these and other terminated employees to take their computers with them, as "parting gifts." This was without making certain that the material was preserved. Indeed, Sierra had employed at least ten different individuals who did work relevant to UCI and its business since the commencement of this matter in October 2007. Some of the employees' desktop computers contained more than one hard drive; in all, some fifteen hard drives were either erased or are simply missing and were never produced to Plaintiffs. *See* Servodidio Decl. ¶ 18, Exs. 50, 26, 27, 35; Spoliation Dep. Tr. 44:12-18, 240:5-241:5; 350:24-352:1.

### 2. Alleged Spoliation of Email

As noted, throughout discovery Plaintiffs pressed Defendants about the absence from their document productions of internal emails. Defendants' rejoinder has been, and remains to this day, that they are a small company that did not use email frequently, and that all responsive emails had been produced. However, after the Heiberg deposition in October 2008, Defendants did produce some additional emails, many of which were allegedly produced from a central server. However, the production of these emails revealed significant and unexplained gaps in production, such as the absence of any email "mailboxes" for certain key former employees; the absence of any non-"spam" emails from the email mailbox of Miro Stoichev; the absence of any non-"spam" emails from IT Manager Brad Allison prior to November 13, 2007; the complete absence of emails prior to September 11, 2007 for Sierra's President Lesa Kraft; and the absence of emails from Heiberg for the last two months of her employment. *See* Servodidio Decl. ¶ 26. Moreover, although numerous employees were directed to create "gmail" accounts (*i.e.*, email accounts available for free through Google) for work activities, Defendants produced no emails from those accounts.

### 3. "Workhorse" Server and Employee Workstations as "Light Terminals"

Defendants deny all allegations of spoliation, arguing that all of the documents on relevant hard drives – both "wiped" hard drives and drives on computers that employees were permitted to take with them upon termination – were backed up on a central server called "Workhorse." Thus,

Defendants argue that the individual employees' workstation computers were merely "dummy" computers or "light stations" used only to access shared drives and not to save any user-generated documents to their local drives. However, Defendants themselves were able to "recover" over 300,000 file fragments from three of the Seven Hard Drives that contained traces of emails and word processing documents. Moreover, a review of the Workhorse server reveals that although some relevant documents were apparently saved centrally, conspicuous gaps in the organization of the server indicates that not all documents created by Defendants' employees were saved there. For instance, documents from certain time periods are entirely missing; documents for key employees are missing; and the server contains only incomplete parts of certain employee email inboxes. Moreover, as Plaintiffs' expert testified, if all email mailboxes were backed up on a central server, the server could be expected to generate file structures for email accounts, including file folders such as "inbox," "sent mail," and "drafts," that approximate the employee's email mailbox as it would appear on his or her workstation; these file structures were simply missing from the scattershot emails that were stored on the Workhorse server. Loveland Reply Decl. ¶ 8.

### 4. Litigation Misconduct

In addition to these allegations of stonewalling and spoliation, Plaintiffs also allege that Defendants engaged in other misconduct to "pursue[] a clear strategy to prevent plaintiffs from discovering evidence demonstrating the true extent to which defendants fostered copyright infringement." First, Plaintiffs allege that at the time they began to serve third-party subpoenas, only five individuals were still employed by Sierra, other than Reynolds, all of whom were potentially significant witnesses. Plaintiffs allege that Defendants engineered these witnesses' unavailability during the height of discovery by causing them to travel to Europe on an expense-paid vacation to avoid being deposed. Defendants do not deny sending their employees out of the country during this critical period, but note that the employees returned from Europe in mid-August, a full two months before the end of the initial discovery period. However, Plaintiffs' information suggests that Defendants attempted to persuade the employees to remain out of the jurisdiction for a longer period, illustrating one more in what appears to be a series of bad faith tactics. Further, upon the employees' return, two of them – Leidholm and Richter – allegedly evaded service. *See* Declaration of Tony Snesko ¶¶ 5-9. Further, Reynolds, testifying as a Rule 30(b)(6) designee, provided misleading information concerning these witnesses' contact information and employment status. Plaintiffs allege that Defendants went to great lengths to shield former President Kraft from discovery by providing misleading information as to her

employment and whereabouts.  Although Ms. Kraft ultimately was deposed, Plaintiffs cite these actions as further evidence of bad faith.

In addition to witness misconduct, Plaintiffs also allege that Defendants knowingly served false responses to interrogatories.  Specifically, Plaintiffs allege that Defendants never identified two employees – Ina Danova and Jolene Goldade – who together made up Sierra's marketing department, and who Plaintiffs later learned drafted incriminating promotional "essays," at Reynolds's request, touting the availability of free music for download on Defendants' service. Defendants' interrogatory responses expressly identified "a list of Sierra employees," which purported to include current and former employees of Sierra since its inception in the 1990s, yet the responses failed to identify Danova or Goldade.  *See* Servodidio Decl. Exs. 26, 27.

Finally, Plaintiffs argue that Defendants violated two Court orders in an effort to conceal their widespread spoliation of evidence.  Specifically, given the issues raised by the Heiberg deposition and the Seven Hard Drives, on December 22, 2008 Magistrate Judge Katz ordered Defendants to provide a detailed accounting of the wiping of the data from the Seven Hard Drives, as well as the whereabouts of other hard drives that had belonged to former employees.  *See* Servodidio Decl. Ex. 49.  On January 8, 2009, Defendants served Plaintiffs with the Reynolds declaration in response to the December 22 Order that Plaintiffs contend was "so general and evasive as to be virtually meaningless."  In particular, the Reynolds Declaration contained no information specifically identifying where in Defendants' production backups of employee hard drives could be found.  *See* Servodidio Decl. Ex. 50.  Plaintiffs raised Defendants' noncompliance with Magistrate Judge Katz, who issued a second order on February 22, 2009 ordering Defendants (1) to provide Plaintiffs with an affidavit setting forth precisely where in Defendants' production the contents of the missing hard drives could be found; and (2) to appear for a deposition prepared to give detailed testimony regarding specifically enumerated categories of information relating to the Seven Hard Drives and other missing employee computers.  *See* Servodidio Decl. Ex. 52. Defendants did not comply with the February 22 Order.  Reynolds submitted a second declaration, but even Defendants' counsel conceded that it did not specify the information that was expressly required to be disclosed.  *See* Spoliation Dep. Tr. at 217:25-218:5.  At the spoliation deposition, Reynolds also was repeatedly unprepared or unwilling to answer questions the Court had expressly directed be answered. *E.g.*, *id.* at 87:17-91:23, 304:11-310:2.

## B.    Legal Standard

A district court has wide discretion to determine appropriate sanctions for discovery abuses under both Rule 37 of the Federal Rules of Civil Procedure and its inherent powers. *Gutman v. Klein*, No. 03 CV 1570 (BMC) (RML), 2008 WL 4682208, at \*11 (E.D.N.Y. Oct. 15, 2008). Rule 37 sanctions require a showing of violation of a court order. *Daval Steel Prod. v. M/V Fakredine*, 951 F.2d 1357, 1363 (2d Cir. 1991). Sanctions under the court's inherent power require a showing of bad faith or willfulness. *See DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998). When deciding a proper sanction, a court generally must consider, in light of the full record of the case, (a) willfulness or bad faith on the part of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party has been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party. *Id.* In the spoliation context, the court must also consider the "prophylactic, punitive and remedial rationales underlying the spoliation doctrine." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). Thus, the sanction should "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence." *Id.*

Terminating sanctions are used "only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *Id.* However, "in this day of burgeoning, costly and protected litigation courts should not shrink from imposing harsh sanctions where they are clearly warranted." *Jones v. Niagara Frontier Transp. Auth.*, 836 F.2d 731, 735 (2d Cir. 1987); *see also Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1968-69 (2d Cir. 1979) (dismissal is particularly appropriate when client, not counsel, is responsible for conduct leading to dismissal). Lesser sanctions have been found to be ill-suited to cases involving bad faith irretrievable spoliation of likely important documents. *Gutman*, 2008 WL 4682208 at \*12 (imposing terminating sanctions when "it is impossible to know what plaintiffs would have found if defendants . . . had complied with their discovery obligations," and especially when "the court has previously imposed lesser sanctions on the responsible party for other discovery misconduct"); *Arista Records, LLC v. Tschirhart*, 241 F.R.D. 462 (W.D. Tex. 2006) ("One who anticipates that compliance with discovery rules and the resulting production of damning evidence will produce an adverse judgment, will not likely be deterred from destroying that decisive

evidence by any sanction less than the adverse judgment she is tempted to thus evade."); *Miller v. Time-Warner Commc'ns, Inc.*, No. 97 Civ. 7286, 1999 WL 739528 (S.D.N.Y. Sept. 22, 1999).

**C.**    **Analysis**

In this case, Plaintiffs have produced evidence of a wide range of discovery abuses that they contend warrant the harshest of available sanctions – the entry of a default judgment.  While I agree that Plaintiffs' evidence credibly illustrates a pattern of destruction of critical evidence, a failure to preserve other relevant documents and communications, and at best dilatory (and at worst, bad-faith) tactics with respect to Defendants' conduct during discovery, I am not prepared to impose the ultimate sanction.

*1.* **Spoliation of Evidence**

The keystone of Plaintiffs' Terminating Sanctions Motion, and the most egregious misconduct alleged, is found in the "wiping" clean of the Seven Hard Drives that had belonged to Defendants' employees without backing up the data to a central server.  To a lesser extent, Plaintiffs focus on the Defendants' failure to produce or preserve email communications, which Plaintiffs contend must have existed, based on the deposition testimony of Jessica Heiberg and the production of documents from the hard drive of Defendants' former employee, Matthew Borud.[10] There can be no dispute that the Defendants were under an obligation to preserve all documents and communications stored on their employees' computers, at least as early as the start of this litigation.  *See In re Terrorist Bombings of U.S. Embassies in E. Africa v. Odeh*, 552 F.3d 93, 148 (2d Cir. 2008) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.") (citation omitted); *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998); *Stephen v. Hanley*, 03-CV-6226(KAM)(LB), 2009 U.S. Dist. LEXIS 42779, at *9 (E.D.N.Y. May 20, 2009).  Indeed, it is likely that the preservation obligation arose much earlier than the initiation of this action, as Plaintiffs had sent several cease and desist letters months prior to filing their complaint.  *See Fox v. Riverdeep, Inc.*, 07 Civ. 13622, 2008 WL 5244297, at *7 (E.D. Mich. Dec. 16, 2008) (imposing sanctions where defendant in copyright infringement action failed to preserve evidence, including email, after it received plaintiff's cease and desist letter).

---

[10] In support of their Sanctions Motion, Plaintiffs also point to the alleged spoliation of certain pages of Defendants' website that contained highly incriminating information.  However, I decline to consider these allegations, as they were squarely before Magistrate Judge Katz and formed at least part of the basis of his January 26, 2009 Sanctions Order.  *See* Sanctions Order at 10-11, 47, 58-59.  If indeed Defendants engaged in spoliation of this website evidence, it is not for me to count such conduct, egregious as it may be, against them twice.

Unlike the Usage Data and Digital Music Files that Magistrate Judge Katz considered in his Sanctions Order, the data alleged to have been despoiled here was not transitory in nature; rather, it was the sort of data – internal reports, email communication, and the like – that are clearly subject to a preservation obligation.

Once a court has determined that a party was under an obligation to preserve evidence that it destroyed, it must then consider whether the party acted with a sufficiently culpable state of mind to warrant the imposition of sanctions. *See Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). "The degree of culpability bears on the severity of sanctions that are warranted. Severe sanctions for discovery violations, including dismissal, may be imposed for intentional conduct, such as bad faith or gross negligence." *Reino De Espana v. American Bureau of Shipping*, No. 03 Civ. 3573, 2007 WL 1686327, at *3 (S.D.N.Y. June 6, 2007). Plaintiffs contend that Defendants despoiled the Seven Hard Drives, removed computers used by other employees, and failed to preserve email communications, all in bad faith. Defendants have failed to come forward with a scintilla of credible evidence to support the disappearance of this likely relevant information or their allegations that all files were backed up on a central server. First, with respect to the Seven Hard Drives, Plaintiffs' forensic expert's testimony conclusively dispels Defendants' purported explanation that the drives were erased as a result of an upgrade to the Vista operating system early last year. The evidence reveals that, based on file fragments that were able to be extracted from some of the drives, the documents were in existence and had been accessed as late as June 2008, which is consistent with Reynolds's admission that he pulled the drives from employee workstations at about that time. Also, Loveland's testimony explains that complete and permanent evisceration of files from the drives would not have been accomplished by a simple operating system upgrade; rather, "wiping" documents permanently from a computer requires running specialized software.

Defendants argue that they did in fact send a copy of all documents to the central "Workhorse" server, and that the computers that were either deleted or taken from the company were merely "light stations" that contained no actual documents, but rather were used only to gain access to shared drives and servers. This explanation defies credibility for several reasons. First, Defendants' own forensic expert was able to extract 300,000 file fragments from three of the Seven Hard Drives, including fragments of emails and word processing documents. To make it plain, this clearly meant that at least those hard drives had contained, at one time, emails and documents that were saved to the local hard drive. This alone belies Defendants' "light station"

theory. Second, former employee Matthew Borud, in response to a subpoena, produced hundreds of thousands of documents from the hard drive of his work-issued computer, including complete email mailboxes and internal documents. Finally, Plaintiffs' forensic expert provided credible evidence that illustrates that it is unlikely that the Workhorse server backed up all of Defendants' employees documents and emails. Specifically, there are numerous files that are missing for certain dates or key employees, and the email mailboxes do not contain the file structure that would be expected to exist if the mailboxes were saved automatically to the server.

Based on this evidence, it is clear that Defendants' "wiping" of the Seven Hard Drives was intentional and in bad faith, and their failure to ensure that all documents – including emails, to the extent they existed – were preserved before intentionally disposing of employees' hard drives was at least grossly negligent. Here, where internal documents concerning, among other things, marketing plans, reports and assessments of the popularity of user newsgroups and communications with users are among the most critical in assessing Defendants' knowledge and fostering of, or material contribution to, copyright infringement, there can be no doubt but that the despoiled documents were highly relevant to this case. Moreover, when evidence is destroyed in bad faith or with gross negligence, that alone has been found to be sufficient to support an inference that the missing evidence would have been favorable to the prejudiced party, and thus relevant. *See Residential Funding Corp. v. Degeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002).

### 2. Other Litigation Misconduct

Plaintiffs also point to several other instances of litigation conduct that, taken in context, adds to the air of wrongdoing surrounding Defendants' actions throughout discovery. As detailed above, the alleged misconduct includes sending potentially key witnesses to Europe to engineer their unavailability during the height of discovery and attempting to entice them to remain unavailable through the end of the discovery period; encouraging witnesses to evade process upon their return; providing evasive or false sworn responses to interrogatories; and violating not one but two orders of the Court requiring them to come forward with specific information regarding the despoiled computer evidence described in the preceding section. While I am of the opinion that none of these deeds would themselves suffice for the imposition of harsh sanctions, viewed in light of the whole of Defendants' conduct in this case, and especially in light of the fact that Defendants have once been sanctioned for bad-faith destruction of evidence, I find that these actions support a finding that some sanction for discovery abuse is warranted in this case.

### 3. *Appropriate Sanction*

Having determined that the imposition of sanctions is warranted in this case, the Court must next determine the appropriate remedy. As noted, tailoring an appropriate sanction lies within the sound discretion of the trial court, and is to be assessed on a case-by-case basis. *West*, 167 F.3d at 779-80; *Fujitsu*, 247 F.3d at 436. Plaintiffs argue that the misconduct is so pervasive and severe, and touches upon the core of Plaintiffs' case, that the only possible remedy is to strike Defendants' answer and enter a default judgment in favor of Plaintiffs. I cannot agree. While there is certainly strong evidence of extreme wrongdoing, courts must be wary of issuing case-dispositive sanctions; such sanctions "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *West*, 167 F.3d at 779. One such lesser sanction is to preclude the wrongdoer from litigating certain claims or defenses during the remainder of the case. *See, e.g.*, *American Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87 (S.D.N.Y. 2002) (adopting recommendation that plaintiffs' motion to preclude affirmative defense be granted due to discovery violations); *see also Logan v. Gary Cmty. Sch. Corp.*, No. 2:07-CV-431-JVB-PRC, 2009 U.S. Dist. LEXIS 4784, at *6 (N.D. Ind. Jan. 23, 2009) (granting motion to strike affirmative defenses as sanction because defenses directly related to substance of discovery sought by plaintiff); *Relectronic Service Corp. v. Kansas City Youth for Christ*, No. 87-2247-O, 1988 U.S. Dist. LEXIS 12238, at *3-4 (D. Kan. Oct. 14, 1988) (granting motion to preclude affirmative defense as sanction because defendant withheld discovery related to that defense).

In this case, Defendants rely in substantial measure on their apparent good-faith reasonable implementation of a non-infringement policy for its users. Indeed, Defendants' motion for summary judgment relies on its entitlement to protection under the safe harbor provisions of the DMCA. To show that it is entitled to such protection, Defendants must not have been aware of "red flags" indicating infringement on the part of their users. *E.g.*, *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir. 2007) (finding a service provider may lose safe harbor protection "if it fails to take action with regard to infringing material when it is 'aware of facts or circumstances from which infringing activity is apparent.'") (quoting 17 U.S.C. § 512(c)(1)(A)(ii)). Thus, if Defendants were aware of such red flags, or worse yet, if they encouraged or fostered such infringement, they would be ineligible for the DMCA's safe harbor provisions. The evidence that is alleged to have been destroyed or lost in this case would have been directly relevant to illustrate Defendants' state of mind in this regard. Moreover, Defendants' promotional marketing and advertising activities –accomplished almost exclusively through former employees Danova and

Goldade, who were not identified in any of Defendants' sworn interrogatory responses – would have been highly relevant to Plaintiffs' allegations that Defendants specifically targeted and encouraged their users' infringement of copyrights, which would also disqualify Defendants from claiming safe harbor protections under the DMCA.  More to the point, however, Defendants' bad faith spoliation of documents and other evasive discovery tactics have prevented Plaintiffs from ascertaining the extent to which they have been prejudiced with respect to their own claims or their arguments in opposition to Defendants' affirmative defense.  *See, e.g.*, *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 960 (9th Cir. 2006).  Accordingly, I find that the appropriate sanction in this case is to preclude Defendants from asserting their affirmative defense of protection under the DMCA's safe harbor provision.  Because Defendants' motion for summary judgment is premised on their entitlement to such protection, that motion is mooted and will be dismissed.[11]

### III.  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Despite the widespread destruction of evidence, as well as other discovery misconduct and evasive tactics, that Defendants have perpetrated throughout discovery, Plaintiffs nonetheless contend that the record evidence – obtained mainly from third parties and their own investigations – provides overwhelming evidence of Defendants' direct infringement of Plaintiffs' copyrights and their complicity in the infringement of their subscribers, such that there is no genuine issue of material fact to be tried on any of Plaintiffs' claims.  I turn now to these contentions and to the heart of the case, which centers on infringement of Plaintiffs' copyrighted material.

### A.     Legal Standard on Motion for Summary Judgment

A motion for summary judgment must be granted if the moving party shows "there is no genuine issue as to any material fact" and it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In showing the existence of a genuine issue of material fact, "the non-moving party

---

[11] Pursuant to the automatic stay against Sierra, this holding applies only to UCI and Reynolds.  To the extent Defendants appear to argue that a ruling on the instant motion should be stayed because all of the alleged misconduct, if it occurred at all, was at the hands of Sierra, such argument is rejected.  As the foregoing discussion makes clear, Sierra employees in general, and Reynolds in particular, undertook all of the referenced actions to further UCI's service, which service comprises the heart of Plaintiffs' case.

may not rely on mere conclusory allegations nor speculation," *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004), nor can it rely on mere denials or unsupported alternative explanations of its conduct, *see SEC v. Grotto*, No. 05 Civ. 5880 (GEL), 2006 WL 3025878, at *7 (S.D.N.Y. Oct. 24, 2006). Rather, it "must come forward with evidence sufficient to allow a reasonable jury to find in [its] favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001); *see also* Fed. R. Civ. P. 56(e).

## B.    Admissibility of Certain Testimony and/or Evidence

Both parties have filed numerous motions to exclude certain witness testimony submitted in support of the cross-motions for summary judgment, as well as detailed and voluminous evidentiary objections. The Court must address these issues as a threshold matter before turning to the merits of Plaintiffs' motion for summary judgment. *See Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) ("[T]he court must evaluate evidence for admissibility before it considers that evidence in ruling on a summary judgment motion.").

### 1.    *Testimony of Richard Waterman*

Defendants' first challenge is to the admissibility of the proffered testimony of Plaintiffs' expert witness, Dr. Richard P. Waterman. As noted, in deciding whether a motion for summary judgment should be granted, a district court may consider only admissible evidence. *See Major League Baseball*, 542 F.3d at 309; *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). Thus, the Second Circuit has found that the district court should consider the admissibility of expert testimony in determining whether summary judgment is appropriate. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). In making this determination, "[t]he court performs the same role at the summary judgment phase as at trial." *Id.*

The admissibility of expert testimony is analyzed under Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that Rule 702's requirements have been met. *See, e.g., Daubert v.*

*Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 n.10 (1993); *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). However, "the district court is the ultimate 'gatekeeper.'" *Williams*, 506 F.3d at 160. Under *Daubert* and its progeny, the district court must perform this gate-keeping function to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.

District courts have wide discretion in determining whether proffered expert testimony is admissible. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 351 (S.D.N.Y. 2005). The Second Circuit has set forth a three-part test for the admissibility of expert testimony under Rule 702, in which the court must determine (1) whether the witness is qualified to be an expert; (2) whether the opinion is based on reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact. *See Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005). With respect to reliability, "the district court should consider the indicia of reliability identified in Rule 702, namely (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Williams*, 506 F.3d at 160 (internal quotation marks and citation omitted).

Here, Dr. Waterman's testimony is based on a statistical survey developed for the purpose of estimating the proportion of infringing content files available in certain music newsgroups on Defendants' service. Specifically, Dr. Waterman designed a protocol to draw a random sample of content files from a list of music newsgroups that had been disabled by Defendants' website Usenet.com, but that remained available on another service called Giganews.com.[12] Dr. Waterman's protocol was implemented in two stages: first, files chosen by random sample were downloaded, and then the downloaded files were analyzed for their authorization status by copyright analyst Brad Newberg. *See* Waterman Decl. ¶¶ 7-9. After reviewing Newberg's classifications, Dr. Waterman concluded that over 94% of the content files available on the music newsgroups were either unauthorized or highly likely to have been unauthorized. Waterman Decl. ¶ 10-13. Defendants contend that Dr. Waterman's conclusion is unreliable and should be excluded because (1) the sampling frame was not representative of the universe of articles available on their service, (2) he improperly excluded text files and incomplete files from his

---

[12] Plaintiffs contend that because the content in the same music newsgroup could be expected to be substantially the same, Dr. Waterman was able to draw conclusions about the level of infringement on Defendants' service using music newsgroups on Giganews.com. *See* Waterman Decl. ¶ 7; Horowitz Decl. ¶ 48 n.12.

analysis, and (3) categories of downloaded files are unreliable because they were created by Newberg, a hired attorney. Plaintiffs contend that, contrary to Defendants' view, the purpose of Dr. Waterman's survey was never to measure infringement on the USENET in general, but rather to estimate the volume of infringing content files in music newsgroups. Moreover, Plaintiffs argue that Dr. Waterman's exclusion of text files and incomplete files was consistent with the purpose of the survey – that is, to measure infringement volume in complete content files available for download on Defendants' service, "because access to content is the crux of the service that defendants provide." Finally, Plaintiffs aver that Newberg's classifications were based on his extensive experience in copyright matters and were made in reliance on "multiple reliable public sources of information containing information on copyright ownership and distribution." Waterman Decl. Ex. 4 (Declaration of Brad Newberg) ¶ 5. Indeed, Plaintiffs correctly point out that such classifications have been found acceptable in other comparable copyright infringement actions. *See Metro-Goldwin-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 985 (C.D. Cal. 2006) (considering percentages of files classified as "infringing" or "highly likely to be infringing") ("*Grokster II*"); *A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 903 n.6 (N.D. Cal. 2000) (noting files from statistical sample were confirmed infringing or classified as "likely to be copyrighted"). Considering the proffered evidence and the parties' contentions *juxtaposed* with Rule 702 and *Daubert* and its progeny, Plaintiffs have met their burden to prove that Dr. Waterman's testimony is reliable and relevant, and admissible for purposes of the instant motion. Thus, the Motion to Exclude Dr. Waterman's testimony is denied.

### 2. *Testimony of Thomas Sehested and Bruce Ward*

Defendants also seek to exclude the declarations of Thomas Sehested and Bruce Ward, principals of DtecNet Software and IP Intelligence, Inc., respectively, who Plaintiffs engaged as forensic investigators. Defendants argue that these declarants are fact witnesses whose identities and supporting documents were wrongfully concealed until the end of discovery under the work product immunity doctrine. Thus, Defendants contend that Plaintiffs have impermissibly used the work product privilege as "both a shield and a sword." Specifically, Defendants argue that Plaintiffs failed to identify Sehested and Ward in response to an interrogatory requesting the names of "all persons with knowledge regarding any monitoring by [Plaintiffs] or on [Plaintiffs'] behalf of the files uploaded, made available, searched for, copied, downloaded, or exchanged by [UCI]." *See* Baker Decl., Ex. A. Additionally, Defendants claim that Plaintiffs claimed privilege over the exhibits to the Ward and Sehested declarations – mainly downloads of Plaintiffs'

copyrighted sound recordings that the declarants obtained on Defendants' service – only to submit them as evidence in support of their motion for summary judgment. Defendants also speculate that these specific documents, or parts thereof, were listed on Plaintiffs' privilege log, contending, for example, that the date of a particular document on the privilege log "coincide[] perfectly with the time period Sehested claims [the document attached to his Declaration] was created."

To the contrary, the record reflects that all of the actual downloads performed by Sehested and Ward were timely produced in discovery, and in fact Defendants deposed a representative of the Recording Industry Association of America ("RIAA"), Mark McDevitt, at length regarding Plaintiffs' investigation, and in particular examined McDevitt regarding those very downloads. Moreover, although Defendant now characterizes Sehested and Ward as "fact witnesses," the record is clear that Plaintiffs disclosed these two individuals as expert witnesses, without objection from Defendants. Plaintiffs made full and timely expert disclosures for the witnesses, and gave Defendants the opportunity to depose them, which Defendants declined. *See* Reply Declaration of Duane C. Pozza ("Pozza Reply Decl.") ¶¶ 16-17. The declarations simply explain the technical processes surrounding the downloads that Plaintiffs produced in discovery. Finally, Plaintiffs aver that Defendants' speculation that the exhibits to the Sehested and Ward Declarations were pre-existing documents listed on their privilege log is simply untrue; rather, these exhibits merely describe the actual downloads produced to Defendants in discovery, and all but one of the exhibits were created after the close of discovery in preparation of the declarations in support of summary judgment, and the remaining exhibit was timely disclosed with Plaintiffs' expert disclosures. For these reasons, Defendants' motion to exclude the Sehested and Ward Declarations is denied.

### 3. *Other Miscellaneous Motions to Exclude and Evidentiary Objections*

Plaintiffs have moved to exclude certain of Defendants' declarations submitted on these cross-motions for summary judgment, in whole or in part, because, *inter alia*, (1) certain witnesses' unavailability was engineered during discovery; (2) certain witnesses' testimony is improper opinion testimony by lay witnesses; (3) certain testimony is contradicted by the declarants' prior deposition testimony; and (4) certain testimony is contradicted by prior testimony of Defendants' designated Rule 30(b)(6) witness on the same topics. Both parties have also filed numerous objections to proffers of evidence by their opponents. In the interest of saving trees (an interest the parties apparently do not share), I will not rule on each motion individually. Rather, I assure the parties that I am fully capable of separating the wheat from the chaff, and will consider only the evidence – both testimony and exhibits – admissible on summary judgment.

C.     **Direct Infringement**

Plaintiffs contend that Defendants' service directly infringes their copyrights by engaging in unauthorized distribution of copies of their musical works to subscribers who request them for download. "To establish a claim of copyright infringement, a plaintiff must establish (1) ownership of a valid copyright and (2) unauthorized copying or a violation of one of the other exclusive rights afforded copyright owners pursuant to the Copyright Act." *Byrne v. British Broad. Corp.*, 132 F. Supp. 2d 229, 232 (S.D.N.Y. 2001) (citing *Twin Peaks Prods. v. Publ'ns Int'l. Ltd.*, 996 F.2d 1366, 1372 (2d Cir. 1993)). It is undisputed that Plaintiffs own the copyrights in the subject sound recordings, and Defendants have not raised any objections or facts to challenge the validity of those copyrights. *See* Pls.' SUF 1.[13] It is likewise undisputed that Plaintiffs did not authorize the distribution or reproduction of any of their copyrighted works via Defendants' service. Pls.' SUF 3. The Court will therefore turn to the remaining question of whether Defendants' service directly distributes Plaintiffs' works in violation of the Copyright Act. *See* 17 U.S.C. § 106(3) (granting a copyright owner the exclusive right to "distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership").

Plaintiffs contend that Defendants' delivery of copies of their copyrighted works by transmitting copies in response to subscribers' requests to download a digital music file constitutes a "distribution" under the Copyright Act. In support of this position, Plaintiffs rely principally on the Supreme Court's ruling in *New York Times Co., Inc. v. Tasini*, 533 U.S. 483 (2001). In that case, the defendants operated an online database from which users could download digital copies of newspaper articles on request. *See id.* at 498. The Court found that it was "clear" that "by selling copies of the Articles through the NEXIS Database," the defendants "'distribute copies' of the Articles 'to the public by sale'" in violation of the copyright owner's exclusive right of distribution. *Id.* In so holding, the majority implicitly rejected the dissenting Justices' conclusion that it was the users, not NEXIS, who were engaging in direct infringement. *See id.* at 518 & n.14 (Stevens, J., dissenting). Defendants correctly point out that the "focus" of the Court's opinion in *Tasini* was not an analysis of whether the service the defendants provided constituted a direct distribution; rather, the Court's analysis was premised primarily on whether the databases were entitled to a privilege under § 201(c) of the Copyright Act, which permits reproduction and

---

[13] In response to Plaintiffs' statement of undisputed fact as to their ownership or control of the copyrights to the subject sound recordings, Defendants' only response is that they are "[u]nable to dispute or confirm at this time." Thus, the fact has not been properly disputed and will be deemed admitted for purposes of this motion. *See* Local Rule 56.1(c) (each fact "will be deemed admitted for purposes of the motion unless specifically controverted").

distribution of, among other things, revisions of collective works.  *See generally id.* at 499-506.  However, a finding of direct infringement of the right of distribution (and reproduction) was essential to the Court's opinion and holding – that is, without a finding of direct distribution and reproduction, there would have been no need for the § 201(c) privilege, because the databases would not have been engaged in direct infringement in the first instance.  Thus, Plaintiffs are correct that *Tasini* indicates that the delivery of articles and/or content to download at the request of subscribers can be the basis of direct infringement of the distribution right.

However, Defendants cite the Second Circuit's decision in *Cartoon Network LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*") for the proposition that direct infringement requires some volitional conduct on the part of the service provider, and where a service acts as a mere "passive conduit" for delivery of works requested by users, it cannot be liable for direct infringement as a matter of law.  Plaintiffs urge that the court in *Cablevision* addressed only direct infringement of the exclusive rights of reproduction and public performance under sections 106(1) and 106(6) of the Copyright Act, and limited the "volitional conduct" requirement to the issues addressed in that case, and not to the exclusive right of distribution.  I disagree.  Although the particular circumstances before the court in *Cablevision* involved the exclusive rights not at issue here, the court made clear that "volitional conduct is an important element of direct liability."  *Id.* at 131.  There is nothing in the court's language or reasoning that convinces me that the *Cablevision* holding is as limited as Plaintiffs contend.  The line of cases on which the *Cablevision* court relied – beginning with *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) – suggest that the volitional-conduct requirement should apply equally to all exclusive rights under the Copyright Act.  *See Cablevision*, 536 F.3d at 131 (finding applicability of the volitional-conduct requirement "a particularly rational interpretation of § 106") (quoting *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004)).  Contrary to Plaintiffs' contentions, this result is not foreclosed by the Supreme Court's holding in *Tasini*.  Accordingly, I hold that a finding of direct infringement of the right of distribution under § 106(3) of the Copyright Act requires a showing that Defendants engaged in some volitional conduct sufficient to show that they actively engaged in distribution of the copies of Plaintiffs' copyrighted sound recordings.  *Accord Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503 (N.D. Ohio 1997) (volition required for direct infringement of distribution right); *cf. CoStar*, 373 F.3d 544 (volition required for direct infringement of any of § 106's exclusive rights); *Parker v. Google, Inc.*, 242 Fed. Appx. 833 (3d Cir. 2007); *NetCom*, 907

F. Supp. 1361 (volition required for infringement of exclusive rights of reproduction and public display).

The question then becomes, did the Defendants engage in such volitional conduct? Defendants argue that their service is akin to a "common carrier" that delivers requested articles to subscribers automatically without active involvement. Plaintiffs argue that even if volitional conduct is required, as I find it to be, the undisputed facts illustrate that Defendants engaged in such conduct. The holding in *Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, is instructive in this regard. In that case, the district court granted summary judgment in favor of the plaintiffs on their claim of direct infringement of the distribution right, despite its agreement with the *NetCom* court that volitional conduct is required for a finding of direct infringement. In *Playboy*, the court found that the defendants (whose service consisted of an online bulletin board, not unlike the USENET, that provided access to downloadable articles and images) had a policy of encouraging subscribers to upload files and also used a screening policy that allowed employees to view files before they were uploaded and to move them to a generally available file for subscribers. *Id.* at 513. These two policies "transform[ed] Defendants from passive providers of a space in which infringing activities happened to occur to active participants in the process of copyright infringement." *Id.* Further, the undisputed facts in *Playboy* indicated that the quantity of copyrighted files available to customers increased the attractiveness of the service to customers, defendants actively encouraged subscribers to upload such files, defendants had control over which files were discarded and which were moved into the general system, and defendants knew there was a possibility that copyrighted photographs were being uploaded but failed to adopt procedures to ensure that such images would be discarded. *Id.* Under these circumstances, the court found that the defendants were liable for direct copyright infringement as a matter of law. *Id.*; *see also Playboy Enters. v. Webbworld, Inc.*, 968 F. Supp. 1171, 1175 (rejecting defendant's argument that it was "nothing more than an information conduit" where "it [was] clear that [defendant's] function is not to provide Internet access, but rather to provide its subscribers with adult images which are contained in the storage devices of its computers").

Similarly, in this case, Defendants were well aware that digital music files were among the most popular articles on their service, and took active measures to create servers dedicated to mp3 files and to increase the retention times of newsgroups containing digital music files. *See* Pls.' SUF 94-96; *see also* Pls.' SUF 52 (42% of subscribers find digital music files the "primary" reason for subscribing to Defendants' service). Moreover, Defendants took active steps, including

both automated filtering and human review, to remove access to certain categories of content, and to block certain users, *see* Pls.' SUF 69-70, and Defendants admit that they have control over which newsgroups their servers accept and store and which they reject, and that they routinely exercised that control, Pls.' SUF 71. Under these circumstances, as in *Playboy*, Defendants' actions have "transform[ed] Defendants from passive providers of a space in which infringing activities happened to occur to active participants in the process of copyright infringement." 982 F. Supp. at 513. In other words, contrary to Defendants' contentions, here their service is not merely a "passive conduit" that facilitates the exchange of content between users who upload infringing content and users who download such content; rather, Defendants actively engaged in the process so as to satisfy the "volitional-conduct" requirement for direct infringement. Accordingly, Plaintiffs' motion for summary judgment on their claim for direct infringement of the exclusive right of distribution under 17 U.S.C. § 106(3) is granted.[14]

**D.     Secondary Liability**

In addition to their claim of direct infringement, Plaintiffs also move for summary judgment on their claims against Defendants for secondary liability based on their subscribers' direct infringement of the Plaintiffs' exclusive right of reproduction under § 106(1) of the Copyright Act. Specifically, Plaintiffs bring claims for (1) inducement of copyright infringement, (2) contributory copyright infringement and (3) vicarious copyright infringement.

For all three theories of secondary copyright infringement, there must be the direct infringement of a third party. *See, e.g.*, *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998). Defendants argue that Plaintiffs have failed to meet this threshold requirement because they have not established conclusively that their subscribers committed direct

---

[14] Defendants also propound several other arguments in opposition to summary judgment on the direct infringement claim, none of which has merit. First, they contend that because their subscribers pay fees based on volume, instead of on a per-article basis, any distribution of articles is not a "sale" under the Copyright Act. Yet, Defendants cite no authority for the position that a per-download payment is required to constitute a sale. *See Playboy*, 982 F. Supp. at 505-06 (bulletin board service liable for direct infringement even where service charged volume-based subscription). Second, Defendants argue they cannot be directly liable because, as they do not own the rights to articles posted on their system, they cannot effectuate a "transfer" under the Copyright Act. Defendants' argument illustrates a basic misunderstanding of the distribution right under § 106(3). As amazing as it may seem, Defendants misquote the language of the Act – it does not define a distribution as a "transfer of ownership *rights*," as Defendants contend, but rather a "transfer of *ownership*" of copies. *See* 17 U.S.C. § 106(3). The Act itself makes clear that ownership of a copy and ownership of copyright are two entirely separate concepts. *See* 17 U.S.C. § 202 ("Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied."); *see also* 3-10 NIMMER ON COPYRIGHT § 10.09 (2009). Thus, ownership of copies of digital music files is transferred from Defendants (who own the copies stored on their servers) to subscribers who download the copies. Finally, Defendants argue that direct liability cannot be premised on making unauthorized copies available. This argument is a red herring, as Plaintiffs have not premised their direct infringement claim on the "making available" theory.

infringement of the works at issue. To the contrary, the undisputed facts establish that Defendants' subscribers have committed direct infringement of the Plaintiffs' exclusive right of reproduction by downloading copies of Plaintiffs' works from Defendants' service, thereby creating copies of the works on their computers without Plaintiffs' authorization. *See* Pls.' SUF 1-3. Plaintiffs submit uncontroverted evidence of unauthorized reproduction of their works from three different sources. First, Plaintiffs were able to access a limited set of data from Defendants' server that Defendants did not destroy, which constitutes direct evidence of subscribers requesting to download Plaintiffs' copyrighted works. *See* Horowitz Dec. ¶ 97, Ex. S. Within Defendants' surviving Usage Data logs, Plaintiffs also identified articles containing copies of Plaintiffs' copyrighted works. *See* Sehested Decl. ¶ 11; Declaration of Mark McDevitt ¶ 2. Second, Defendants' former employees admitted to downloading certain of Plaintiffs' works from Defendants' service, and produced copies of those works to Plaintiffs. *See* Borud Decl. ¶ 34 & Ex. 49; Goldade Decl. ¶ 23 & Ex. 25.[15] Finally, Plaintiffs submit direct evidence from their forensic investigators of downloads of Plaintiffs' copyrighted works from Defendants' service. *See* Sehested Decl. ¶¶ 5, 7, 9; Ward Decl. ¶¶ 5-7.[16] Moreover, in the Sanctions Order, in response to Defendants' "bad faith" spoliation of Usage Data and Digital Music Files, Magistrate Judge Katz granted an adverse inference that "[e]ach of Plaintiffs' copyrighted works that has appeared in one of the disabled Music Groups has been transmitted from Defendants' computer servers to the personal computers of Defendants' subscribers." Sanctions Order at 68-69. Defendants have not presented any evidence to rebut this inference. Thus, Plaintiffs have established the threshold of users' direct infringement for their claims of secondary liability for copyright infringement.

---

[15] Defendants argue that there are issues of material fact on Plaintiffs claims because they assert that these declarants' testimony is not credible. However, "[m]erely to assert that a witness may be lying, without any evidence to contradict the witness' testimony cannot defeat a motion for summary judgment." *Fernandez v. China Ocean Shipping, (Group) Co.*, 312 F. Supp. 2d 369, 278 (E.D.N.Y. 2003).

[16] Defendants' argument that these downloads are not proof of unauthorized copying because Plaintiffs had "authorized" the downloads by their investigators is without merit. Courts routinely base findings of infringement on the actions of plaintiffs' investigators. *See, e.g.*, *U2 Home Entm't, Inc. v. Fu Shun Wang*, 482 F. Supp. 2d 314, 317-18 (E.D.N.Y. 2007) (infringement liability based on rentals of copyright works to plaintiffs' investigator); *see also Microsoft Corp. v. Rechanik*, 249 Fed Appx. 476, 478 (7th Cir. 2007); *Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1347-48 (8th Cir. 1994); *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1215 (D. Minn. 2008); *Atlantic Records, Inc. v. Howell*, 554 F. Supp. 2d 976, 978 (D. Ariz. 2008).

### 1. _Inducement of Infringement_[17]

In the recent case of _Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd._, 545 U.S. 913 (2005) ("_Grokster_"), the Supreme Court enunciated what some have interpreted as a new theory of secondary copyright liability: inducement of infringement. _See_ 3-12 NIMMER ON COPYRIGHT § 12.04[A][3][b][ii]. The _Grokster_ Court held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." 545 U.S. at 936-37. The Court was careful to note that "mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability;" rather, "[t]he inducement rule . . . premises liability on purposeful, culpable expression and conduct, and thus does nothing to compromise legitimate commerce or discourage innovation having a lawful purpose." _Id._ at 937. Several features about the defendants' service in _Grokster_ led the Court to conclude that their unlawful objective was "unmistakable." _See id._ at 940. First, the defendants "aimed to satisfy a known source of demand for copyright infringement, the market comprising former Napster users." _Id._ at 939. Second, "this evidence . . . [was] given added significance by [plaintiff's] showing that neither [defendant] attempted to develop filtering tools or other mechanisms to diminish the infringing activity using their software." _Id._ Finally, the evidence revealed that the defendants made substantial income from advertising, and that the defendants' business model relied on the existence of infringement. _Id._ at 939-40, _see also id._ at 926. The Court also noted that "[t]he classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations." _Id._ at 937.

On remand, the district court granted the plaintiffs' motion for summary judgment based on "overwhelming" evidence of unlawful intent. The district court considered a number of factors that, taken together, indicated the defendant had acted with intent to foster or induce infringement of its users. First, based on a statistical study based on a random sample, the plaintiffs presented

---

[17] Plaintiffs have stated their theories of inducement and contributory copyright infringement as two separate causes of action. While Defendants have raised no objection to Plaintiffs' articulation of their claims, it is worth noting that several courts recently have expressed doubt as to whether inducement of infringement states a separate claim for relief, or rather whether it is a species of contributory infringement. _See, e.g._, _KBL Corp. v. Arnouts_, 08 Civ. 4873 (JGK), 2009 U.S. Dist. LEXIS 9192, at *27-29 & n.5 (S.D.N.Y. Feb. 2, 2009) (finding inducement claim cannot exist separately from claim for contributory infringement). However, as one court put it, "[i]t is immaterial whether the [inducement] theory of liability is a subspecies of contributory . . . liability, or whether it is a wholly separate theory based on inducement. The question is whether it applies to defendants in this case." _In re Napster, Inc. Copyright Litig._, 2006 U.S. Dist. LEXIS 30338, at *31 (N.D. Cal. May 17, 2006). For the sake of clarity, I will address the inducement and contributory theories of secondary liability separately in the same way in which the parties briefed the issues.

evidence of massive infringement of their copyrighted content. Specifically, plaintiffs' expert testified that approximately 87% of the files offered for distribution on the defendant's network were infringing or highly likely to be infringing, and that almost 97% of the files actually requested for download were infringing or highly likely to be infringing. The court noted that "the staggering scale of infringement makes it more likely that [defendant] condoned illegal use, and provides the backdrop against which all of [defendant's] actions must be assessed." *Grokster II*, 454 F. Supp. 2d at 985. Second, the district court noted that the defendant's "courting of the Napster community, which was notorious for copyright infringement, indicated an intent to foster infringement." *Id.* Third, the undisputed facts indicated that the defendant had provided users with technical assistance for playback of copyrighted content. *Id.* at 986. Fourth, the fact that the defendant had evaluated its system's functionality by its infringing capabilities evinced an intent for widespread infringing use. *Id.* at 987. Fifth, the evidence showed that the defendant knew its business model depended on the existence of massive infringement and that it had acted to grow its business accordingly. *Id.* at 989. Finally, the court found that the fact that the defendant had failed to prevent infringing uses, while not sufficient to establish liability on its own, "may be considered along with other circumstances in determining the defendant's motive." *Id.*

Here, the undisputed facts are equally compelling, and in many respects not dissimilar. Like in *Grokster II*, a statistical survey based on random sampling methodology revealed that Defendants' service harbors massive amounts of infringement. To wit, Dr. Waterman's study concluded that over 94% of all content files offered in Defendants' music-related binary newsgroups were infringing or highly likely to be infringing. *See* Waterman Decl. ¶¶ 5, 12-13. As in *Grokster II*, this "staggering scale of infringement makes it more likely that [Defendants] condoned illegal use." 454 F. Supp. 2d at 985. Moreover, also similarly to *Grokster*, the undisputed facts in this case indicate that Defendants openly and affirmatively sought to attract former users of other notorious file-sharing services such as Napster and Kazaa.[18] *See, e.g.*, Pls.' SUF 8, 12. Just as a for instance, in promotional essays, explaining how Napster and Kazaa were scrutinized and shut down for copyright infringement, Defendants boasted that "[t]his made way for Usenet to get back in the game." Pls.' SUF 11.[19] Another sign that Defendants pursued

---

[18] Importantly, Defendants admit in their opposition to summary judgment that they advertised their service as better than Morpheus (Grokster's file-sharing program) and Kazaa, but they argue that they did so only to promote the service generally, and not with a mind specifically to attract infringement-minded users. As discussed in detail in this opinion, this disavowal of intent is belied by the undisputed facts.

[19] Defendants' contention that they cannot be held liable for the actions of "rogue employees" in creating these promotional essays cannot withstand scrutiny. Indeed, as this Court recently has held, "[k]nowledge and actions of a

infringement-minded users is their use of "meta tags" in the source code of their website, which embedded words such as "warez" (computer slang for pirated content) and "Kazaa" to ensure that a search on a search-engine for illegal content would return Defendants' website as a result. *See* Pls.' SUF 13-15; Horowitz Decl. ¶¶ 94-95.

Further, the record is replete with evidence of Defendants' own employees overtly acknowledging the infringing purpose for which their service was used, and advertising such uses on their website. For example, one employee commented that the tag line for Defendants' service should be "piracy, porno and pictures – Usenet," Pls.' SUF 16; another employee commented that "Usenet is full of Music and Movies so get your pirate on!," Pls.' SUF 17; after that employee received copies of several infringing albums downloaded by a co-worker, he clearly expressed his delight in Defendants' unlawful purpose in exclaiming "Bless the Usenet and all that it steals!" Pls.' SUF 18; *see also* Borud Decl., Ex. 2 at 419-20; *id.* at ¶ 10 & Ex. 3; Deposition of Matthew Borud ("Borud Dep.") at 343:1-344:7. Even more, the record reflects numerous instances when Defendants' own employees acknowledged the availability of infringing uses through Defendants' service and used the service themselves to download Plaintiffs' copyrighted works. *See, e.g.*, Pls.' SUF 16-18; *see also* Pls.' SUF 46-49, 78. Defendants' website also featured promotional materials advertising the service's infringing uses, including webpages advertising music files by popular recording artists, Pls.' SUF 20; webpages encouraging users to "[d]ownload thousands of FREE CD quality music files!," Pls.' SUF 21-22, 25; and advertisements for a specialized server dedicated to mp3's and groups containing sound and music files, Pls.' SUF 28. Additionally, Defendants' employees specifically provided technical assistance to users in obtaining copyrighted content, *see* Pls.' SUF 30-35, 37-39a; *see also* Pls.' SUF 79-80; Borud Decl. ¶ 10, Ex. 6, and provided website tutorials on how to download content, using infringing works as examples. *See* Pls.' SUF 81. Courts have taken this type of assistance into account in the secondary copyright infringement liability calculus. *See Grokster*, 545 U.S. at 926 (finding that defendants "showing

_____

corporation's employees and agents are generally imputed to the corporation where the acts are performed on behalf of the corporation and are within the scope of their authority." *UCAR Int'l, Inc. v. Union Carbide Corp.*, No. 00 CV 1338 (GBD), 2004 WL 137073, at *13 (S.D.N.Y. Jan. 26, 2004); *see also United States v. Koppers Co., Inc.*, 652 F.2d 290, 298 (2d Cir. 1981) (finding employee or agent need not be high-ranking for knowledge and actions to be imputed to corporation if employee was acting within the scope of his responsibilities). Here, it is undisputed that Defendants' marketing department – namely, former employees Danova and Goldade – drafted the "essays" that promoted Defendants' server as a new replacement for Napster and similar file-sharing programs, and that they created these essays at the direction of Reynolds, who provided outlines of the topics to be addressed in the essays. Accordingly, the marketing department employees demonstrably were acting within the scope of their responsibilities, and Defendants cannot disclaim knowledge or responsibilities for acts they committed in furtherance of Defendants' collective goal to attract infringement-minded users to their service.

copyrighted [works] as examples" helped serve the purpose of "attract[ing] users of a mind to infringe"). Further, Defendants promoted the fact that file transmissions could not be monitored, and that unlike other "lower security" file-sharing programs like Napster and Kazaa, users could conduct infringing activities anonymously. *See* Pls.' SUF 40-42, 44; Goldade Decl. ¶¶ 10-11.

Other evidence reveals that, while Defendants had in place various tools and mechanisms that could be used to block access to infringing articles or newsgroups, Defendants never used them to limit copyright infringement on its servers. Indeed, Defendants did use this functionality to limit the downloading of questionable conduct, to block users from posting "spam" and to limit certain users' downloading speed, but they never used the same filtering capabilities to search for, limit or eliminate infringement on their service. *See* Pls.' 69-70, 72, 112. As in *Grokster*, Defendants did not even attempt to use "filtering tools or other mechanisms to diminish the infringing activity" on their service, 545 U.S. at 939; worse yet, Defendants had developed such tools, but declined to use them when to do so would have harmed their business model and customer base. As Defendants well knew, infringing music content formed the backbone of their business model, serving as at least a "primary" reason for the subscriptions of approximately 42% of their subscribers. *See* Pls.' SUF 52. Indeed, when they disabled access to certain music groups in March 2008, there was an overwhelming number of complaints from users, and a substantial number of users even canceled their subscriptions to Defendants' servers. *See* Pls.' SUF 56. Further, Defendants' graded subscription payment plan ensures that users pay more the more they download, *see* Defs.' SUF 19, 38; Pls.' SUF 63-64; thus, when the musical content of a service is as overwhelmingly infringing as Defendants' service, it cannot be said that Defendants did not have the same "reliance on revenue from infringing use" as was found to be evidence of unlawful intent in *Grokster II*. *See* 454 F. Supp. 2d at 988. Defendants' failure to exercise their clear ability to filter and limit infringement under such circumstances is strong circumstantial evidence of their intent to foster copyright infringement by their users.[20]

Defendants' primary arguments in opposition to Plaintiffs' inducement claim are based on their position that questions of intent and witness credibility are traditionally reserved for a jury. This is quite so, in the ordinary case; however, this is not the ordinary case. Indeed, the Supreme

---

[20] Defendants attempt to thwart this conclusion by contending they had actually implemented measures to reduce infringement by, for example, requiring subscribers to comply with copyright laws and forbidding their technical support staff to assist with infringement. *See* Defendants' Responses to Pls.' SUF ("RSUF") 30-36, 66-68, 102; Defs.' SUF 19-22. However, actions speak louder than words. While the facts do reveal that Defendants at times paid lip service to their obligations under the copyright law not to allow or foster infringement by their users, the facts indicate that they indeed violated their own policies by engaging in the very conduct those policies prohibited.

Court in *Grokster* all but explicitly instructed the district court to grant the plaintiffs' summary judgment motion, even where the central issue in an inducement claim is the defendant's intent to induce or foster infringement. *See Grokster*, 545 U.S. at 936-37. Indeed, as the Second Circuit has acknowledged, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). In addition, as noted earlier, "merely to assert that a witness may be lying, without any evidence to contradict the witness' testimony cannot defeat a motion for summary judgment." *Fernandez*, 312 F. Supp. 2d at 278. Here, Defendants have submitted testimony denying wrongful intent; yet, the facts speak for themselves, and paint a clear picture of Defendants' intent to foster infringement by their users. *See United States v. One Parcel of Real Prop.*, 985 F.2d 70, 73 (2d Cir. 1993) ("[C]aution normally exercised in granting summary judgment where state of mind is at issue . . . is unnecessary . . . where . . . the claimed state of mind is so inconsistent with the uncontested facts."). Accordingly, based on the undisputed facts, I find that the Defendants' intent to induce or foster infringement by its users on its services was unmistakable, and no reasonable factfinder could conclude otherwise. Plaintiffs' motion for summary judgment on their claim for inducement of infringement is therefore granted.

## 2. *Contributory Infringement*

Contributory copyright infringement "is a form of secondary liability with roots in tort-law concepts of enterprise liability and imputed intent." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794-95 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 2871 (2008). A party is liable for contributory infringement if, "with knowledge of the infringing activity," it "induces, causes, or materially contributes to the infringing conduct of another." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). The requisite knowledge for contributory infringement liability may be actual or constructive. *Faulkner v. Nat'l Geographic Soc'y*, 211 F. Supp. 2d 450, 474 (S.D.N.Y. 2002), *aff'd*, *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26 (2d Cir. 2005); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir. 2001) ("Contributory liability requires that the secondary infringer 'know or have reason to know' of direct infringement."). Turning a "blind eye" to infringement has also been found to be the equivalent of knowledge. *Aimster*, 334 F.3d at 650. Thus, knowledge of specific infringements is not required to support a finding of contributory infringement. *See Arista Records, Inc. v. Flea World, Inc.*, No. 03-2670 (JBS), 2006 U.S. Dist. LEXIS 14988, at *47-48 (D.N.J. Mar. 31, 2006).

In this case, it is beyond peradventure that the Defendants knew or should have known of infringement by its users. Defendants' employees' own statements make clear that they were aware that Defendants' service was used primarily to obtain copyrighted material. *See, e.g.*, Pls.' SUF 73; Goldade Decl. ¶ 9 ("[T]he widespread availability of . . . copyrighted entertainment media on Sierra's [USENET] servers [was] obvious."); Heiberg Dep. 197:5-13 (employee "was aware the users of the Usenet.com service were downloading MP3s from the service" because "they told [her]" while she gave tech support). Indeed, employees acknowledged that Defendants' "primary audience" were "people who want to get free music, ilelgal [sic] or not," Pls.' SUF 19, and on many occasions, Defendants' users explicitly told Defendants' technical support employees that they were engaged in copyright infringement, *see* Pls.' SUF 79-80, 82. Reynolds also directed the marketing department of Sierra to create promotional "essays" to emphasize the availability of popular copyrighted content, and to entice former users of services such as Napster and Kazaa to try Defendants' service. *See* Pls.' SUF 77, 88a. Moreover, Defendants' employees themselves used Defendants' service to commit copyright infringement by downloading Plaintiffs' copyrighted sound recordings. Pls.' SUF 46-49. Additionally, Defendants were explicitly put on notice of the existence of thousands of copies of Plaintiffs' copyrighted sound recordings available on its service.

With respect to the "material contribution" prong, "the alleged contributory infringer must have made more than a mere quantitative contribution to the primary infringement: in other words, the participation or contribution must be substantial." *Faulkner*, 211 F. Supp. 2d at 473 (internal quotation marks and citation omitted). This requirement has been found to be met where a defendant provides the "site and facilities" or the "environment and market" for infringing activity. *See Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996); *see also Napster*, 239 F.3d at 1022; *Flea World*, 2006 U.S. Dist. LEXIS 14988 at *51 (one "need only provide a central 'hub' for infringing activity to materially contribute to infringement"). In this case, Defendants' servers are the sole instrumentality of their subscribers' infringement. Defendants operate over 30 different computers that store and distribute content. Pls' SUF 89. To use their service to download content, subscribers must connect to one of those servers; once connected, subscribers may search through newsgroups by header or they may run searches for particular desired works they wish to download. *See* Pls.' SUF 90-91. The user then transmits a request to download to Defendants' front-end servers, and the request is passed to another server (the "spool" server) that physically stores the content that the subscriber requested for download. Pls.'

SUF 92; Defs.' SUF 28. Defendants also have created designated servers for newsgroups containing mp3 or music binary files so as to maximize the average retention time of those articles. *See* Pls.' SUF 93-96. Thus, it is beyond cavil that Defendants' service literally creates the "site and facilities" that their subscribers use to directly infringe copyrights.

In opposing summary judgment, Defendants do not address either the knowledge or material-contribution prongs of Plaintiffs' contributory infringement claim. Rather, they rely entirely on their assertion that the Supreme Court's holding in *Sony Corp. of America v. Universal Studios, Inc.*, 464 U.S. 417 (1984), creates a complete defense to contributory infringement liability where a product is "capable of substantial noninfringing uses." *Id.* at 442. In *Sony*, the Supreme Court considered whether the manufacturer of a VHS recorder device could be held liable for the infringing conduct of the end-user of the product. The court held that Sony was not liable where, in addition to infringing uses of which it was aware, the device was also capable of substantial noninfringing uses. *See id.* at 456. Defendants rely on this portion of the Court's holding, asserting that because their service is capable of substantial noninfringing uses, they cannot be held liable for contributory infringement as a matter of law. To be sure, there is no dispute that Defendants' service can be used for reasons other than reproduction and distribution of infringing music content. However, Defendants' argument rides roughshod over a critical part of the Supreme Court's reasoning in *Sony*. To wit, the Court noted that Sony's last meaningful contact with the product or the purchaser was at the point of purchase, after which it had no "ongoing relationship" with the product or its end-user. *Id.* at 438 ("The only contact between Sony and the users of the Betamax . . . occurred at the moment of sale. . . . [Sony had no] direct involvement with the allegedly infringing activity or direct contact with purchasers of Betamax who recorded copyrighted works off-the-air."). In this case, there is no dispute that Defendants maintain an ongoing relationship with their users; thus, Defendants' service is quite unlike *Sony*, where the defendants had no contact with the product or user once the device was released into the stream of commerce. As such, I find that the noninfringing uses for Defendants' service are immaterial, as *Sony*'s insulation from contributory liability is inapplicable in this case. Accordingly, Plaintiffs' motion for summary judgment on their contributory copyright infringement claim is granted.

### 3. *Vicarious Infringement*

Finally, Plaintiffs contend Defendants are vicariously liable for their users' infringement. A defendant is liable for vicarious copyright infringement by "profiting from direct infringement

while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930; *see also Gershwin*, 443 F.2d at 1162 ("[O]ne may be vicariously liable if he had the right and ability to supervise the infringing activity and also has a direct financial interest in such activities."). Thus, vicarious liability is premised wholly on direct financial benefit and the right and ability to control infringement; it does not include an element of knowledge or intent on the part of the vicarious infringer. *See Ellison v. Robertson*, 189 F. Supp. 2d 1051, 1060 (C.D. Cal. 2002), *rev'd on other grounds*, 357 F.3d 1072 (9th Cir. 2004).

Here, it is apparent from the record that Defendants earn a direct financial benefit from infringement. First, Defendants' revenues increased depending on their users' volume of downloads; thus, the greater the volume of downloads (the majority of which has been shown to be infringing), the greater the Defendants' income. *See* Pls.' SUF 63-65; *see also Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316, F.2d 304, 308 (2d Cir. 1963) (finding defendant had definite financial interest from percentage commission based on record sales, regardless of whether the records sold were "bootleg" or legitimate). Moreover, infringing content certainly acts as "a draw" for users to subscribe to Defendants' service. Magistrate Judge Katz has granted an adverse inference that music files "constituted a substantial portion of the content previously available through Defendants' service" and that music groups "acted as a draw to entice users to subscribe to Defendants' service." Sanctions Order at 59, 68-69. Indeed, Defendants' employees have acknowledged that Defendants profit from the availability of copyrighted material, including music, stored on their servers. *See* Pls.' SUF 61. Defendants argue that they lack direct financial benefit from infringement because they are paid on a per-volume, not per-download, basis and because infringing music accounts for less than 1% of the newsgroups available on their service. However, the law is clear that to constitute a direct financial benefit, the "draw" of infringement need not be the primary, or even a significant, draw – rather, it need only be "a" draw. *E.g.*, *Ellison*, 357 F.3d at 1079 ("The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits."); *Flea World*, 2006 U.S. Dist. LEXIS 14988 at *41. On this record, there is no doubt that infringement constitutes a draw for users of Defendants' service.

Defendants have also failed to exercise their right and ability to stop or limit infringement on their service. In this regard, the Second Circuit has found that a defendant need not have "formal power to control" where a direct infringer "depend[s] upon [the defendant] for direction."

*Gershwin*, 443 F.2d at 1163.  Rather, "[t]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Napster*, 239 F.3d at 1023.[21]  Here, it is undisputed that Defendants expressly reserve the right, in their sole discretion, to terminate, suspend or restrict users' subscriptions, thereby limiting their access to uploading or downloading content to or from Defendants' servers.  Pls.' SUF 68.  Defendants have, in the past, exercised this right and ability to control their subscribers' actions by terminating or limiting access of subscribers who posted "spam," *see* Pls.' SUF 69; restricting download speeds for subscribers who downloaded what they considered a disproportionate volume of content, *id.*; and taking measures to restrict users from posting or downloading articles containing pornography, Pls. SUF 70.  Defendants likewise have the right and ability to block access to articles stored on their own servers that contain infringing content, Pls.' SUF 72, but the record does not show any instance of Defendants exercising that right and ability to limit infringement by its users.  More generally, Defendants have the right and ability to control which newsgroups to accept and maintain on their servers and which to reject, an ability they chose to exercise when they disabled access to approximately 900 music-related newsgroups in 2008.  Pls.' SUF 88.  Such unfettered ability to control access to newsgroups on the USENET has been found to be "total dominion" over the content of a provider's servers.  *See Playboy Enter., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 552-53 (N.D. Tex. 1997), *aff'd without opinion*, 168 F.3d 543 (5th Cir. 1999).

As a primary defense to vicarious infringement liability, Defendants rely on the same defense under *Sony*'s "staple article of commerce" doctrine as formed the basis of their defense to Plaintiffs' contributory infringement claim.  Although *Sony* was a contributory infringement case, Defendants rely on the Court's dicta, in a footnote, in which the Court observed that "the line between direct infringement, contributory infringement and vicarious liability are not clearly drawn." *Sony*, 464 U.S. at 435 n.17.  That is, Defendants contend that *Sony* is best understood as a general limitation on secondary liability.  In support, Defendants cite to the *Aimster* opinion, which noted in dicta that *Sony* treated contributory and vicarious liability interchangeably.  224 F.3d at 654.  Other courts, however, have expressly found that *Sony*'s holding bears no relation to vicarious liability.  *See Napster*, 239 F.3d at 1022 ("*Sony*'s 'staple article of commerce' analysis has no application to Napster's potential liability for vicarious copyright infringement.").  The

---

[21] Further, courts have disapproved of defendants' arguments that to monitor and control infringement on their own premises or systems is too burdensome.  *See, e.g.*, *Flea World*, 2006 U.S. Dist. LEXIS 14988 at *37 ("If . . . growth outpaced Defendants' ability to monitor and control what happens on their own premises . . ., then they should have reduced the size and scope of their operations or hired more security to meet their obligations, or both.").

Court need not resolve this apparently difficult question, as it has already been determined that *Sony*'s "staple article of commerce" doctrine does not provide Defendants immunity, as they maintain an ongoing relationship with their users. Accordingly, because the undisputed facts illustrate that Defendants garnered a direct financial benefit from copyright infringement and failed to exercise their right and ability to control or limit infringement on their servers, Plaintiffs' motion for summary judgment on their claim for vicarious copyright infringement is granted.

**E.     Liability of Defendant Reynolds**

As a last-ditch effort to avoid liability, Defendants contend that Plaintiffs have no evidence that Reynolds can be held liable for conduct that has been described only in broad terms referring to the "Defendants" in the collective. This argument cannot withstand scrutiny. It is well settled in this Circuit that "[a]ll persons and corporations who participate in, exercise control over, or benefit from the infringement are jointly and severally liable as copyright infringers." *Sygma Photo News, Inc. v. High Society Magazine, Inc.*, 778 F.2d 89, 92 (2d Cir. 1985) (citing *Shapiro*, 316 F.2d at 308-09). Here, the evidence bears out that Reynolds was personally responsible for a major share of Defendants' infringing activities; moreover, he was the moving force behind the entire business of both corporate Defendants. UCI has never had employees; rather, its business is carried out by Sierra's employees, all of whom (besides Reynolds) were terminated by August 2008. Reynolds is the director and sole shareholder of both companies, and he and other employees of Sierra have expressly admitted his ubiquitous role in the companies' activities. *See, e.g.*, Pls.' SUF 102-05. Specifically, Reynolds was admittedly responsible for the "overall strategic vision" of the corporate defendants, Pls.' SUF 105, and former president of Sierra, Lesa Kraft, testified that she "ran the company as [Reynolds] requested," and "followed through with whatever he wanted, how he wanted it ran [sic]," Pls.' SUF 103; *see also* Pls.' SUF 115 ("[W]e aren't a publicly owned corp[oration]. We are running things how [Reynolds] . . . would like things done."); *see also* June 16 Order at 5-7. Further, separate and apart from this general role, the evidence conclusively reveals that Reynolds was personally and intimately involved in many of the activities that form the basis of Defendants' copyright liability. For example, Reynolds directed the marketing department of Sierra to draft promotional "essays" to drive traffic to the Usenet.com website and gave detailed instructions "to make sure everything [was] covered." Pls.' SUF 108-09. As discussed above, these promotional essays are among the multitude of evidence that shows Defendants' intent to foster infringement. Also, Reynolds had an active role in the corporate Defendants' technical operations, directing employees to block certain groups and filter

37

certain conduct – though never issuing these imperatives, so far as the record shows, to limit the extent of copyright infringement on their service. *See* Pls.' SUF 112.

\* \* \*

Accordingly, the record evidence reveals no genuine issue of material fact as to any of Plaintiffs' theories of direct or secondary liability for copyright infringement on the part of Defendants UCI and Reynolds. Plaintiffs are therefore entitled to summary judgment as a matter of law, and the only remaining question is the extent of Defendants' liability for damages.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for sanctions is GRANTED to the extent discussed above. Plaintiffs' motion for summary judgment is also GRANTED. The Clerk of this Court shall close all open motions in this matter and enter judgment in favor of the Plaintiffs on all causes of action. The parties shall submit supplemental briefing of no more than ten (10) pages and proposed orders on the scope of permanent injunctive relief within twenty-one (21) days of the date of this Opinion and Order. By separate order of reference accompanying this Opinion, this matter shall be referred to Magistrate Judge Katz for a damage determination.

**IT IS SO ORDERED.**

**New York, New York**
**June 30, 2009**

U.S.D.J.

38